IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

JOYCE BEATTY

Plaintiff, CA No: 1:25-cv-4480-CRC

Washington, D.C.
Thursday, March 12, 2026
3:04 p.m.

v.

DONALD J. TRUMP, et al.,

Defendants.

- - - - - - - - - - - - - - - - x

TRANSCRIPT OF MOTION HEARING
HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff: **NATHANIEL AVI GIDEON ZELINSKY, ESQ.**
**KYLE RENEE FREENY, ESQ.**
**WASHINGTON LITIGATION GROUP**
1717 K St NW
Washington, DC 20006
(202) 521-8750

**NORMAN LARRY EISEN, ESQ.**
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Ave SE, Unit 15180
Washington, DC 20003
(202) 594-9958

For the Defendants: **WILLIAM S. JANKOWSKI, ESQ.**
**STEPHEN MCCOY ELLIOTT, ESQ.**
U.S. DEPARTMENT OF JUSTICE
1100 L St NW
Washington, DC 20530
(202) 353-7578

Court Reporter: Lisa A. Moreira, RDR, CRR
Official Court Reporter
U.S. Courthouse, Room 6718
333 Constitution Avenue, NW
Washington, DC 20001
(202) 354-3187

P R O C E E D I N G S

THE COURTROOM DEPUTY: Your Honor, we're on the record for Civil Case 25-4480, *Joyce Beatty v. Donald J. Trump, et al.*

Starting with the plaintiff, please approach and identify yourself for the record.

MR. ZELINSKY: Good afternoon, Your Honor; Nathaniel Zelinsky on behalf of Congresswoman Beatty. I'm joined by Congresswoman Beatty, my colleagues Norm Eisen, David Ogden, Kyle Freeny, and Alex Kristofcak.

THE COURT: Okay. Welcome, everybody.

MR. JANKOWSKI: Good afternoon, Your Honor; William Jankowski for the United States, and with me I have Steven Elliott, also from the federal programs branch.

THE COURT: I'm sorry, tell me your last name again.

MR. JANKOWSKI: Jankowski.

THE COURT: Jankowski, I got you.

Okay. Good to see you folks. Before I turn it over to you, let me just set the stage, particularly for folks who are in the gallery and are coming at this fresh.

The plaintiff's amended complaint challenges not only the name change to the Kennedy Center but also the announced closure of the center in July and its subsequent renovation or reconstruction, whatever form that may or may

not take; and the plaintiffs have filed a motion for a preliminary injunction to enjoin both of those things.

Separately, the plaintiff has filed a motion for a temporary restraining order, which seeks an order requiring that Congresswoman Beatty, one, be able to attend a March 16th board meeting where a vote on the closure and potentially the reconstruction is scheduled to be held; two, to be provided materials regarding the closure of the center and the reconstruction prior to that meeting on Monday; three, to be allowed to participate in the meeting, at least to some extent; and finally, four, that she be allowed to vote at the meeting as an *ex officio* trustee. That TRO is the only order of business today, although it may bleed over into some of the other issues raised in the case.

Now, since the filing of the TRO last Friday, I understand that Congresswoman Beatty has, in fact, been invited to the meeting or was invited to the meeting and that there may have been a miscommunication on that point initially. So I take it that that request in the TRO is off the table.

I also take it from the government's opposition that she will be allowed to participate in the meeting on par with other trustees, subject to the discretion of the chair, who happens to be the President of the United States.

There may be some questions as to what that

participation entails, but with that, subject to that caveat, what is left for the Court's consideration today is to what extent, if any, Congresswoman Beatty is entitled to a TRO requiring that the defendants provide her materials about whatever it is the board will vote on on Monday; and, two, whether she and other *ex officio* trustees will be allowed to cast a vote at that meeting.

Because the government did not take me up on my suggestion to postpone the meeting, we are obviously here on an extremely expedited basis. The plaintiff filed her motion for a temporary restraining order last Friday afternoon. We held a scheduling conference later that afternoon. The government filed its opposition brief Tuesday night. I received a reply last night from the plaintiff. And obviously a decision is needed by Monday morning at the latest.

In that regard, if the ruling turns out to be that Congresswoman Beatty is entitled to at least some relevant materials, and I am very much still chewing on that issue and have not judged it -- prejudged it whatsoever, but given that possibility, it behoove the defendants to at least start the process of gathering such information to the extent that it has not or they have not done so thus far. I don't want to hear later that there's no time, especially since the meeting could have been postponed by a couple of

weeks to allow for that additional breathing room.

So with that, Mr. Zelinsky, it is your motion. I will turn it over to you.

MR. ZELINSKY: Thank you, Your Honor. Good afternoon.

THE COURT: Good afternoon.

MR. ZELINSKY: The board meeting on Monday concerns a monumental question, which is whether the defendants should shut down the Kennedy Center -- we think in violation of the organic statute -- and whether the president may demolish or substantially alter the center; again, we think in violation of the statute that Congress has passed.

As the Court noted, we're here seeking three forms of relief in advance of the Monday hearing. And I would like to, if I could, just touch on each of those, though obviously I will take the Court's guidance as to what may be most beneficial to the Court.

THE COURT: Okay. I've sort of -- I've organized this in my mind into two buckets: the first being access to information; and the second being, you know, what's going to happen at that meeting on Monday, to what extent she will be allowed to participate along with other trustees, and then the voting issue. And so those second two issues I think can be considered together.

And proceed in whatever order you'd like, but I think chronologically may be the most --

MR. ZELINSKY: Sure.

THE COURT: -- that may make the most sense.

MR. ZELINSKY: On the document front, what we're asking for is what any prudent trustee would have in these circumstances.

THE COURT: Before we get to the merits of what she may or may not be entitled to, what I'd like for you to do is to, I mean, link or connect the relief that you are seeking with the claims in your complaint and the causes of action that you believe are available under those claims and the Court's jurisdiction to hear those causes of actions. There's a lot of discussion and there's a lot of talk about the merits, but let's talk first about the vehicle that you believe is available for you to pursue. Let's start with the access to information.

MR. ZELINSKY: So we brought a claim, and I believe it's Claim 3 in the amended complaint, and then an *ultra vires* claim, but Claim 3 is brought directly under the statute.

THE COURT: Okay.

MR. ZELINSKY: And the statute provides that the board has, quote, the rights and obligations or the powers and obligations of trustees. That's 20 USC 76*l*(b). So one

of the classic powers and obligations of a trustee is the access to documents as well as participation and voting in meetings. So that provides us a cause of action, we think, to come into this Court.

THE COURT: Well, where is Section 76 --

MR. ZELINSKY: It's 76*l*(b).

THE COURT: *l*(b). And where does that provide a cause of action for you to come into federal court and sue under that provision?

MR. ZELINSKY: So it provides the usual powers and obligations of a trustee, and one of the classics -- we think this is an old soil circumstance. One of the classic common law powers of a trustee is the right to sue a co-trustee for, among many other things -- and the *Benedict* case in the Southern District of New York I think illustrates this -- to come in and sue in court for access to documents. So we think Congress --

THE COURT: So usually those suits -- and you've cited a number of cases -- those are common law trust suits in state court. And so your argument is because this is a federal statute that refers to those responsibilities and powers, you can come to federal court with essentially a common law breach of fiduciary duty or breach of trust duty claim?

MR. ZELINSKY: So I would make two points in

response.

The first is, yes, we think that what Congress is doing there is it is legislating against the backdrop of a long-standing rule. It then is using the language to trigger the common law rule, and under the old soil doctrine, that meaning is sucked up into the statute. So all of that common law meaning is pregnant in the statute, and we can sue under the cause of action, the powers of a trustee that are provided for in the statute.

I would note just two more things --

THE COURT: Okay. So you're not arguing that that provision contains an implied cause of action through the -- through 76*k*(e), which says that the board -- that the actions of the board may not be subject to review by any officer or agency other than a court of law.

MR. ZELINSKY: So we think that that confirms -- whether it's the combination of those two or just 76*l*(b), we think that *k*(e) is important because it confirms that there's going to be judicial review. So that is Congress's understanding, that, yes, there is going to be judicial review here. And so we think that the best way to read the statute is you just have to look at 76*l*(b), but if you have any doubt, we think *k*(e) then confirms that.

And I would just make, if I could, Your Honor, two points.

First, as a technical matter, the government hasn't contested the existence of a cause of action here, and that is forfeitable. And this Court has jurisdiction under Section 1331 to hear any claim arising under federal law. And so we have in this case alleged a claim under federal law. So for purposes of this motion, the Court has jurisdiction under 1331, and a cause of action is a classic forfeitable argument. It has been forfeited.

So I don't take the government to be disputing that we have that cause of action, but I don't think the Court has to concern itself from the jurisdictional perspective because 1331 provides jurisdiction.

THE COURT: Okay. And so -- and, look, this has all come up very quickly. I've had a couple of days --

MR. ZELINSKY: Yes.

THE COURT: -- and in some instances a couple of hours to consider your argument. So if I'm asking elemental questions, forgive me.

You are not rooting jurisdiction in some notion of pendent or supplemental jurisdiction to bring a D.C. state law trust claim?

MR. ZELINSKY: No, Your Honor. We are bringing a 1331 classic. We are invoking this Court's federal question jurisdiction under 1331. Our claim is rooted in the statute. We think that we have a claim there.

I would also note --

THE COURT: And let me just follow up. So the existence of judicial review in the first instance, a cause of action, is not rooted in your *ultra vires* claim?

MR. ZELINSKY: So that's what I was about to get to, so I'm glad you asked it.

The *ultra vires* claim is a backup. So to the extent that you disagree with us -- and we're here on a likelihood of success standard, so I think we've met it because we have both of these. Right? We're either going to succeed because the statute itself provides that common law backdrop or, if there is no common law right of action in 76*l*(b), then *ultra vires* is a backstop.

So we think this is a classic circumstance. It's *ultra vires*. This runs directly counter to the rights and obligations of a trustee. If you agree with us on that, then this is a classic *ultra vires* scenario.

THE COURT: Okay. And, again, sticking with *ultra vires*, the claim is the failure to provide sufficient documents to allow a trustee to responsibly exercise her duties is not a -- there's nothing about that in the statute, in 76*l*. You are importing that mandate in the statute through its provision of, you know, general trust duties.

MR. ZELINSKY: So let me answer that in two parts.

The first is that there is this statutory phrase "usual powers and obligations" that has to be given meaning. So I think the way we would give it meaning is by saying, Okay, what are the usual powers and obligations that Congress was harkening to?

The second thing I would point you to is the *Cummock v. Gore* case from the D.C. Circuit. We cite it both in our motion and in our reply.

THE COURT: Sorry, one more time.

MR. ZELINSKY: *Cummock v. Gore*. And I can give you a citation for it, if that would be helpful.

THE COURT: If it's in your brief, I --

MR. ZELINSKY: So in the *Gore* case, that's a circumstance where there's a minority member of a commission. It's a safety commission that's established after an air accident.

THE COURT REPORTER: After a what accident? I'm going to need you to slow down.

MR. ZELINSKY: An air accident. I apologize.

THE COURT: We have an expedited briefing schedule, but we've got plenty of time this afternoon. Take your time.

MR. ZELINSKY: So in *Cummock*, what happens is there's a minority member of the commission, and she sues for access for information. And what the D.C. Circuit said

is looking at the structure of this statute, the only way to interpret the structure of this statute to make any sense is that commission members have access to information, because otherwise they can be shut out entirely, and there's no purpose in having minority members of a commission.

And so we think that that is pretty instructive, both in interpreting the 76*l* provision and also in interpreting the structure of the statute.

You've got a bunch of congressional *ex officio* members who are put on this board, and the whole purpose of putting them on there is in part to conduct congressional oversight.

THE COURT: Okay. So your position then is that, you know, any dissenting or minority member on any congressionally chartered charitable board, of which there are many, who is unhappy with a result or a process or a procedure can come into federal court, point to the organic statute and say, you know, "This is a trust. I have these duties. District Court Judge, give me relief. Make them do what I want them to do."

MR. ZELINSKY: So let me give you a few answers to that, if I can, Your Honor.

The first one is not every one of those boards is going to be a trust and rooted in trust language "with the usual powers and obligations." So we are on especially

strong footing here because Congress specifically looked to trust law, harkened to trust law, and adopted it in the statute.

The second answer to your question is that's kind of what the D.C. Circuit said in *Cummock v. Gore*. So in one respect, we're not really breaking new ground here.

And my friends on the other side suggest that it's going to be a parade of horribles because any trustee could sue. That's actually the law of trusts generally. It's pretty forgiving for the ability of a trustee to sue for information as necessary to perform their duties.

I think part of the reason you don't have that occurring is because this is a pretty unique fact pattern. Someone's being asked to go in and vote on Monday and have received not a lick of information beforehand. We're talking about a shutdown. We're talking about, you know, potential construction, demolition, whatever it is. We don't know because we don't have any information. This is pretty atypical. Highly imprudent. It's not the way boards normally operate.

And we're talking about things, I would just stress, that the government should have. President Trump said on February 1st that they conducted a one-year review, that this was comprehensive, that there were all of these analyses. They say that they're beginning preliminary work.

So they should have things like blueprints, plans, budgets. It shouldn't be terribly difficult for them to pull this together and provide it to the board in advance.

And I just want to stress how sort of gobsmacking it is to have a presentation on construction and then vote the same day on something of this magnitude with all of the attendant concerns that surround it.

THE COURT: Okay. I think you submitted a draft agenda of the meeting, and there was an indication that a vote on the closure was planned. But it was less clear to me that a vote on whatever construction is contemplated was planned.

MR. ZELINSKY: So, Your Honor, the two things are the same. They're linked. Because the whole reason for this shutdown -- and President Trump's February 1st Tweet makes this very clear --

THE COURT: They're not necessarily linked. I mean, they could close it and then continue to develop a plan to do whatever it is they plan to do with it, right?

MR. ZELINSKY: So if I could?

THE COURT: Sure.

MR. ZELINSKY: Just two points in response.

The first is that is not what President Trump said on February 1st. And by defendant's own admission they are giving a, quote-unquote, construction update prior to the

vote. So they've linked it in their own papers as sort of, well, it's a construction update and then a vote on the closure. So I think they're linking them together.

THE COURT: Okay.

MR. ZELINSKY: And I think that highlights the need for information. We're going into a meeting on Monday with no idea beyond just one bullet line on an agenda what's even going to be said.

And again I just want to stress the declaration by Deborah Borda, who is the former president of the New York Philharmonic, that was submitted with our motion I think illustrates this. This is just far outside the norm of what a board in any comparable circumstance would be doing.

We also submitted a declaration from Professor Taylor, who teaches arts management at American University. He said the same thing. In this type of circumstance it could take months or years of deliberation and planning by a board. You would expect to see all kinds of materials, budgets, again, independent analyses, blueprints. These shouldn't be, again, difficult things because they should already be in place. And if they're not in place -- and I think this is critical for us on our -- from our side -- if there isn't information, if the plans never occurred, if there was no one-year review, if the President's one-year review never happened, all of that is actually information

that the Congresswoman needs before going into the vote. If it turns out that there's nothing backing this up, that's information, too.

So I think it's really up to the government to say whether they even have information.

THE COURT: All right. Why don't you move to irreparable harm on that score.

MR. ZELINSKY: So we think that the vote's going to go forward one way or another on Monday.

THE COURT: Okay.

MR. ZELINSKY: In order to -- the core of what we're seeking here is full participation, and in one of the ingredients -- and I think the *Benedict* case, again, from the Southern District of New York is helpful on this. One of the critical ingredients to full participation is knowledge. You can't be expected to exercise prudence and all of the other fiduciary obligations if you don't know what you're voting on, you don't know how to deliberate. And so in order to participate, she needs to have the data.

THE COURT: All right. So I understand your argument to be that without that full participation, she is in a sense being induced to violate her fiduciary duties to the trust.

MR. ZELINSKY: Well, I would also go that she has -- I think the *Cummock v. Gore* case again is helpful on

this. As a minority member, she has the right to dissent. That is one of the critical rights.

THE COURT: So let's assume she shows up on Monday, and a motion is tabled, and there's a second, and the chair asks for comments, and Congresswoman Beatty is able to comment, and she voices her dissent. Hasn't she, in effect, fulfilled her fiduciary duty?

MR. ZELINSKY: Well, so are we assuming in this scenario --

THE COURT: If she votes no, or if she voices her dissent because she doesn't have sufficient information or because she objects to the decision on substantive grounds, how has she breached her fiduciary duty by the lack of -- by not having information beforehand?

MR. ZELINSKY: So I don't think it's just that she's at risk of breaching her fiduciary duties. She has the right to that information in order to make the most informed, impassioned argument to her fellow trustees.

THE COURT: Okay. So you say this is a rubber stamp board, that the result is going to be what it's going to be regardless of what happens. Because no trustees are getting information apart from the building and grounds commission, right?

MR. ZELINSKY: So there are two points to that, Your Honor.

The first is we would hope that there are trustees who are coming into that meeting -- even though they voted to rename it, that there are some trustees who are going to come into that meeting who are going to vote the other way.

If my friends on the other side truly say that this is a rubber stamp and that nothing is going to change, I think that's going to be a huge problem for them come the merits time because that is the antithesis of a prudent fiduciary. I mean, to me that would just be the opposite of what a board should be doing.

But to the extent that there are some minds that can be changed, that is one of the things that the Congresswoman has a right to do.

The second thing is she has a right to articulate. And I think the *Cummock* case is important here. In *Cummock*, the --

THE COURT: But how is that right? I understand your argument. But how is the denial of that right an irreparable harm to her?

MR. ZELINSKY: Because there is a moment on Monday when this occurs. She will not get that moment again back. She will not have the ability to redo that meeting. And every day that she is denied access to that information is a day without that information she can't get back. There's no remedable --

THE COURT: So let's assume -- okay, assuming that she has standing to pursue her claims related to the closure and the construction, all right, and whatever happens here happens here and we move on to the PI motion, and you come in and you say, "Judge, in order for us to determine whether what they plan to do is *ultra vires*, whether it's a violation of a clear and mandatory duty in 76*l* or whatever it is, you know, we need some discovery. We need expedited discovery. We need to see what those plans are." Okay? And if I agree with you, and she gets the plans next week, ten days, three weeks, why has she been harmed -- irreparably harmed by not having those plans on Monday --

MR. ZELINSKY: So because she has --

THE COURT: -- when she can voice her dissent and vote no if I decide that she has a right to vote?

MR. ZELINSKY: So two things, Your Honor.

The first is she has this right to articulate the most forceful, powerful dissent to her colleagues at the meeting, to the public, to Congress. She's, in essence -- because she's an *ex officio* congressional member, this is a form of congressional oversight that she's being denied. I mean, I think there are serious interbranch concerns if she's not given this access to documents. That's the first answer.

And I think the harm is really the harm from being

prevented from being able to have access to this information for any amount of time that is not reasonable. That's a harm to her that cannot be remedied, and it's especially true because there's going to be this moment of enormous public salience on Monday where public attention, congressional attention, is going to be focused on this decision, and she should have the documents going into that.

I think it's also going to prevent her from effectively opposing it because she's not going to know -- or as effectively, because she's not going to know what's going to be happening.

The shell game here throughout this entire process has been a sort of a pretense of, well, we're not doing this -- like the East Wing of the White House. We're not doing this. We're not going to touch the East Wing. The next thing you know, the bulldozers are at the door.

And the third point I'd just make is her right as a trustee is independent of any discovery process. That's a right that inures to her. And if you think she has that right, she deserves to have those documents independent of whatever discovery she may be entitled to on the merits of her claim.

THE COURT: Just continue to indulge me for one more moment.

I prefaced my last question by saying assuming she

has standing to pursue the other forms of relief. Could you at least pre -- we're not here to talk about those claims, but could you at least preview your theory of standing on the name change and more importantly the construction and the closure.

MR. ZELINSKY: Sure. So let me start -- and I apologize, I'm going to start at a too high level of a generality, and you tell me at what point this is maybe unhelpful.

In the *TransUnion* case, one of the things the Supreme Court said was we look to the common law backdrop to understand the contours of standing. This is a classic common law case that would occur at common law.

So it would be -- I mean, I think the thumb starts on the scale by saying we don't expect that what Congress -- that what the framers did at the founding was cleave off a whole set of common law cases from the case or controversy in Article III.

So I think we start from the proposition that this is squarely within that historic core, and so under *TransUnion*, there is an assumption that this is a case that --

THE COURT: So if It was the common --

MR. ZELINSKY: -- or controversy.

THE COURT: -- law tort of intrusion upon

seclusion in *TransUnion*, your analog would be breach of trust duty?

MR. ZELINSKY: Right. And so what the Court said was -- in *TransUnion* is that it was outside the common law; that particular action, right, was outside the common law, the bounds. And because it was something unheard of at common law, then it was outside of Article III.

This is the opposite. We're inside the common law, so we're inside the Article III.

I think that's the simplest way of articulating it to you, and then I think there are a couple of other follow-ons from that.

The first is that she is harmed because she's charged with an obligation.

Take the shutdown. She's charged with the obligation to maintain and administer a living memorial to John F. Kennedy. She cannot perform that duty. She is prevented from performing that duty if the center shuts down.

That's our theory of the case, that they have certain mandatory duties to perform. They have certain things the statute requires them to do, and that they're being prevented from doing that. She's being prevented from doing that.

So that's our theory of injury in a nutshell.

Obviously we'd want to be able to brief that fully in front of you, and this is not with prejudice to anything else we might say on standing, but I think that that is the core of our standing theory.

THE COURT: Okay. Why don't we move to the voting rights.

MR. ZELINSKY: Yes, Your Honor. And I would just stress that we do have concerns on the full participation aspect of this. We don't think the government's representations to the Court about, you know, "subject to the chair's discretion" solve the concern. I just want to flag that at the beginning because I think -- I understand it's separate from voting rights, but we still think that's live.

THE COURT: All right. So what would an order look like? I mean, you know, I'm not here -- it's not my role to micromanage the board meeting, to tell the chair how much time to give each trustee. There are over 40 trustees.

MR. ZELINSKY: Totally. So I think --

THE COURT: What would you propose that I do if I agree with you?

MR. ZELINSKY: Something as simple as she can't be categorically barred from speaking, I think, would solve -- go a long way toward solving the concerns.

And, look, the truth is if someone wants to play

chicken with the Court and sort of say, "Well, how close can I get to the line of categorical bar? Is 30 seconds enough?" That is -- we understand you can't police that. So we would -- you know, our hope would be that that wouldn't come to pass. Our hope would be an order that says she can't be categorically barred like she was categorically barred in December of 2025 of speaking on an issue about renaming of, again, significant, substantial, existential importance to the board.

THE COURT: Okay.

MR. ZELINSKY: But as to voting, again, we think we --

THE COURT: And let's start where we started. Is it the same sort of analytical framework as the access to information?

MR. ZELINSKY: Well, so I think it's an even -- so it is a similar analytical framework. It bears rights and powers. It's also -- I mean, this is true as well for the access to information.

It lists the board members. Right? One of the classic things about a board is you can speak on the board. It would be -- and, again, it's just a classic breach of fiduciary duty to say -- and we cited common law cases on this and the restatements -- you can't shove dissenting voices to one side. That is not what prudent boards do.

That's not what trustees are allowed to do.

We're not talking about her monopolizing the meeting. Right? We're talking about her being able to speak at all.

THE COURT: I meant for the voting.

MR. ZELINSKY: So on the voting, it's even stronger.

THE COURT: Okay.

MR. ZELINSKY: Because on the voting what we have is we have the fact that we have the rights and usual obligations. We have the fact that there's nothing in the statute that says she can't vote. And then we have this very long list, I mean, just a huge number of statutes where Congress has said this person can't vote. This *ex officio* is not allowed to vote. This member is not allowed to vote.

Congress did nothing of the sort here. And if there were any other concern, we also have in addition a legislative history that is just incredibly strong. I just would read from the House Report from 1994.

So the legislative history, the House Report, is -- and it's cited in our briefs. The government doesn't even respond to it. This is when the Congress is adding new *ex officios* to the board.

So it's adding new members in 1994. And what the House says in the report is, quote, Trustees who serve, by

virtue of their office, *ex officio* are permitted to vote," period. I mean, it is crystal clear.

THE COURT: Isn't the response that the fact that it didn't wind up in the statute shows that Congress thought about it and chose not to --

MR. ZELINSKY: No, that's -- that's Congress talking about it based on the statute it enacted. This is Congress saying this is our understanding of the language we're enacting.

THE COURT: That's the House Report, right? That's not the statute.

MR. ZELINSKY: Sure.

So you could say we don't look to the legislative history, in which case, okay. So we point you to a couple of other sources. Right?

One is the context, the backdrop that trustees vote. Right? It's the core fundamental power.

Two, you've got all of these other statutes. I mean, just heaps and heaps of other statutes where Congress, when it wants to say someone doesn't vote, says this person doesn't vote.

And then to top it all off, you have the fact that Congress gave the Smithsonian Institution the power to delineate how many board members are on, for example, you know, the other boards within the Smithsonian, but not the

Kennedy Center. So Congress said, "We are not giving the Smithsonian the power to change itself, the Kennedy Center, and a handful of other boards, their composition." It did not give that structural power to alter the board to the board of the Kennedy Center.

And what my friends on the other side point to is primarily two things. And I think it might be helpful to drill down -- at least if it would be helpful to the Court, to drill down and show why those don't do enough.

The first is they say, "Well, this is always the past practice."

The evidence -- they give extremely scant evidence. Right? One is a declaration of LaFauci where he has no -- I mean, he provides no information. He just says, "I reviewed documents." He doesn't say what documents they are.

He hasn't worked at the center very long. He started there in May 2025. So a LaFauci declaration doesn't get them much.

And then they say, "Well, I've got one declaration of a former *ex officio* who says 'I don't recall voting, and I don't remember other people voting.'"

In reply, we submitted a declaration by the former president of the Kennedy Center who confirms it was always the case that *ex officio*s were voting.

And so the history side of this, to the extent it matters, just decisively cuts on our side. We're not asking for something unusual. We're asking for effectively until May 2025 the status quo.

The second thing that they point to is a provision of the statute, and this is to USC 76*l*(a), where the board is empowered to, among other things, make bylaws for administration of function, organization, and procedure. Well, we don't think -- and the language they focus on is organization and procedure. We do not think the foundational structure of the board is organization and procedure.

And their argument collapses on itself in another respect. Nobody here, I think, disputes that you couldn't, say, identify a handful of the trustees and the general trustees and say, "I don't like them. They're not going to vote."

THE COURT: But there are all sorts of boards that have *ex officio* members. Sometimes they vote; sometimes they don't vote. In an exercise of, you know, corporate governance, why isn't it procedural, a matter of process, to say, "We're going to have some trustees vote, but *ex officio* trustees not to vote because otherwise it would be too unwieldy," or for whatever reason? Why isn't that process as opposed to substance?

MR. ZELINSKY: Because it goes to the very power that Congress gave. It goes to who wields the structural, foundational power of the board. And if the argument is that's what process means, it would mean that the board could decide that it's going to hand all the power to one person. It votes tomorrow, and the only voting member is the chair, President Trump.

That can't be right because it would allow them to neuter the statute, the very foundation of the statute --

THE COURT: The statute says that there has to be at least, I think, 12 or 13 board members for there to be --

MR. ZELINSKY: For a quorum.

THE COURT: -- for there to be a quorum. So the statute itself speaks to single-person governance. Right?

MR. ZELINSKY: Our view would be that it is akin to amending that provision of the statute; that these -- that when it names who the board members are and grants them those powers, the usual rights and obligations of a trustee, powers and obligations, it's granting them voting power and that it's not just a procedural nicety.

I mean, procedure is things like: Do we use Robert's Rules? Do we have subcommittees? You know, do we vote -- do we meet monthly or bimonthly? Those are the types of things that we typically think of as procedure, and I think we would be taking an elephant and jamming it into a

pretty small mouse hole to say this word "procedure" was a power to give the board an ability to neuter the congressional oversight.

I mean, the reason Congress puts congressmen on the board, if you look at the evolution of the statute, is -- so in 1994 Congress is saying, "We want to have more congressional oversight. Certain duties are taken from the Park Service and given to the Kennedy Center. And so we want more congressional oversight."

And I think it would be just gobsmaking again to say that the board can neuter all of that congressional oversight.

THE COURT: So what is -- I mean, as I read your briefs, your argument is that there is a background presumption that *ex officio* members should vote or have the power to vote because, generally speaking, all trustees stand on the same footing.

MR. ZELINSKY: And --

THE COURT: And so what is the authority for that?

MR. ZELINSKY: So the restatement -- I mean, we've given several in our -- I mean, *Black's Law* has an entry on *ex officio* because it's true that sometimes -- and the statute, by the way, never uses the term "*ex officio*" here. It just identifies who is on the list. So what *Black's Law* says is sometimes people confuse "*ex officio*" with

"honorary," and that's not what it means. It means they're there by virtue of their office.

And, candidly, I suspect that may have been what happened with defendants. They may have gotten a little confused about what the Latin meant. There may be an answer as to how this all happened.

But it's not just a background norm, and we think the background norm is very strong. It's also the fact that Congress everywhere else in the U.S. Code has pointed -- not everywhere, but in many other places in the U.S. Code has pointed and said, "That's a nonvoting member. That's a voting." It knows how to do this if it wants to have nonvoting members.

THE COURT: And the fact that it didn't do it here, why isn't that evidence that it left it to the board to decide, to fill in the gaps and decide whether *ex officio* members should vote or not?

And I guess your response would be that organization and procedure limits the board's authority, unlike perhaps other boards where there's no --

MR. ZELINSKY: And you've got this portion of the powers of the Smithsonian Institution that shows here's how you toggle real structural changes. Right?

When Congress wanted to give the Smithsonian Institute real structural power over the nature of the

boards, it did so expressly. We don't normally expect Congress to change the fundamental powers of -- to give to the agency the authority to change the fundamental powers of the agency.

And I would add just one more thing. We're in a post-*Chevron* world of *Loper Bright* where we've got to look at the statute and come up with the answer. We can't imply sort of congressional delegation that's not on its face. And we think the clearest statutory answer, certainly a statutory answer that we're likely to succeed on, is that Congress said, "These members have the right to vote."

Again, under the theory that my friends on the other side are offering, you could take, to your point, the minimum 12 trustees and say the other 24 presidentially appointed trustees, they can't vote either. No one thinks that that's true.

The last point I'd add is settled practice does help liquidate meaning in some circumstances. To the extent that you do look to settled practice, the fact that we know this is what occurred, from the legislative history, from the evidence we put in, that is quite helpful in suggesting that this is -- it's my friends on the other side who are asking you to really deviate from the norm here.

THE COURT: Okay. Address the government's argument with respect to the equities that the voting change

was enacted or implemented, what, ten months ago now?

MR. ZELINSKY: So it wasn't --

THE COURT: If it was so important, why didn't Congresswoman Beatty come to court back then? And why are we here on an emergency motion now?

MR. ZELINSKY: Sure. A couple of answers to that. And I apologize. I'll try to be slow, but there might be some long answers so I apologize.

The first thing is, just as a pure legal matter, the D.C. Circuit's been clear in *Gordon* that delay alone is not a reason to deny relief.

THE COURT: But it's a factor.

MR. ZELINSKY: It's a factor. But what the Ninth Circuit has already said is it's a pretty poor factor when you have a circumstance where the harm keeps ratcheting up.

The reality is if we had come in I think in May screaming and running to the Court and said, "Oh, my God, the voting changed," we might have had a ripeness problem at that point because it wasn't even clear that they were going to be voting on things of particular consequence. And as this became apparent, that this was an issue, when they vote to change the name, we do come running, as quickly as we can, to this Court, and it is Count 2 of our original complaint.

So we've been in this Court for months trying to

solve this problem. We do not want to be here on an emergency posture. We tried to stop that.

In February, we sent a letter -- the Congresswoman sent a letter to the President and to Defendant Grenell and said, "Give me some advanced warning about when the voting will occur." Part of the reason for that advanced warning was precisely so we wouldn't be here.

They ignored that. They also ignored your suggestion to try and kick this down the road a little bit so that we wouldn't be in this emergency posture.

So we think we have done sort of everything we can. And I think this is similar to the *Federation of Education Association v. Trump* case, and that -- we said in our brief that this Court said that an alleged delay in challenging an executive order was not a basis to deny an injunction because the, quote, effects of the agency's actions were most acutely felt as the affected teachers prepared for the school year, and that's when they brought the lawsuits.

Very similar to here. As soon as we had an effect of that decision in December, we came to this Court. We've been here for months on this issue.

THE COURT: I just want to go back to the access to information. The same question I asked with respect to participation. What would an order in your favor look like?

MR. ZELINSKY: So --

THE COURT: Hold on. You've asked for what looks like a civil discovery request in one of your letters. You know, I take it, based on your representations, that there was a buildings and grounds committee. There is a present -- there was a presentation to that committee, I take it?

What --

MR. ZELINSKY: We don't know.

THE COURT: Okay. What would an order look like that would provide her the documents that she thinks she's entitled to without the Court, again, micromanaging the process and saying, "You have to give her X, Y, and Z"?

MR. ZELINSKY: So, Your Honor, I think the -- I want to answer your question, and I apologize if I back up a little bit before I do, and then I want to answer it.

I think the Borda declaration -- again, that's the former president of the New York Philharmonic -- and the Taylor declaration, who is a professor at American who teaches in this area, are both instructive, because in both of those declarations they go into extensive detail about the types of things that would be available to a board in these circumstances. And the government either has them or doesn't, and those are the things we asked for in our letter.

So, for example, we asked for the President's one-

year review. It may be that it doesn't exist, but the government has to say it doesn't exist.

Candidly, the government has said that the presentation to the building and grounds crew was limited. We don't think that's enough.

I think the best order here is an order that says, "Comply with her request for the things she listed; and if you don't have them, say so."

I mean, right now they've just gestured to burden. They haven't given you any reason to think that they don't have these documents, and if they don't, they've got to say so, I think. And they haven't said, "Here's why it's burdensome."

THE COURT: Well, Counsel, look, I've been on nonprofit boards. Right? There's a committee structure, be it the finance committee or the building and grounds committee. And the normal course of, you know, dealing is you get a presentation from that committee if you're on the committee of the whole. It has some backup, but it doesn't have every piece of -- you know, every spreadsheet, every, you know, financial projection, every, you know, proposed contract, every, you know, interim drawing.

MR. ZELINSKY: So respectfully --

THE COURT: You know, there is some level of diffusion by the time it gets to the full board as to how

much information is required to responsibly exercise your duties as a member of the board. Right?

MR. ZELINSKY: Respectfully, Your Honor --

THE COURT: Yes.

MR. ZELINSKY: -- we're talking here about an institution that is a landmark, federal institution. This is not just any nonprofit board. And in front of you the only evidence in the record is the Borda declaration and the Taylor declaration. And those are some pretty -- I mean, one is the president of the New York Philharmonic that did many renovations of, you know, comparable size and scope. The other, Taylor, both has been involved in renovations of massive scope and teaches in this area. And they outline in pretty extensive detail in their affidavits -- in the declarations what it is that a board would normally have in this circumstance.

So we don't think it's going to be a carefully curated presentation. It includes things like independent analyses. Boards often get not just the analysis of the management, because the management is not always accurate, but an independent analysis. It does get things like budgets and contracts and things like that.

THE COURT: Let me go back to your -- the standing discussion that we had.

MR. ZELINSKY: Yes.

THE COURT: I know we're not here for this ultimately, but when I asked you to preview your argument, you mentioned *TransUnion*, which goes to the injury prong of standing. But address briefly causation and redressability. I mean, if the injury that she has suffered or she alleges she suffered is a -- you know, a violation of her trust duties, how would an order to stop the closure or stop any reconstruction go to the procedural injury that she has alleged?

By "procedural," I mean sort of in terms of the processes of the board.

MR. ZELINSKY: So I just want to make sure I understand the question. We're talking about access to documents for a second, or are we talking about shutdown; remedying the shutdown or the documents? Because I think there are two separate injuries there.

THE COURT: I agree. And so, you know, once we get to the PI, what's the injury that she has? So the injury, you said, based on the *TransUnion* historical analog is an induced violation of her trust obligations. All right.

MR. ZELINSKY: Yes.

THE COURT: How would the ultimate relief that you are seeking, which is to enjoin the construction, match up to that injury?

MR. ZELINSKY: So one of --

THE COURT: You know, because I could order it closed, or I could --

MR. ZELINSKY: You can order it open.

THE COURT: -- or I can order it not to go forward. How would that address the fact that she didn't get documents beforehand?

MR. ZELINSKY: So it's a living center. It's a living memorial to John F. Kennedy. So the access to documents, just -- I want to make sure I understand your question.

On access to documents, she has a sort of quintessential informational injury, right? Which is she needs this stuff now.

THE COURT: I understand.

MR. ZELINSKY: If she doesn't get it now, she's harmed.

THE COURT: Okay.

MR. ZELINSKY: So that is a separate -- we think a separate -- I would view that as a separate injury, the access to the information.

And the procedural right to vote, I'd again view that as a separate Article III injury from the injury of "I have certain obligations to maintain a living memorial. The statute says maintain a living memorial. I can't maintain

the living memorial because they're shutting it down."

And the statute has in it in 76, 20 USC 76, a provision that deals with the mandatory duties of the board. And it's pretty clear. It says, "The board shall," and then it lists out things the board has to do, like have opera performances and concerts and plays. You know, it's got a list.

Those aren't going to happen. And they've just said, "We're going to shut it down."

And not for some exigency, for what it's worth, but by choice. The February 1st Tweet says, "We're doing this because we don't want to comply with the statutory obligations anymore."

So when you issue an order that says, "Don't shut down," that remedies the harm because she then is able to maintain a living memorial to John F. Kennedy.

THE COURT: So those harms are distinct from the harm that we're here today talking about.

MR. ZELINSKY: Yes. Now, we think they're all bound up. I mean, so one way to look at it is part of the reason we need this information desperately is because we have no real idea why they're doing this, what the plans are, if there even is a plan. Are there going to be bulldozers there tomorrow? I mean, these are really important.

And they also go to your point, Your Honor, about not wanting to be here in an emergency. I mean, again, it's sort of breathtaking that the government has provided a board nothing. This comes out like a bolt of lightning out of the blue on February 1st. This is not how boards -- any board I would be on, I suspect any board you would be on, would handle something of this magnitude.

THE COURT: Okay. Anything else?

MR. ZELINSKY: No, Your Honor.

THE COURT: All right.

MR. ZELINSKY: Thank you.

THE COURT: Thank you.

All right. Mr. Jankowski, you're up. How are you?

MR. JANKOWSKI: Good afternoon, Your Honor. I'm well. How are you?

THE COURT: Good afternoon. Doing well.

MR. JANKOWSKI: I will do my best to speak as slowly as I can. I also sometimes have a tendency to speed up so...

THE COURT: We've got plenty of time. Don't worry.

MR. JANKOWSKI: I'll give it my best shot.

Good afternoon, Your Honor, and I understand that you have a couple of ways of thinking about this, so like my

friend, I'll let you lead the conversation.

But I'll just start -- I'll start by noting that Representative Beatty at this stage seeks extraordinary relief that is neither warranted or available to her as of right. She brings this emergency action seeking at bottom that the Court administer the internal proceedings and the -- administer the board's discretionary functions in organizing its procedure and in undertaking its organization of a federally chartered trust instrumentality. But the board under the law may make bylaws, rules, and regulations relating to the administration of its trust funds and the organization and procedure of the board.

The Court should --

THE COURT: But assuming she has a cause of action and that I have jurisdiction over that cause of action, hasn't she identified pretty clear duties and alleged at least that those trust duties are being impeded by her lack of information?

I mean, there's a duty of prudence. It's recognized in her statement. It's recognized in the case law. And how can she fulfill that duty without having at least some modicum of information in order to make an informed either objection or vote?

MR. JANKOWSKI: So, Your Honor, that does go to one point I want to make about plaintiff's asserted

irreparable harm, which is to say that she alleges that she'll have no opportunity whatsoever to assess any modicum of information, but that information will be provided at the board meeting.

THE COURT: But if you're -- you know, this -- I've got to say, this is a pretty big deal. You know, who knows what the plans are, but a major renovation of the nation's premier performing arts center would strike me as something that someone would need some advanced materials on to determine whether the plans are in the interest of the trust or not. Right?

MR. JANKOWSKI: Your Honor, that's something that's, again, expressly by statute. The specific procedures the board would use to govern those kinds of questions that come up at the meeting are committed to the board's discretion.

I think, you know, without making any assertion necessarily that a specific procedure might be available, typically I think in board meetings like this, proceedings like this, there might be an opportunity to say "I object to proceeding at this time. I haven't received enough information." She could put that kind of a motion to a vote.

She could seek a request from the board or from the chair to say, "I think we are not able to fulfill our

fiduciary duties in this particular instance, and I'd ask that the board consider a motion or some kind of relief extending that time."

And that's exactly why, as you've noted, Your Honor, many of the elements, if not really all of the elements of the Congresswoman's requested relief really go to internal proceedings and would in many ways ask this Court to micromanage the procedures that a board follows at a given board meeting.

THE COURT: Okay. So would there be any circumstances where a trustee could, you know, object to the procedures or policies or course of action of a charitable board that would violate their core trust duties?

MR. JANKOWSKI: So if we're taking the trust duties as --

THE COURT: So all the board is obligated to do is invite her to the meeting and have her sit there and, you know, lodge an objection when comments are called?

MR. JANKOWSKI: So, Your Honor, if you're asking whether I think that would satisfy the board's responsibility under the statute, yes, I do, because that's all that the statute provides, if it even can be read to provide that.

THE COURT: Well, the statute provides that the trustees be given the -- I forget the exact language, but

customary trust duties and responsibilities, correct?

MR. JANKOWSKI: Well, so, Your Honor, I do want to make a point. We haven't raised this argument, but the statutory language actually isn't even that clear and, I think, one of the reasons why the Congresswoman's arguments here don't necessarily and really can't be characterized as sounding in clear duties that the trust or the trustees have under the law.

THE COURT: Okay.

MR. JANKOWSKI: So the provision itself, Section 76*l*, Subsection (b), says, "The board shall have all the usual powers and obligations of a trustee in respect of all trust funds administered by it."

Now, again, at this stage we're not arguing that the trustees don't operate as traditional trustees, except to the extent that we think the statute -- the terms of the trust as embodied in the organic statute here are the only terms that actually provide any specific duties or rights or obligations that the board itself as an entity must follow.

And, of course, we've made some certain arguments about satisfying state law predicates for bringing breach of trust claims; and we think that those, in the alternative to our arguments about the statutory text, would also apply.

But that language itself is not so clear. Congress didn't necessarily specify that every trustee on

the board shall have all of the rights and obligations owed to trustees under the common law. Congress specified that the board itself would have the usual --

THE COURT: Could you just point me to the exact language so that I'm --

MR. JANKOWSKI: Yes, so this is Section 76*l* and Subsection (b), 20 USC 76*l*. And use of the singular there is --

THE COURT: "The board shall have all the usual powers and obligations of a trustee in respect of all trust funds administered by it."

MR. JANKOWSKI: Correct.

THE COURT: Period, stop.

MR. JANKOWSKI: Yes.

THE COURT: Okay. And why does not that language vest traditional and usual powers, trust powers, in each trustee, including the plaintiff here?

MR. JANKOWSKI: Well, because the statutory language invokes those trust funds -- trustee funds rights and responsibilities in the board itself. And, again, I want to be clear --

THE COURT: What is the board if not a collective of its trustees?

MR. JANKOWSKI: Well, and as noted earlier, the board is, under Section 76*h*, a collective of its trustees

that -- and must have a minimal quorum of 12 members and shall be composed of exactly the *ex officio* members who are listed in the statute as well as the general trustees subject to the appointment of the President.

And that's all that the statute can give us with respect to -- with respect to the specific rights and duties that each trustee individually has under the usual powers of a trustee with respect to the board's administration of its funds.

THE COURT: Okay.

MR. JANKOWSKI: To that point, Your Honor, if I might turn to the Congresswoman's statutory argument a little bit. Our position is actually that the litany of statutes that the Congresswoman cites in her motion really underscores why it's clear in this particular scenario that Congress intended for the board to have near discretion within the bounds of these specific terms outlined in the organic statute, near full discretion to manage its organization and procedures.

So if I might, I would look to the plaintiff's temporary restraining order motion. I'll just flip to it.

So we have a litany of statutes cited on Pages 13, 14, and 15 of that brief. And as plaintiff notes, in many of those Congress did indeed explicitly lay out certain rights in the statute in terms of the trust that trustees

possess under those statutes for those boards.

For instance, we have 2 USC 803(a)(1)(E), "The director of the board who shall serve as a nonvoting member." In that particular instance there doesn't appear to be anything else in that provision that relates to the voting rights of any other members of the board.

The second one I want to point to -- and the reason I'm pointing to this one is because there are several others, I think roughly eight or nine of the ones that plaintiff cites on those two pages, 7 USC 1627(b).

THE COURT: So just to be clear, these are statutes that have created other congressionally chartered organizations and have vested voting authority in some executive or *ex officio* members and not others?

MR. JANKOWSKI: Correct.

THE COURT: Okay.

MR. JANKOWSKI: And in many of these Congress has done that explicitly, and that's an important choice.

THE COURT: And your point is Congress knows how to do that. The fact that they didn't do that here shows that they intended for the board to pass bylaws that dealt with that issue.

MR. JANKOWSKI: Your Honor, you and I are on the same page.

THE COURT: Maybe.

So address your colleague's point that this particular board is not authorized to do that because the bylaws are limited to issues that are procedural in nature.

MR. JANKOWSKI: As well as dealing with the --

THE COURT: Or organizational in nature.

I don't think voting is organizational. Voting may be procedural. But address their argument that because voting goes to the core of the exercise of trust duties it is more on the substantive side of the line than the procedure side of the line.

MR. JANKOWSKI: Well, first, Your Honor, I'd like to back up and note that we would actually argue that the board's organization as well in terms of splitting it into multiple classes of trustees who may have different rights and obligations, we think that that's absolutely a means by which --

THE COURT: Well, Congress did that.

MR. JANKOWSKI: So --

THE COURT: Congress created *ex officios*, and then they added some *ex officios* in 1994, right?

MR. JANKOWSKI: Yes. Yes, Your Honor. Correct.

But so with respect to the organization of those two classes of trustees, that's something that we would argue -- we would argue the board has some discretion to manage.

THE COURT: Okay.

MR. JANKOWSKI: But procedurally as well, of course, the extent to which the members might have procedural rights to participate on certain terms, which includes voting itself, to participate on certain terms in the activities and in the administration of the trust, that's something that absolutely would fall under that provision as well.

So if I can make a reference, also because my friends brought it up, the organic statute of the board, the Smithsonian Board of Regents is another important place to look for statutory clues as to whether Congress saw itself as restraining the board for the center here or for whether it saw itself as granting it expansive discretionary power.

The specific point, and as my friend rightfully noted, the Board of Regents of the Smithsonian Institution may modify the number of members, manor of appointment of members, or tenure of members of the boards or commissions under the jurisdiction of the Smithsonian Institution, other than Subsection (1). So we have Subsection (b)(1) of that statute, the Board of Regents of the Smithsonian Institution.

And that's a very important limitation that Congress chose to impose on the Board of Regents itself. Very importantly it did not impose that restriction on the

center's board of trustees itself. And we think that that in many ways is one of the strongest pieces of statutory evidence pending in defendants' favor here.

THE COURT: What about the House report that referred to the additional *ex officio* members that were added in 1994 and they said they shall have voting powers? Isn't that a clue that that's what Congress intended, despite the fact that they didn't make it into the statute?

MR. JANKOWSKI: So yes again, Your Honor, reserving, of course, all of those arguments that we look to the text of the statute, and that this is only a House Report.

I think the exact language in the report was that *ex officio* members are permitted to vote, and that is not the same thing as requiring -- as being -- showing an awareness that, again, both houses of Congress and the President understood that the statute required the board to permit trustees to vote.

It may have been a description of current -- of the current state of affairs. As my friends have noted, there is some conflicting evidence on exactly the extent of what voting rights and powers trustees may have had throughout the center's history. Without making any representations as to that, it may have well been the case in 1994 that as a matter of practice *ex officio* members

voted.

That has not been true in recent history. And it's also not true after the board --

THE COURT: What's the evidence of that? It's Mr. LaFauci's declaration? And he started there in May of 2025, so that's not recent history. And it's Mr. -- Former Representative Shuster's declaration that he doesn't remember voting himself. Is that the extent of it?

MR. JANKOWSKI: Well, and Representative Shuster also never observed any *ex officio* members voting and never heard of any *ex officio* members voting.

THE COURT: Now, one might expect that there would be historical minutes that one would consult that would be the official record of who voted on what and when. And the absence of such minutes might suggest that, you know, if this were -- if we were in trial, that might be subject to an adverse inference, right?

MR. JANKOWSKI: Your Honor, we're here on an emergency litigation as -- potentially conducting litigation as quickly as one can.

THE COURT: Okay.

MR. JANKOWSKI: And my understanding is that some of the documents that Mr. LaFauci did review were historical minutes, including minutes from the beginning of 2025 and then minutes from I think it was in September of 2022 --

THE COURT: Okay.

MR. JANKOWSKI: -- when there were board meetings and *ex officio* trustees attended the meetings.

And I will say, again, we don't have this in the record. We haven't been able to gather it on this timeline. Generally what happens at those meetings is that the board adjourns or -- "adjourns" I think is the wrong word, but moves on to an executive session where matters are voted upon by general trustees. *Ex officio* trustees are voted -- are dismissed from the board meetings at that time.

Votes occur at those executive sessions, and the board of trustees makes decisions at those executive sessions, and, of course, under the statute it has a right to do so.

THE COURT: But the fact that there are executive sessions where only certain board members vote on those matters that are sensitive enough to be considered only in executive session does not necessarily mean -- correct me if I'm wrong -- that *ex officio* members don't vote in the general session or as the body of the whole. Right?

MR. JANKOWSKI: It doesn't necessarily, but my understanding is that's the conclusion that Mr. LaFauci drew from his understanding of those meetings.

THE COURT: Okay.

MR. JANKOWSKI: And I will say I think, to the

extent that this might be sort of his personal knowledge as well, there was a transition period that happened with Mr. LaFauci's predecessor as well as --

THE COURT: It says he started in the spring. Do you know when exactly he started?

MR. JANKOWSKI: I think it was May. I don't want to promise that, Your Honor. It was the spring of 2025, I think.

THE COURT: Okay.

I mean, I understand there's a dispute here, but to -- isn't this just really a matter of statutory interpretation? And if that's the case, why does it matter what historical practice was? It could be that they were doing it wrong or doing it right from the start. Right?

MR. JANKOWSKI: It very well could be.

THE COURT: Okay.

MR. JANKOWSKI: I think to the extent -- I very much take your point, and our primary argument is that the text is clear in its commission of discretion here.

THE COURT: Okay. Let's go to sort of the balance of the equities. Why not just give her the information? I mean, how is the government harmed?

I mean, I have to believe that for the building and grounds committee to have voted to recommend whatever it is they're going to recommend on Monday, that they had

information that they were provided, and that, you know, that information might include, you know, the budget, you know, the contractors, the plans, or at least some, you know, conceptual designs. And if that information is already in existence and readily available, what's the harm to the board of giving that to all the trustees?

MR. JANKOWSKI: Well, Your Honor, I'll start with -- I know you're very familiar with assessing whether agencies have taken final actions. And I think that the logic here applies in that we don't -- an action isn't final until it's final. And when a board decides the buildings and grounds committee has recommended that the board should present information to the trustees at the upcoming meeting, the problem with saying that right at this moment we can give information is that the information may not be accurate. It may not reflect the --

THE COURT: It's 4:00 on Friday afternoon or Thursday afternoon. This meeting is on Monday. Right?

MR. JANKOWSKI: That's correct.

THE COURT: You know, I have an agenda that indicates that something is going to be presented. Right? Whatever is going to be presented, there were some materials that supported that presentation and that recommendation. And the question is, you know, whether, you know, they can be, you know, put neatly into a binder now or, you know,

tomorrow afternoon or Sunday afternoon. Why not just give that material to all the trustees?

MR. JANKOWSKI: Because, to bring us back to fiduciary duties, the board has to make sure that it's -- the information that's provided is satisfactory and is accurate and is providing material information to the trustees.

THE COURT: And when will the board be able to do that? Prior to 12:30 on Monday?

MR. JANKOWSKI: That's my understanding, is that it could take up until that moment. The chair of the center, also the President of the United States, has a well-known proclivity for trying to make sure that pieces of information are included that might be relevant, that might be relevant to upcoming matters that he's involved in. And that -- my understanding from our clients is that could be happening up until the meeting itself.

Your Honor, if it might be helpful to the Court -- stop me if it's not -- I'm happy to talk a little bit about some of the state law trustee doctrine as well and why we also see that as dispositively preventing the Congresswoman from --

THE COURT: So, I mean, that raises the question, you know, assuming I get to the merits of their breach of trust duty arguments, what is the relevant law? It seems as

if D.C. law has adopted both the restatement, second and third. It seems like the Circuit has blessed this treatise that I have come to -- that I've become familiar with over the last couple of days by Mr. Bogert. We'll give him a plug here.

Is there any inconsistencies in any of those legal sources on the claims and assertions that the plaintiff has made?

MR. JANKOWSKI: The government's position is that there are no inconsistencies and that the D.C. law is the appropriate law to look to at least at persuasive and potentially as binding.

And the important point there is that the *Hooker* test forecloses the Congresswoman's claims here.

THE COURT: Why?

MR. JANKOWSKI: Because she's not challenging an extraordinary action that threatens the existence of the trust.

THE COURT: Well, that was the special relationship justification for standing. The plaintiffs have cited materials -- and correct me if I'm wrong, but I believe *Hooker*, the plaintiff in *Hooker*, was a beneficiary.

MR. JANKOWSKI: Correct.

THE COURT: Here the plaintiff is not a beneficiary.

MR. JANKOWSKI: No.

THE COURT: So why is the beneficiary's special relationship to the trust even relevant when we have a trustee suing a co-trustee?

MR. JANKOWSKI: Because in the --

THE COURT: Isn't that a separate and independent basis for standing?

MR. JANKOWSKI: No, Your Honor.

THE COURT: Why?

MR. JANKOWSKI: Because the two *Family Federation v. Moon* cases make clear that D.C. also applies this two-part test to any trustee or ousted director or alleged successor trustee as well.

THE COURT: Okay.

MR. JANKOWSKI: And the justifications for that come from *Hooker*, which is to note that the risk of the burden of litigation on trustees are typically bound by majority vote.

Again, we're going back to sort of foundational trust law. Usually outside of really -- of showing that there's been a breach of some sort of fiduciary --

THE COURT: So your point is D.C. law is inconsistent with the restatement and with Mr. Bogert on that question.

MR. JANKOWSKI: No, Your Honor. I think we'd

argue that D.C. law actually incorporates the same standards.

And so obviously summarizing and summing up the common law in an area like this can be very, very complicated. Many states -- there are case citations in the restatement itself. Many states hold that exclusively a public officer of the state may bring, and only that officer may bring, actions to enforce charitable trusts.

And the point with the rest of the expansion of any standing, if you might term it that -- obviously we're not talking about Article III standing here. But the point of any expansion to that standing to bring such claims is to recognize the policy concerns inherent in allowing an indefinite and constantly shifting class of beneficiaries and other persons with special interests.

D.C. groups trustees under those -- under that prong, which is to say they do -- they are persons who have a special interest. That doesn't obviate the need to prove that they're challenging an action that threatens the existence of the trust.

And, again, I think, without having done a full case survey, I think case law in other --

THE COURT: So, I'm sorry, so it's *Family Education v. Moon* that you say supports your argument that those two requirements are conjunctive?

MR. JANKOWSKI: Yes. Correct, Your Honor. So -- and it's the two cases specifically. There's the 2015 opinion, and then the 2025 opinion as well.

And specifically in the first one, it should be Footnote -- I think it's Footnote -- I'm so sorry. Let me find it. I think it's Footnote 18.

THE COURT: Footnote 18, "All plaintiffs are challenging an extraordinary measure, fundamentally changing the purpose of UCI and taking steps to divest itself from the Unification Church."

MR. JANKOWSKI: Exactly.

THE COURT: So based on that footnote, your position is that for Ms. Beatty to have standing it is not enough for her to be a co-trustee. She must be also challenging an extraordinary measure.

MR. JANKOWSKI: Exactly. And that's confirmed in the second *Family Federation* opinion, Your Honor, which is on Pages 27 and 28 of that 2025 opinion. "The dismissal of the remaining claims against Preston Moon under Rule 12(b)(6) was proper where appellants," who included these directors, "lost special interest standing after an earlier Moon opinion."

THE COURT: Okay. Those were former directors. Here we have a current trustee. Does that make a difference?

MR. JANKOWSKI: It doesn't appear to under D.C. law, Your Honor, because they were proceeding in those cases under the theory that they were rightful trustees under the trust. They'd been wrongfully ousted.

Unless Your Honor has further questions on that, I'm happy to talk about irreparable harm, balance of the equities.

THE COURT: Go ahead.

MR. JANKOWSKI: We can move to irreparable harm then.

So as the government prefaced in its brief, many -- really a lot of the requests that the Congresswoman requests here has and will be granted, which really obviates any showing that she's suffering irreparable harm at this moment or will necessarily suffer irreparable harm on Monday.

She was invited. She will be permitted to attend. She'll be permitted to participate subject to the orderly management of the board's procedures, subject to the right that any trustee would have to participate who was invited to participate.

My understanding -- I've been assured by the client that the person responsible for the -- for administering the meeting I think is typically the vice chair in these scenarios. My understanding is that the vice

chair is absent and so that the treasurer in his stead will be proceeding, administering, and presiding over the meeting in that sense.

THE COURT: This is not a Zoom meeting, I take it. It's in a room in the White House?

MR. JANKOWSKI: Correct, yes.

THE COURT: Okay.

MR. JANKOWSKI: And to the extent that might bear on the Congresswoman's access, I've -- my understanding also is that she has managed to RSVP. Obviously there are security protocols that attend going to a meeting at the White House. You know, I don't want to represent that necessarily those will be satisfied given --

THE COURT: She's a member of Congress, Counsel.

MR. JANKOWSKI: Exactly. To the extent that anybody might in a similar position have access to the meeting, it will be possible.

The informational harm that the Congresswoman alleges she's suffering now, they have also failed to show that the harm will be imminent and irreparable because there will be information provided at the meeting, and the right to dictate what information, again, like Your Honor noted, appears in many ways like a civil discovery request.

THE COURT: Can you make any representations as to what information or what is the nature of the information

and the format of the information that you anticipate will be provided at this meeting?

MR. JANKOWSKI: I can't make anything firm -- any firm commitments other than to say there will be information, much of which was already discussed with the buildings and grounds committee about things. My understanding -- again, subject to how information might be added between now and then, my understanding is there should be information about budget. There should be information about the extent of the renovations, proposed renovations, to the center, the extent of the closure that might exist.

But I can't get into --

THE COURT: And I read somewhere that the President threw out the figure of $200 million. Is that -- is that ballpark? You probably don't know.

MR. JANKOWSKI: Well, Your Honor, there was an appropriations passed by Congress for $257 million of capital repair. And that's where the funds for this project are coming from.

THE COURT: Okay.

MR. JANKOWSKI: And I should note, to the extent that that's at all relevant, that's exactly the authority that the center is using to proceed with proposed -- with proposed renovations.

And, I'm sorry, I'll duck back to the merits a

little bit, but this might be prefacing slightly construction arguments. But in terms of the duties that the board possesses, my friend very well makes the point that this is a living memorial to John F. Kennedy, to President Kennedy. And of course the board shall -- under the statute, 76*j*, "The board shall present classical and contemporary music."

I'll point you to a little bit further down in that provision, Your Honor, which is Subsection *g*, "With respect to the building and site of the John F. Kennedy Center for the Performing Arts, plan, design, and construct each capital repair, replacement, improvement, rehabilitation, alteration or modification necessary to maintain the functionality of the building and site at current standards of life, safety, security, and accessibility."

And then the next provision that might be relevant is also "to provide all necessary maintenance, repair, and alteration for the operations of the building and site in a manner consistent with requirements for high-quality operations."

THE COURT: Right. And so that's the nub of the merits of the case. Right? Whether or whatever it is that is being planned is consistent with those authorizations, those statutory authorizations, or are they in excess of

them? And if they are consistent with the authorizations, a trustee might vote yay. If they are inconsistent with the authorizations, a trustee might vote nay. And in order to decide whether it's yay or nay, doesn't she need the documents to do that? Isn't that -- that's why we're here, right?

MR. JANKOWSKI: And that's why she'll have those documents, material facts, relevant --

THE COURT: Okay.

MR. JANKOWSKI: -- reasonable and material facts relevant to that decision at the meeting on Monday.

THE COURT: Okay.

MR. JANKOWSKI: As they will be provided to all trustees, all other trustees other than those on the buildings and grounds committee, I might add, which we think is also an important -- an important point here. This -- my friend cites the *Cummock* case and the FACA context, the Federal Advisory Commission context. And even there the D.C. Circuit, I think it was at the end of the *Cummock* opinion, made clear that the relief available wasn't necessarily to provide all and any information to the complaining party in that particular instance that she might request.

Of course, a right to dissent is protected under that case law, but only because that right to dissent is

enjoyed by every single member of the board, the commission, that was at issue in that case.

THE COURT: All right. I've not looked at that. I'll take a look at *Cummock*.

All right. Thank you.

MR. JANKOWSKI: Thank you, Your Honor.

THE COURT: Brief rebuttal?

MR. ZELINSKY: Thank you, Your Honor. I promise to both be brief and speak slowly. I confess I feel a little bit like I'm through the looking glass. I have some very quick points.

First, on the *Family Federation for World Peace* case, it just really -- look at the 2015 one. My friend pointed you to Footnote 18. If you look at Footnote 16, the Court expressly adopts the rule under D.C. law that co-trustees can sue one another.

THE COURT: I'm sorry, go -- say that again.

MR. ZELINSKY: *Family Federation* -- there's two *Family Federations*. The 2015 *Family Federation*, my friend pointed out --

THE COURT: This is the Unification Church?

MR. ZELINSKY: Yes.

So my friend says this means you can only go by special interest standing. That's just not true. If you look at Footnote 16 -- so that's two footnotes up from where

my friend pointed to -- the D.C. Court of Appeals says, "In addition to finding that the ousted directors have special interest standing, we also conclude that they fall within the definition of 'among others' in the D.C. code for enforcement and charitable trusts and may maintain a proceeding to enforce a trust. The District of Columbia is one of many jurisdictions that adopted the Uniform Trust Code, which establishes that when co-trustees are appointed to act as its stewards," I mean, it goes on and adopts that view.

THE COURT: I'll take a look.

MR. ZELINSKY: And the reason -- by the way, just to put a point on it -- why the 2025 one doesn't talk about the co-director standing is because those parties, my understanding is, had dropped out of the case by that point. So that's why the second *Family Federation* case doesn't talk about that theory of standing.

I would just point out we also fervently believe that we can satisfy Special Interest Standing 2 even if we had to. We're in a small defined class of people. That's the first test of special interest standing. And, yeah, we think this is really existential, Your Honor.

THE COURT: Perhaps I should have asked your colleague this, but she's also a public official.

MR. ZELINSKY: Yes.

THE COURT: She's not a public official designated by state law, like the Attorney General, to file suit, but does she not also have a representational interest?

MR. ZELINSKY: That's why they put her on the board. That's why we have members of Congress on the board.

Your Honor, I want to just, if I can, hammer home some of the things my friend said about the information.

He suggested they can't provide information because it might not yet be accurate. By their own admission, they're engaged in preliminary construction. They should have things like budgets, blueprints. I mean, there was supposedly a one-year review.

THE COURT: Where do they admit that?

MR. ZELINSKY: The LaFauci declaration. It says, "We're doing preliminary work."

THE COURT: Okay.

MR. ZELINSKY: So this is happening now. I mean, and so the idea that we don't have this information -- there was supposedly a one-year review that was conducted by the President. If there wasn't, they should tell us. If there was, we should get the review.

And I would also point out this is not a lowest common denominator situation where you just get whatever the chair of the board decides what you get. I'll point you to the *Benedict* case. Even where a majority can outvote you,

you still get the information. This is not a circumstance where the majority of the board acts as sort of tyranny.

I have two other points, and I don't want to belabor myself or take your time, but I would point you very briefly to the statute involving -- I don't have it right with me, but the statute involving the Smithsonian. The statute involving the Smithsonian is incredibly powerful evidence for when Congress intends to enable a board to engage in structural changes. What it says is, "The Regents of the Smithsonian may modify number of members, manner of appointment of members, or tenure of members of boards and commissions within their jurisdiction, except for the Kennedy Center," and one or two other boards.

That's the type of language, not vague terms like "organization and procedure," when Congress wants to give structural power to change composition and fundamental powers.

What they're trying to do is take a mouse hole, organization and procedure, and jam a massive elephant into it. That's not how Congress writes statutes. When Congress wants to give that kind of power, it does so expressly.

And then I would make one final -- two final points.

The first is that, just as a factual matter, my client has never been excluded from a meeting even when

they've gone into executive session. So I just -- I have some deep concerns with sort of the historical record that may be in front of you.

And then I would just end on the speaking front. My friend on the other side did not give any assurance that the vice chair or the treasurer is going to actually let my client speak. She was prohibited from speaking in 2025. The government has not promised her that she can speak. They're going to try to silence dissent. That's what happened before, and we think your intervention is urgently needed.

THE COURT: Okay. Thank you.

MR. ZELINSKY: Thank you, Your Honor.

THE COURT: All right. The Court will take the motion under advisement, and I usually tell folks we'll get something out sooner rather than later, but that's got to be the case in this one so stay tuned.

And we'll stand in recess.

(Whereupon the hearing was adjourned at 4:29 p.m.)

**CERTIFICATE OF OFFICIAL COURT REPORTER**

I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 12th day of March, 2026.

/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001

## $

**$200** [1] - 63:14
**$257** [1] - 63:17

## '

**'among** [1] - 67:4

## /

**/s/Lisa** [1] - 71:10

## 1

**1)** [1] - 50:20
**1100** [1] - 1:20
**12** [4] - 1:5, 29:11, 32:14, 47:1
**12(b)(6** [1] - 60:20
**12:30** [1] - 56:9
**12th** [1] - 71:8
**13** [2] - 29:11, 47:22
**1331** [5] - 9:4, 9:7, 9:12, 9:23, 9:24
**14** [1] - 47:23
**15** [1] - 47:23
**15180** [1] - 1:16
**16** [2] - 66:14, 66:25
**1627(b)** [1] - 48:10
**16th** [1] - 3:6
**1717** [1] - 1:13
**18** [3] - 60:6, 60:7, 66:14
**1994** [6] - 25:19, 25:24, 30:6, 49:20, 51:6, 51:25
**1:25-cv-4480-CRC** [1] - 1:3
**1st** [5] - 13:23, 14:15, 14:24, 40:11, 41:5

## 2

**2** [3] - 33:23, 48:2, 67:19
**20** [3] - 6:25, 40:2, 46:7
**20001** [2] - 1:25, 71:13
**20003** [1] - 1:17
**20006** [1] - 1:14
**2015** [3] - 60:2, 66:13, 66:19
**202** [4] - 1:14, 1:17, 1:21, 1:25
**2022** [1] - 52:25
**2025** [11] - 1:5, 24:7, 27:18, 28:4, 52:6, 52:24, 54:7, 60:3, 60:18, 67:13, 70:7
**2026** [1] - 71:8
**20530** [1] - 1:21
**24** [1] - 32:14
**25-4480** [1] - 2:3
**27** [1] - 60:18
**28** [1] - 60:18

## 3

**3** [2] - 6:19, 6:20
**30** [1] - 24:2
**333** [2] - 1:24, 71:12
**353-7578** [1] - 1:21
**354-3187** [1] - 1:25
**3:04** [1] - 1:5

## 4

**40** [1] - 23:18
**4:00** [1] - 55:17
**4:29** [1] - 70:20

## 5

**521-8750** [1] - 1:14
**594-9958** [1] - 1:17

## 6

**600** [1] - 1:16
**6718** [2] - 1:24, 71:12

## 7

**7** [1] - 48:10
**76** [3] - 7:5, 40:2
**76h** [1] - 46:25
**76j** [1] - 64:6
**76k(e** [1] - 8:13
**76l** [6] - 10:22, 12:7, 19:7, 45:11, 46:6, 46:7
**76l(a** [1] - 28:6
**76l(b** [3] - 8:17, 8:22, 10:13
**76l(b)** [2] - 6:25, 7:6

## 8

**803(a)(1)(E** [1] - 48:2

## A

**ability** [4] - 13:10, 18:22, 30:2, 71:7
**able** [9] - 3:5, 17:6, 20:1, 23:1, 25:3, 40:15, 43:25, 53:5, 56:8
**absence** [1] - 52:15
**absent** [1] - 62:1
**absolutely** [2] - 49:15, 50:7
**access** [18] - 5:20, 6:17, 7:2, 7:16, 11:25, 12:3, 18:23, 19:23, 20:1, 24:14, 24:19, 34:23, 38:13, 39:9, 39:12, 39:21, 62:9, 62:16
**accessibility** [1] - 64:16
**accident** [3] - 11:16, 11:17, 11:19
**accurate** [5] - 37:20, 55:16, 56:6, 68:9, 71:5
**act** [1] - 67:9
**action** [18] - 6:12, 7:3, 7:8, 8:8, 8:12, 9:2, 9:7, 9:10, 10:4, 10:12, 22:5, 42:5, 42:14, 42:15, 44:12, 55:10, 57:17, 59:19
**actions** [5] - 6:13, 8:14, 34:17, 55:9, 59:8
**activities** [1] - 50:6
**acts** [1] - 69:2
**acutely** [1] - 34:17
**add** [3] - 32:5, 32:17, 65:15
**added** [3] - 49:20, 51:6, 63:8
**adding** [2] - 25:22, 25:24
**addition** [2] - 25:17, 67:2
**additional** [2] - 5:1, 51:5
**address** [5] - 32:24, 38:4, 39:6, 49:1, 49:7
**adjourned** [1] - 70:20
**adjourns** [2] - 53:7
**administer** [3] - 22:16, 42:6, 42:7
**administered** [2] - 45:13, 46:11
**administering** [2] - 61:24, 62:2
**administration** [4] - 28:8, 42:11, 47:8, 50:6
**admission** [2] - 14:24, 68:10
**admit** [1] - 68:13
**adopted** [3] - 13:2, 57:1, 67:7
**adopts** [2] - 66:15, 67:9
**advance** [2] - 5:15, 14:3
**advanced** [3] - 34:5, 34:6, 43:9
**adverse** [1] - 52:17
**advisement** [1] - 70:15
**advisory** [1] - 65:18
**affairs** [1] - 51:20
**affected** [1] - 34:17
**affidavits** [1] - 37:14
**afternoon** [14] - 2:7, 2:12, 4:12, 4:13, 5:5, 5:6, 11:21, 41:15, 41:17, 41:24, 55:17, 55:18, 56:1
**agencies** [1] - 55:9
**agency** [3] - 8:15, 32:3, 32:4
**agency's** [1] - 34:16
**agenda** [3] - 14:9, 15:7, 55:20
**ago** [1] - 33:1
**agree** [4] - 10:16, 19:10, 23:21, 38:17
**ahead** [1] - 61:8
**air** [2] - 11:16, 11:19
**akin** [1] - 29:15
**al** [2] - 1:6, 2:4
**Alex** [1] - 2:10
**alleged** [5] - 9:5, 34:14, 38:9, 42:16, 58:12
**alleges** [3] - 38:5, 43:1, 62:19
**allow** [3] - 5:1, 10:20, 29:8
**allowed** [8] - 3:10, 3:11, 3:22, 4:7, 5:23, 25:1, 25:15
**allowing** [1] - 59:13
**alone** [1] - 33:10
**alter** [2] - 5:11, 27:4
**alteration** [2] - 64:13, 64:19
**alternative** [1] - 45:22
**amended** [2] - 2:22, 6:19
**amending** [1] - 29:16
**American** [2] - 15:15, 35:18
**amount** [1] - 20:2
**analog** [2] - 22:1, 38:19
**analyses** [3] - 13:25, 15:19, 37:19
**analysis** [2] - 37:19, 37:21
**analytical** [2] - 24:14, 24:17
**announced** [1] - 2:24
**answer** [9] - 10:25, 13:4, 19:24, 31:5, 32:7, 32:9, 32:10, 35:14, 35:15
**answers** [3] - 12:21, 33:6, 33:8
**anticipate** [1] - 63:1
**antithesis** [1] - 18:8
**apart** [1] - 17:22
**apologize** [5] - 11:19, 21:7, 33:7, 33:8, 35:14
**apparent** [1] - 33:21
**Appeals** [1] - 67:1
**appear** [2] - 48:4, 61:1
**APPEARANCES** [1] - 1:11
**appellants** [1] - 60:20
**applies** [2] - 55:10, 58:11
**apply** [1] - 45:23
**appointed** [2] - 32:15, 67:8
**appointment** [3] - 47:4, 50:17, 69:11
**approach** [1] - 2:5
**appropriate** [1] - 57:11
**appropriations** [1] - 63:17
**area** [3] - 35:19, 37:13, 59:4
**argue** [4] - 49:12, 49:24, 59:1
**arguing** [2] - 8:11, 45:14
**argument** [16] - 7:20, 9:8, 9:17, 16:21, 17:18, 18:18, 28:13, 29:3, 30:14, 32:25, 38:2, 45:3, 47:12, 49:7, 54:18, 59:24
**arguments** [6] - 45:5, 45:20, 45:23, 51:10, 56:25, 64:2
**arising** [1] - 9:4
**Article** [5] - 21:18, 22:7, 22:9, 39:23, 59:11
**articulate** [2] - 18:14, 19:17
**articulating** [1] - 22:10
**arts** [3] - 15:15, 43:8, 64:11
**aspect** [1] - 23:9
**asserted** [1] - 42:25
**assertion** [1] - 43:17
**assertions** [1] - 57:7
**assess** [1] - 43:2
**assessing** [1] - 55:8
**association** [1] - 34:13
**assume** [2] - 17:3, 19:1

**assuming** [5] - 17:8, 19:1, 20:25, 42:14, 56:24
**assumption** [1] - 21:21
**assurance** [1] - 70:5
**assured** [1] - 61:22
**attend** [3] - 3:5, 61:17, 62:11
**attendant** [1] - 14:7
**attended** [1] - 53:3
**attention** [2] - 20:5, 20:6
**Attorney** [1] - 68:2
**atypical** [1] - 13:19
**authority** [5] - 30:19, 31:19, 32:3, 48:13, 63:22
**authorizations** [4] - 64:24, 64:25, 65:1, 65:3
**authorized** [1] - 49:2
**available** [7] - 6:12, 6:16, 35:21, 42:4, 43:18, 55:5, 65:20
**Ave** [1] - 1:16
**Avenue** [2] - 1:24, 71:12
**AVI** [1] - 1:12
**awareness** [1] - 51:16

## B

**b)(1** [1] - 50:20
**backdrop** [4] - 8:3, 10:12, 21:11, 26:16
**background** [3] - 30:14, 31:7, 31:8
**backing** [1] - 16:2
**backstop** [1] - 10:13
**backup** [2] - 10:7, 36:19
**balance** [2] - 54:20, 61:6
**ballpark** [1] - 63:15
**bar** [1] - 24:2
**barred** [3] - 23:23, 24:6, 24:7
**based** [4] - 26:7, 35:4, 38:19, 60:12
**basis** [3] - 4:10, 34:15, 58:7
**bear** [1] - 62:8
**bears** [1] - 24:17
**Beatty** [11] - 2:3, 2:8, 2:9, 3:5, 3:16, 4:3, 4:18, 17:5, 33:4, 42:3, 60:13
**BEATTY** [1] - 1:2
**became** [1] - 33:21
**become** [1] - 57:3
**BEFORE** [1] - 1:10
**beforehand** [3] - 13:15, 17:14, 39:7
**beginning** [3] - 13:25, 23:12, 52:24
**behalf** [1] - 2:8
**behoove** [1] - 4:21
**belabor** [1] - 69:4
**Benedict** [3] - 7:14, 16:13, 68:25
**beneficial** [1] - 5:18
**beneficiaries** [1] - 59:14
**beneficiary** [2] - 57:22, 57:25
**beneficiary's** [1] - 58:2
**best** [5] - 8:21, 36:6, 41:18, 41:23, 71:6
**between** [1] - 63:8
**beyond** [1] - 15:7
**big** [1] - 43:6
**bimonthly** [1] - 29:23
**binder** [1] - 55:25
**binding** [1] - 57:12
**bit** [7] - 34:9, 35:15, 47:13, 56:19, 64:1, 64:8, 66:10
**black's** [1] - 30:21
**Black's** [1] - 30:24
**bleed** [1] - 3:13
**blessed** [1] - 57:2
**blue** [1] - 41:5
**blueprints** [3] - 14:1, 15:19, 68:11
**Board** [3] - 50:16, 50:21, 50:24
**board** [94] - 3:6, 4:5, 5:7, 6:24, 8:13, 8:14, 12:10, 12:15, 14:3, 15:13, 15:18, 17:20, 18:10, 23:17, 24:9, 24:20, 24:21, 25:23, 26:24, 27:4, 27:5, 28:6, 28:11, 29:3, 29:4, 29:11, 29:17, 30:2, 30:5, 30:11, 31:15, 35:21, 36:25, 37:2, 37:7, 37:15, 38:11, 40:3, 40:4, 40:5, 41:4, 41:6, 42:10, 42:12, 43:4, 43:14, 43:19, 43:24, 44:2, 44:8, 44:9, 44:13, 44:16, 45:11, 45:19, 46:1, 46:3, 46:9, 46:20, 46:22, 46:25, 47:16, 48:3, 48:6, 48:21, 49:2, 49:24, 50:10, 50:11, 50:13, 51:1, 51:17, 52:3, 53:2, 53:6, 53:10, 53:12, 53:16, 55:6, 55:11, 55:12, 56:4, 56:8, 64:3, 64:5, 64:6, 66:1, 68:5, 68:24, 69:2, 69:8
**board's** [7] - 31:19, 42:7, 43:16, 44:20, 47:8, 49:13, 61:19
**boards** [15] - 12:23, 13:19, 24:25, 26:25, 27:3, 28:18, 31:20, 32:1, 36:15, 37:19, 41:5, 48:1, 50:18, 69:11, 69:13
**body** [1] - 53:20
**Bogert** [2] - 57:4, 58:23
**bolt** [1] - 41:4
**Borda** [3] - 15:10, 35:16, 37:8
**bottom** [1] - 42:5
**bound** [2] - 40:20, 58:17
**bounds** [2] - 22:6, 47:17
**branch** [1] - 2:14
**breach** [7] - 7:23, 22:1, 24:22, 45:21, 56:24, 58:21
**breached** [1] - 17:13
**breaching** [1] - 17:16
**breaking** [1] - 13:6
**breathing** [1] - 5:1
**breathtaking** [1] - 41:3
**brief** [8] - 4:13, 11:12, 23:1, 34:14, 47:23, 61:11, 66:7, 66:9
**briefing** [1] - 11:20
**briefly** [2] - 38:4, 69:5
**briefs** [2] - 25:21, 30:14
**Bright** [1] - 32:6
**bring** [5] - 9:20, 56:3, 59:7, 59:8, 59:12
**bringing** [2] - 9:22, 45:21
**brings** [1] - 42:5
**brought** [4] - 6:18, 6:20, 34:18, 50:10
**buckets** [1] - 5:20
**budget** [2] - 55:2, 63:9
**budgets** [4] - 14:1, 15:19, 37:22, 68:11
**building** [7] - 17:22, 36:4, 36:16, 54:23, 64:10, 64:14, 64:19
**buildings** [4] - 35:5, 55:11, 63:6, 65:15
**bulldozers** [2] - 20:16, 40:24
**bullet** [1] - 15:7
**bunch** [1] - 12:9
**burden** [2] - 36:9, 58:17
**burdensome** [1] - 36:13
**business** [1] - 3:13
**bylaws** [4] - 28:7, 42:10, 48:21, 49:3

## C

**CA** [1] - 1:3
**candidly** [2] - 31:3, 36:3
**cannot** [2] - 20:3, 22:17
**capital** [2] - 63:18, 64:12
**carefully** [1] - 37:17
**case** [32] - 2:3, 3:14, 7:15, 9:5, 11:7, 11:13, 16:13, 16:25, 18:15, 21:10, 21:13, 21:17, 21:21, 22:20, 26:14, 27:25, 34:13, 42:20, 51:24, 54:12, 59:5, 59:22, 64:23, 65:17, 65:25, 66:2, 66:13, 67:15, 67:16, 68:25, 70:17
**cases** [6] - 7:19, 21:17, 24:23, 58:11, 60:2, 61:2
**cast** [1] - 4:7
**categorical** [1] - 24:2
**categorically** [3] - 23:23, 24:6
**causation** [1] - 38:4
**causes** [2] - 6:11, 6:13
**caveat** [1] - 4:2
**Center** [8] - 2:23, 5:9, 27:1, 27:2, 27:5, 27:24, 30:8, 69:13
**center** [12] - 2:24, 3:8, 5:11, 22:18, 27:17, 39:8, 43:8, 50:13, 56:12, 63:11, 63:23, 64:11
**center's** [2] - 51:1, 51:23
**certain** [9] - 22:21, 30:7, 39:24, 45:20, 47:24, 50:4, 50:5, 53:16
**certainly** [1] - 32:9
**CERTIFICATE** [1] - 71:1
**certify** [1] - 71:4
**chair** [10] - 3:24, 17:5, 23:17, 29:7, 43:25, 56:11, 61:25, 62:1, 68:24, 70:6
**chair's** [1] - 23:11
**challenges** [1] - 2:22
**challenging** [5] - 34:15, 57:16, 59:19, 60:8, 60:15
**change** [9] - 2:23, 18:6, 21:4, 27:2, 32:2, 32:3, 32:25, 33:22, 69:16
**changed** [2] - 18:12, 33:18
**changes** [2] - 31:23, 69:9
**changing** [1] - 60:8
**characterized** [1] - 45:6
**charged** [2] - 22:14, 22:15
**charitable** [4] - 12:15, 44:12, 59:8, 67:5
**chartered** [3] - 12:15, 42:9, 48:12
**Chevron** [1] - 32:6
**chewing** [1] - 4:19
**chicken** [1] - 24:1
**choice** [2] - 40:11, 48:18
**chose** [2] - 26:5, 50:24
**CHRISTOPHER** [1] - 1:10
**chronologically** [1] - 6:2
**church** [1] - 66:21
**Church** [1] - 60:10
**Circuit** [6] - 11:7, 11:25, 13:5, 33:14, 57:2, 65:19
**Circuit's** [1] - 33:10
**circumstance** [8] - 7:12, 10:14, 11:14, 15:13, 15:16, 33:15, 37:16, 69:1
**circumstances** [4] - 6:7, 32:18, 35:22, 44:11
**citation** [1] - 11:11
**citations** [1] - 59:5
**cite** [1] - 11:7
**cited** [5] - 7:19, 24:23, 25:21, 47:22, 57:21
**cites** [3] - 47:14, 48:10, 65:17
**civil** [3] - 2:3, 35:3, 62:23

**claim** [12] - 6:18, 6:20, 7:24, 9:4, 9:5, 9:21, 9:24, 9:25, 10:4, 10:7, 10:19, 20:22
**Claim** [2] - 6:19, 6:20
**claims** [9] - 6:11, 6:12, 19:2, 21:2, 45:22, 57:7, 57:14, 59:12, 60:19
**class** [2] - 59:14, 67:20
**classes** [2] - 49:14, 49:23
**classic** [9] - 7:1, 7:12, 9:7, 9:23, 10:14, 10:17, 21:12, 24:21, 24:22
**classical** [1] - 64:6
**classics** [1] - 7:11
**clear** [17] - 14:10, 14:16, 19:7, 26:2, 33:10, 33:19, 40:4, 42:16, 45:4, 45:7, 45:24, 46:21, 47:15, 48:11, 54:19, 58:11, 65:20
**clearest** [1] - 32:9
**cleave** [1] - 21:16
**client** [3] - 61:23, 69:25, 70:7
**clients** [1] - 56:16
**close** [2] - 14:18, 24:1
**closed** [1] - 39:3
**closure** [9] - 2:24, 3:6, 3:8, 14:10, 15:3, 19:2, 21:5, 38:7, 63:11
**clue** [1] - 51:7
**clues** [1] - 50:12
**co** [6] - 7:13, 58:4, 60:14, 66:15, 67:8, 67:14
**co-director** [1] - 67:14
**co-trustee** [2] - 58:4, 60:14
**co-trustees** [1] - 67:8
**Code** [2] - 31:9, 31:10
**code** [2] - 67:4, 67:8
**collapses** [1] - 28:13
**colleague** [1] - 67:24
**colleague's** [1] - 49:1
**colleagues** [2] - 2:9, 19:18
**collective** [2] - 46:22, 46:25
**Columbia** [1] - 67:6
**COLUMBIA** [1] - 1:1
**combination** [1] - 8:17
**coming** [3] - 2:21, 18:2, 63:19
**comment** [1] - 17:6
**comments** [2] - 17:5, 44:18
**commission** [9] - 11:15, 11:24, 12:3, 12:5, 17:23, 54:19, 65:18, 66:1
**commissions** [2] - 50:18, 69:12
**commitments** [1] - 63:4
**committed** [1] - 43:15
**committee** [11] - 35:5, 35:6, 36:15, 36:16, 36:17, 36:18, 36:19, 54:24, 55:12, 63:6, 65:15
**common** [20] - 7:13, 7:19, 7:23, 8:5, 8:7, 10:11, 10:12, 21:11, 21:13, 21:17, 21:23, 22:4, 22:5, 22:7, 22:8, 24:23, 46:2, 59:4, 68:23
**comparable** [2] - 15:13, 37:11
**complaining** [1] - 65:22
**complaint** [4] - 2:22, 6:11, 6:19, 33:24
**complete** [1] - 71:6
**complicated** [1] - 59:5
**comply** [2] - 36:7, 40:12
**composed** [1] - 47:2
**composition** [2] - 27:3, 69:16
**comprehensive** [1] - 13:24
**conceptual** [1] - 55:4
**concern** [3] - 9:11, 23:11, 25:17
**concerns** [7] - 5:8, 14:7, 19:22, 23:8, 23:24, 59:13, 70:2
**concerts** [1] - 40:6
**conclude** [1] - 67:3
**conclusion** [1] - 53:22
**conduct** [1] - 12:11
**conducted** [2] - 13:23, 68:19
**conducting** [1] - 52:19
**conference** [1] - 4:12
**confess** [1] - 66:9
**confirmed** [1] - 60:16
**confirms** [4] - 8:16, 8:18, 8:23, 27:24
**conflicting** [1] - 51:21
**confuse** [1] - 30:25
**confused** [1] - 31:5
**Congress** [42] - 5:12, 7:17, 8:2, 11:4, 13:1, 19:19, 21:15, 25:14, 25:16, 25:22, 26:4, 26:6, 26:8, 26:19, 26:23, 27:1, 29:2, 30:4, 30:6, 31:9, 31:24, 32:2, 32:11, 45:25, 46:2, 47:16, 47:24, 48:17, 48:19, 49:17, 49:19, 50:12, 50:24, 51:7, 51:16, 62:14, 63:17, 68:5, 69:8, 69:15, 69:20
**Congress's** [1] - 8:19
**congressional** [10] - 12:9, 12:11, 19:20, 19:21, 20:6, 30:3, 30:7, 30:9, 30:11, 32:8
**congressionally** [2] - 12:15, 48:12
**congressmen** [1] - 30:4
**Congresswoman** [15] - 2:8, 2:9, 3:5, 3:16, 4:3, 4:18, 16:1, 17:5, 18:13, 33:4, 34:3, 47:14, 56:21, 61:12, 62:18
**Congresswoman's** [5] - 44:6, 45:5, 47:12, 57:14, 62:9
**conjunctive** [1] - 59:25
**connect** [1] - 6:10
**consequence** [1] - 33:20
**consider** [2] - 9:17, 44:2
**consideration** [1] - 4:2
**considered** [2] - 5:25, 53:17
**consistent** [3] - 64:20, 64:24, 65:1
**constantly** [1] - 59:14
**constitutes** [1] - 71:4
**Constitution** [2] - 1:24, 71:12
**construct** [1] - 64:11
**construction** [10] - 13:17, 14:5, 14:11, 14:25, 15:2, 19:3, 21:4, 38:24, 64:2, 68:10
**consult** [1] - 52:13
**contains** [1] - 8:12
**contemplated** [1] - 14:11
**contemporary** [1] - 64:7
**contested** [1] - 9:2
**context** [3] - 26:16, 65:17, 65:18
**continue** [2] - 14:18, 20:23
**contours** [1] - 21:12
**contract** [1] - 36:22
**contractors** [1] - 55:3
**contracts** [1] - 37:22
**controversy** [2] - 21:17, 21:24
**conversation** [1] - 42:1
**COOPER** [1] - 1:10
**core** [6] - 16:11, 21:20, 23:3, 26:17, 44:13, 49:8
**corporate** [1] - 28:20
**correct** [10] - 45:1, 46:12, 48:15, 49:21, 53:18, 55:19, 57:21, 57:23, 60:1, 62:6
**Counsel** [2] - 36:14, 62:14
**Count** [1] - 33:23
**counter** [1] - 10:15
**couple** [8] - 4:25, 9:14, 9:16, 22:11, 26:14, 33:6, 41:25, 57:4
**course** [8] - 36:17, 44:12, 45:20, 50:3, 51:10, 53:13, 64:5, 65:24
**Court** [28] - 1:23, 1:23, 5:14, 5:18, 7:4, 9:3, 9:6, 9:11, 12:19, 21:11, 22:3, 23:10, 24:1, 27:8, 33:17, 33:23, 33:25, 34:14, 34:21, 35:11, 42:6, 42:13, 44:8, 56:18, 66:15, 67:1, 70:14, 71:11
**court** [7] - 7:8, 7:16, 7:20, 7:22, 8:15, 12:17, 33:4
**COURT** [145] - 1:1, 2:11, 2:15, 2:18, 5:6, 5:19, 6:4, 6:8, 6:22, 7:5, 7:7, 7:18, 8:11, 9:13, 9:16, 10:2, 10:18, 11:9, 11:12, 11:17, 11:20, 12:13, 14:8, 14:17, 14:21, 15:4, 16:6, 16:10, 16:20, 17:3, 17:10, 17:19, 18:17, 19:1, 19:14, 20:23, 21:23, 21:25, 23:5, 23:15, 23:20, 24:10, 24:13, 25:5, 25:8, 26:3, 26:10, 28:18, 29:10, 29:13, 30:13, 30:19, 31:14, 32:24, 33:3, 33:12, 34:23, 35:2, 35:9, 36:14, 36:24, 37:4, 37:23, 38:1, 38:17, 38:23, 39:2, 39:5, 39:15, 39:18, 40:17, 41:8, 41:10, 41:12, 41:17, 41:21, 42:14, 43:5, 44:10, 44:16, 44:24, 45:9, 46:4, 46:9, 46:13, 46:15, 46:22, 47:10, 48:11, 48:16, 48:19, 48:25, 49:5, 49:17, 49:19, 50:1, 51:4, 52:4, 52:12, 52:21, 53:1, 53:15, 53:24, 54:4, 54:9, 54:16, 54:20, 55:17, 55:20, 56:8, 56:23, 57:15, 57:19, 57:24, 58:2, 58:6, 58:9, 58:14, 58:22, 59:23, 60:7, 60:12, 60:23, 61:8, 62:4, 62:7, 62:14, 62:24, 63:13, 63:20, 64:22, 65:9, 65:12, 66:3, 66:7, 66:17, 66:21, 67:11, 67:23, 68:1, 68:13, 68:16, 70:12, 70:14, 71:1
**court's** [1] - 6:13
**Court's** [3] - 4:2, 5:17, 9:23
**Courthouse** [2] - 1:24, 71:11
**COURTROOM** [1] - 2:2
**created** [2] - 48:12, 49:19
**crew** [1] - 36:4
**critical** [3] - 15:22, 16:15, 17:2
**CRR** [3] - 1:23, 71:3, 71:10
**crystal** [1] - 26:2
**Cummock** [10] - 11:7, 11:10, 11:23, 13:5, 16:25, 18:15, 65:17, 65:19, 66:4
**curated** [1] - 37:18
**current** [4] - 51:19, 51:20, 60:24, 64:15
**customary** [1] - 45:1
**cuts** [1] - 28:2

## D

**D.C** [17] - 1:4, 9:20, 11:7, 11:25, 13:5, 33:10, 57:1, 57:10, 58:11, 58:22, 59:1, 59:16, 61:1, 65:19, 66:15, 67:1, 67:4
**data** [1] - 16:19
**Dated** [1] - 71:8
**David** [1] - 2:10
**days** [3] - 9:14, 19:11, 57:4
**DC** [5] - 1:14, 1:17, 1:21, 1:25, 71:13
**deal** [1] - 43:6
**dealing** [2] - 36:17, 49:4
**deals** [1] - 40:3
**dealt** [1] - 48:21
**Deborah** [1] - 15:10
**December** [2] - 24:7, 34:21
**decide** [5] - 19:15, 29:5, 31:16, 65:4
**decides** [2] - 55:11, 68:24
**decision** [5] - 4:15, 17:12, 20:7, 34:21, 65:11
**decisions** [1] - 53:12
**decisively** [1] - 28:2
**declaration** [13] - 15:9, 15:14, 27:13, 27:18, 27:20, 27:23, 35:16, 35:18, 37:8, 37:9, 52:5, 52:7, 68:14
**declarations** [2] - 35:20, 37:15
**deep** [1] - 70:2
**Defendant** [1] - 34:4
**defendant's** [1] - 14:24
**defendants** [4] - 4:4, 4:21, 5:9, 31:4
**Defendants** [2] - 1:7, 1:19
**defendants'** [1] - 51:3
**DEFENDERS** [1] - 1:16
**defined** [1] - 67:20
**definition** [1] - 67:4
**delay** [2] - 33:10, 34:14
**delegation** [1] - 32:8
**deliberate** [1] - 16:18
**deliberation** [1] - 15:17
**delineate** [1] - 26:24
**DEMOCRACY** [1] - 1:16
**demolish** [1] - 5:11
**demolition** [1] - 13:17
**denial** [1] - 18:18
**denied** [2] - 18:23, 19:21
**denominator** [1] - 68:23
**deny** [2] - 33:11, 34:15
**DEPARTMENT** [1] - 1:20
**DEPUTY** [1] - 2:2
**description** [1] - 51:19
**deserves** [1] - 20:20
**design** [1] - 64:11
**designated** [1] - 68:1
**designs** [1] - 55:4
**desperately** [1] - 40:21
**despite** [1] - 51:8
**detail** [2] - 35:20, 37:14
**determine** [2] - 19:5, 43:10
**develop** [1] - 14:18
**deviate** [1] - 32:23
**dictate** [1] - 62:22
**difference** [1] - 60:25
**different** [1] - 49:14
**difficult** [2] - 14:2, 15:20
**diffusion** [1] - 36:25
**directly** [2] - 6:20, 10:15
**director** [3] - 48:3, 58:12, 67:14
**directors** [3] - 60:21, 60:23, 67:2
**disagree** [1] - 10:8
**discovery** [6] - 19:8, 19:9, 20:18, 20:21, 35:3, 62:23
**discretion** [7] - 3:23, 23:11, 43:16, 47:16, 47:18, 49:24, 54:19
**discretionary** [2] - 42:7, 50:14
**discussed** [1] - 63:5
**discussion** [2] - 6:14, 37:24
**dismissal** [1] - 60:18
**dismissed** [1] - 53:10
**dispositively** [1] - 56:21
**dispute** [1] - 54:10
**disputes** [1] - 28:14
**disputing** [1] - 9:9
**dissent** [8] - 17:1, 17:6, 17:11, 19:14, 19:18, 65:24, 65:25, 70:9
**dissenting** [2] - 12:14, 24:24
**distinct** [1] - 40:17
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [4] - 7:15, 12:19, 16:14, 67:6
**divest** [1] - 60:9
**doctrine** [2] - 8:6, 56:20
**document** [1] - 6:5
**documents** [18] - 7:2, 7:17, 10:20, 19:23, 20:7, 20:20, 27:15, 35:10, 36:11, 38:14, 38:15, 39:7, 39:10, 39:12, 52:23, 65:5, 65:8
**Donald** [1] - 2:3
**DONALD** [1] - 1:6
**done** [4] - 4:23, 34:11, 48:18, 59:21
**door** [1] - 20:16
**doubt** [1] - 8:23
**down** [10] - 5:9, 11:18, 22:19, 27:8, 27:9, 34:9, 40:1, 40:9, 40:15, 64:8
**draft** [1] - 14:8
**drawing** [1] - 36:22
**drew** [1] - 53:22
**drill** [2] - 27:8, 27:9
**dropped** [1] - 67:15
**duck** [1] - 63:25
**duties** [23] - 10:21, 10:24, 12:19, 13:11, 16:22, 17:16, 22:21, 30:7, 37:2, 38:7, 40:3, 42:16, 42:17, 44:1, 44:13, 44:15, 45:1, 45:7, 45:18, 47:6, 49:8, 56:4, 64:2
**duty** [12] - 7:23, 17:7, 17:13, 19:7, 22:2, 22:17, 22:18, 24:23, 42:19, 42:21, 56:25

## E

**east** [1] - 20:14
**East** [1] - 20:15
**education** [1] - 59:24
**Education** [1] - 34:13
**effect** [2] - 17:7, 34:20
**effectively** [3] - 20:9, 20:10, 28:3
**effects** [1] - 34:16
**eight** [1] - 48:9
**EISEN** [1] - 1:15
**Eisen** [1] - 2:9
**either** [4] - 10:10, 32:15, 35:22, 42:23
**elemental** [1] - 9:17
**elements** [2] - 44:5, 44:6
**elephant** [2] - 29:25, 69:19
**Elliott** [1] - 2:14
**ELLIOTT** [1] - 1:19
**embodied** [1] - 45:17
**emergency** [6] - 33:5, 34:2, 34:10, 41:2, 42:5, 52:19
**empowered** [1] - 28:7
**enable** [1] - 69:8
**enacted** [2] - 26:7, 33:1
**enacting** [1] - 26:9
**end** [2] - 65:19, 70:4
**enforce** [2] - 59:8, 67:6
**enforcement** [1] - 67:5
**engage** [1] - 69:9
**engaged** [1] - 68:10
**enjoin** [2] - 3:2, 38:24
**enjoyed** [1] - 66:1
**enormous** [1] - 20:4
**entails** [1] - 4:1
**entire** [1] - 20:12
**entirely** [1] - 12:4
**entitled** [5] - 4:3, 4:18, 6:9, 20:21, 35:11
**entity** [1] - 45:19
**entry** [1] - 30:21
**equities** [3] - 32:25, 54:21, 61:7
**especially** [3] - 4:24, 12:25, 20:3
**ESQ** [5] - 1:12, 1:12, 1:15, 1:19, 1:19
**essence** [1] - 19:19
**essentially** [1] - 7:22
**established** [1] - 11:15
**establishes** [1] - 67:8
**et** [2] - 1:6, 2:4
**everywhere** [2] - 31:9, 31:10
**evidence** [9] - 27:12, 27:13, 31:15, 32:21, 37:8, 51:3, 51:21, 52:4, 69:8
**evolution** [1] - 30:5
**ex** [28] - 3:12, 4:6, 12:9, 19:20, 25:14, 25:23, 26:1, 27:21, 27:25, 28:19, 28:22, 30:15, 30:22, 30:23, 30:25, 31:16, 47:2, 48:14, 49:19, 49:20, 51:5, 51:14, 51:25, 52:10, 52:11, 53:3, 53:9, 53:19
**exact** [3] - 44:25, 46:4, 51:13
**exactly** [8] - 44:4, 47:2, 51:21, 54:5, 60:11, 60:16, 62:15, 63:22
**example** [2] - 26:24, 35:25
**except** [2] - 45:15, 69:12
**excess** [1] - 64:25
**excluded** [1] - 69:25
**exclusively** [1] - 59:6
**executive** [8] - 34:15, 48:14, 53:8, 53:11, 53:12, 53:15, 53:18, 70:1
**exercise** [5] - 10:20, 16:16, 28:20, 37:1, 49:8
**exigency** [1] - 40:10
**exist** [3] - 36:1, 36:2, 63:11
**existence** [5] - 9:2, 10:3, 55:5, 57:17, 59:20
**existential** [2] - 24:8, 67:22
**expansion** [2] - 59:9, 59:12
**expansive** [1] - 50:14
**expect** [4] - 15:18, 21:15, 32:1, 52:12
**expected** [1] - 16:16
**expedited** [3] - 4:10, 11:20, 19:8
**explicitly** [2] - 47:24, 48:18
**expressly** [4] - 32:1, 43:13, 66:15, 69:21
**extending** [1] - 44:3
**extensive** [2] - 35:20, 37:14
**extent** [19] - 3:11, 4:3, 4:23, 5:22, 10:8, 18:11, 28:1, 32:18, 45:16, 50:3, 51:21, 52:8, 54:1, 54:17, 62:8, 62:15, 63:10, 63:11, 63:21
**extraordinary** [4] - 42:3, 57:17, 60:8, 60:15
**extremely** [2] - 4:10, 27:12

## F

**FACA** [1] - 65:17
**face** [1] - 32:8
**fact** [13] - 3:16, 13:13, 25:10, 25:11, 26:3, 26:22, 31:8, 31:14, 32:19, 39:6, 48:20, 51:8, 53:15
**factor** [3] - 33:12, 33:13, 33:14
**facts** [2] - 65:8, 65:10
**factual** [1] - 69:24
**failed** [1] - 62:19
**failure** [1] - 10:19
**fall** [2] - 50:7, 67:3
**familiar** [2] - 55:8, 57:3
**family** [8] - 58:10, 59:23, 60:17, 66:12, 66:18, 66:19, 67:16
**far** [2] - 4:23, 15:12
**favor** [2] - 34:25, 51:3
**February** [6] - 13:23, 14:15, 14:24, 34:3, 40:11, 41:5
**federal** [10] - 2:14, 7:8, 7:21, 7:22, 9:4, 9:6, 9:23, 12:17, 37:6, 65:18
**federally** [1] - 42:9
**federation** [7] - 34:12, 58:10, 60:17, 66:12, 66:18, 66:19, 67:16
**federations** [1] - 66:19
**fellow** [1] - 17:18
**felt** [1] - 34:17
**fervently** [1] - 67:18
**few** [1] - 12:21
**fiduciary** [11] - 7:23, 16:17, 16:22, 17:7, 17:13, 17:16, 18:9, 24:23, 44:1, 56:4, 58:21
**figure** [1] - 63:14
**file** [1] - 68:2
**filed** [4] - 3:1, 3:3, 4:10, 4:13
**filing** [1] - 3:15
**fill** [1] - 31:16
**final** [5] - 55:9, 55:10, 55:11, 69:22
**finally** [1] - 3:11
**finance** [1] - 36:16
**financial** [1] - 36:21
**firm** [2] - 63:3, 63:4
**first** [19] - 5:20, 6:15, 8:2, 9:1, 10:3, 11:1, 12:23, 14:23, 18:1, 19:17, 19:23, 22:13, 27:10, 33:9, 49:11, 60:4, 66:12, 67:21, 69:24
**flag** [1] - 23:12
**flip** [1] - 47:21
**focus** [1] - 28:9
**focused** [1] - 20:6
**folks** [3] - 2:19, 2:21, 70:15
**follow** [3] - 10:2, 22:11, 45:19
**follows** [1] - 44:8
**footing** [2] - 13:1, 30:17
**Footnote** [6] - 60:5, 60:6, 66:14, 66:25
**footnote** [2] - 60:7, 60:12
**footnotes** [1] - 66:25
**FOR** [1] - 1:1
**forceful** [1] - 19:18
**forecloses** [1] - 57:14
**foregoing** [1] - 71:4
**forfeitable** [2] - 9:3, 9:8
**forfeited** [1] - 9:8
**forget** [1] - 44:25
**forgive** [1] - 9:18
**forgiving** [1] - 13:10
**form** [2] - 2:25, 19:21
**format** [1] - 63:1
**former** [6] - 15:10, 27:21, 27:23, 35:17, 52:6, 60:23
**forms** [2] - 5:14, 21:1
**forward** [2] - 16:9, 39:6
**foundation** [1] - 29:9
**foundational** [3] - 28:11, 29:3, 58:19
**founding** [1] - 21:16
**four** [1] - 3:11
**framers** [1] - 21:16
**framework** [2] - 24:14, 24:17
**Freeny** [1] - 2:10
**FREENY** [1] - 1:12
**fresh** [1] - 2:21
**Friday** [3] - 3:15, 4:11, 55:17
**friend** [10] - 42:1, 50:15, 64:3, 65:17, 66:13, 66:19, 66:23, 67:1, 68:7, 70:5
**friends** [7] - 13:7, 18:5, 27:6, 32:12, 32:22, 50:10, 51:20
**front** [5] - 6:5, 23:1, 37:7, 70:3, 70:4
**fulfill** [2] - 42:21, 43:25
**fulfilled** [1] - 17:7
**full** [8] - 16:12, 16:15, 16:21, 23:8, 36:25, 47:18, 59:21, 71:5
**fully** [1] - 23:1
**function** [1] - 28:8
**functionality** [1] - 64:14
**functions** [1] - 42:7
**FUND** [1] - 1:16
**fundamental** [4] - 26:17, 32:2, 32:3, 69:16
**fundamentally** [1] - 60:8
**funds** [7] - 42:11, 45:13, 46:11, 46:19, 47:9, 63:18

## G

**gallery** [1] - 2:21
**game** [1] - 20:12
**gaps** [1] - 31:16
**gather** [1] - 53:5
**gathering** [1] - 4:22
**General** [1] - 68:2
**general** [5] - 10:23, 28:15, 47:3, 53:9, 53:20
**generality** [1] - 21:8
**generally** [3] - 13:9, 30:16, 53:6
**gestured** [1] - 36:9
**GIDEON** [1] - 1:12
**given** [9] - 4:20, 11:2, 19:23, 30:8, 30:21, 36:10, 44:9, 44:25, 62:13
**glad** [1] - 10:6
**glass** [1] - 66:10
**gobsmacking** [1] - 14:4
**gobsmaking** [1] - 30:10
**God** [1] - 33:17
**Gordon** [1] - 33:10
**Gore** [5] - 11:7, 11:10, 11:13, 13:5, 16:25
**govern** [1] - 43:14
**governance** [2] - 28:21, 29:14
**government** [14] - 4:8, 4:13, 9:1, 9:9, 13:22, 16:4, 25:21, 35:22, 36:2, 36:3, 41:3, 54:22, 61:11, 70:8
**government's** [4] - 3:21, 23:9, 32:24, 57:9
**granted** [1] - 61:13
**granting** [2] - 29:19, 50:14
**grants** [1] - 29:17
**Grenell** [1] - 34:4
**ground** [1] - 13:6
**grounds** [9] - 17:12, 17:22, 35:5, 36:4, 36:16, 54:24, 55:12, 63:6, 65:15
**GROUP** [1] - 1:13
**groups** [1] - 59:16
**guess** [1] - 31:18
**guidance** [1] - 5:17

## H

**hammer** [1] - 68:6
**hand** [1] - 29:5
**handful** [2] - 27:3, 28:15
**handle** [1] - 41:7
**happy** [2] - 56:19, 61:6
**harkened** [1] - 13:2
**harkening** [1] - 11:5
**harm** [16] - 16:7, 18:19, 19:25, 20:3, 33:15, 40:15, 40:18, 43:1, 55:5, 61:6, 61:9, 61:14, 61:15, 62:18, 62:20
**harmed** [5] - 19:11, 19:12, 22:13, 39:17, 54:22
**harms** [1] - 40:17
**heaps** [2] - 26:19
**hear** [3] - 4:24, 6:13, 9:4
**heard** [1] - 52:11
**HEARING** [1] - 1:9
**hearing** [2] - 5:15, 70:19
**held** [2] - 3:7, 4:12
**HELD** [1] - 1:10
**help** [1] - 32:18
**helpful** [7] - 11:11, 16:14, 16:25, 27:7, 27:8, 32:21, 56:18
**hereby** [1] - 71:3
**high** [2] - 21:7, 64:20
**high-quality** [1] - 64:20
**highlights** [1] - 15:5
**highly** [1] - 13:19
**himself** [1] - 52:8
**historic** [1] - 21:20
**historical** [5] - 38:19, 52:13, 52:23, 54:13, 70:2
**history** [8] - 25:18, 25:20, 26:14, 28:1, 32:20, 51:23, 52:2, 52:6
**hold** [2] - 35:2, 59:6
**hole** [2] - 30:1, 69:18
**home** [1] - 68:6
**Honor** [45] - 2:2, 2:7, 2:12, 5:4, 8:24, 9:22, 12:22, 14:13, 17:25, 19:16, 23:7, 35:13, 37:3, 41:1, 41:9, 41:15, 41:24, 42:24, 43:12, 44:5, 44:19, 45:2, 47:11, 48:23, 49:11, 49:21, 51:9, 52:18, 54:7, 55:7, 56:18, 58:8, 58:25, 60:1, 60:17, 61:2, 61:5, 62:22, 63:16, 64:9, 66:6, 66:8, 67:22, 68:6, 70:13
**HONORABLE** [1] - 1:10
**honorary** [1] - 31:1
**Hooker** [4] - 57:13, 57:22, 58:16
**hope** [3] - 18:1, 24:4, 24:5
**horribles** [1] - 13:8
**hours** [1] - 9:17
**house** [1] - 51:11
**House** [8] - 20:14, 25:19, 25:20, 25:25, 26:10, 51:4, 62:5, 62:12
**houses** [1] - 51:16
**huge** [2] - 18:7, 25:13

## I

**idea** [3] - 15:7, 40:22, 68:18
**identified** [1] - 42:16
**identifies** [1] - 30:24
**identify** [2] - 2:6, 28:15
**ignored** [2] - 34:8
**III** [5] - 21:18, 22:7, 22:9, 39:23, 59:11
**illustrates** [2] - 7:16, 15:12
**imminent** [1] - 62:20
**impassioned** [1] - 17:18
**impeded** [1] - 42:17
**implemented** [1] - 33:1
**implied** [1] - 8:12
**imply** [1] - 32:7
**importance** [1] - 24:9
**important** [10] - 8:18, 18:15, 33:3, 40:25,

48:18, 50:11, 50:23, 57:13, 65:16
**importantly** [2] - 21:4, 50:25
**importing** [1] - 10:22
**impose** [2] - 50:24, 50:25
**improvement** [1] - 64:12
**imprudent** [1] - 13:19
**IN** [1] - 1:1
**include** [1] - 55:2
**included** [2] - 56:14, 60:20
**includes** [2] - 37:18, 50:5
**including** [2] - 46:17, 52:24
**inconsistencies** [2] - 57:6, 57:10
**inconsistent** [2] - 58:23, 65:2
**incorporates** [1] - 59:1
**incredibly** [2] - 25:18, 69:7
**indeed** [1] - 47:24
**indefinite** [1] - 59:14
**independent** [6] - 15:19, 20:18, 20:20, 37:18, 37:21, 58:6
**indicates** [1] - 55:21
**indication** [1] - 14:9
**individually** [1] - 47:7
**induced** [2] - 16:22, 38:20
**indulge** [1] - 20:23
**inference** [1] - 52:17
**information** [56] - 4:22, 5:21, 6:17, 11:25, 12:3, 13:11, 13:15, 13:18, 15:6, 15:23, 15:25, 16:3, 16:5, 17:11, 17:14, 17:17, 17:22, 18:23, 18:24, 20:1, 24:15, 24:19, 27:14, 34:24, 37:1, 39:21, 40:21, 42:18, 42:22, 43:3, 43:22, 54:21, 55:1, 55:2, 55:4, 55:13, 55:15, 56:5, 56:6, 56:14, 62:21, 62:22, 62:25, 63:1, 63:5, 63:7, 63:9, 65:21, 68:7, 68:8, 68:18, 69:1
**informational** [2] - 39:13, 62:18
**informed** [2] - 17:18, 42:23
**ingredients** [2] - 16:13, 16:15
**inherent** [1] - 59:13
**injunction** [2] - 3:2, 34:16
**injuries** [1] - 38:16
**injury** [11] - 22:25, 38:3, 38:5, 38:8, 38:18, 38:19, 38:25, 39:13, 39:20, 39:23
**inside** [2] - 22:8, 22:9
**instance** [5] - 10:3, 44:1, 48:2, 48:4, 65:22
**instances** [1] - 9:16
**institute** [1] - 31:25
**institution** [5] - 26:23, 31:22, 37:6, 50:19
**Institution** [2] - 50:16, 50:22
**instructive** [2] - 12:6, 35:19
**instrumentality** [1] - 42:9
**intended** [3] - 47:16, 48:21, 51:7
**intends** [1] - 69:8
**interbranch** [1] - 19:22
**Interest** [1] - 67:19
**interest** [7] - 43:10, 59:18, 60:21, 66:24, 67:3, 67:21, 68:3
**interests** [1] - 59:15
**interim** [1] - 36:22
**internal** [2] - 42:6, 44:7
**interpret** [1] - 12:2
**interpretation** [1] - 54:12
**interpreting** [2] - 12:7, 12:8
**intervention** [1] - 70:10
**intrusion** [1] - 21:25
**inures** [1] - 20:19
**invite** [1] - 44:17
**invited** [4] - 3:17, 61:17, 61:20
**invokes** [1] - 46:19
**invoking** [1] - 9:23
**involved** [2] - 37:12, 56:15
**involving** [3] - 69:5, 69:6, 69:7
**irreparable** [8] - 16:7, 18:19, 43:1, 61:6, 61:9, 61:14, 61:15, 62:20
**irreparably** [1] - 19:12
**issue** [8] - 4:19, 5:24, 24:7, 33:21, 34:22, 40:14, 48:22, 66:2
**issues** [3] - 3:14, 5:24, 49:3
**itself** [18] - 9:11, 10:11, 27:2, 28:13, 29:14, 45:10, 45:19, 45:24, 46:3, 46:20, 50:5, 50:12, 50:14, 50:24, 51:1, 56:17, 59:6, 60:9

## J

**jam** [1] - 69:19
**jamming** [1] - 29:25
**JANKOWSKI** [64] - 1:19, 2:12, 2:17, 41:15, 41:18, 41:23, 42:24, 43:12, 44:14, 44:19, 45:2, 45:10, 46:6, 46:12, 46:14, 46:18, 46:24, 47:11, 48:15, 48:17, 48:23, 49:4, 49:11, 49:18, 49:21, 50:2, 51:9, 52:9, 52:18, 52:22, 53:2, 53:21, 53:25, 54:6, 54:15, 54:17, 55:7, 55:19, 56:3, 56:10, 57:9, 57:16, 57:23, 58:1, 58:5, 58:8, 58:10, 58:15, 58:25, 60:1, 60:11, 60:16, 61:1, 61:9, 62:6, 62:8, 62:15, 63:3, 63:16, 63:21, 65:7, 65:10, 65:13, 66:6
**Jankowski** [4] - 2:13, 2:17, 2:18, 41:13
**John** [5] - 22:17, 39:9, 40:16, 64:4, 64:10
**joined** [1] - 2:9
**JOYCE** [1] - 1:2
**Joyce** [1] - 2:3
**JUDGE** [1] - 1:10
**Judge** [2] - 12:19, 19:5
**judged** [1] - 4:20
**judicial** [3] - 8:19, 8:20, 10:3
**July** [1] - 2:24
**jurisdiction** [10] - 6:13, 9:3, 9:7, 9:12, 9:19, 9:20, 9:24, 42:15, 50:19, 69:12
**jurisdictional** [1] - 9:11
**jurisdictions** [1] - 67:7
**JUSTICE** [1] - 1:20
**justification** [1] - 57:20
**justifications** [1] - 58:15

## K

**k(e** [2] - 8:18, 8:23
**keeps** [1] - 33:15
**Kennedy** [14] - 2:23, 5:9, 22:17, 27:1, 27:2, 27:5, 27:24, 30:8, 39:9, 40:16, 64:4, 64:5, 64:10, 69:13
**kick** [1] - 34:9
**kind** [4] - 13:4, 43:22, 44:2, 69:21
**kinds** [2] - 15:18, 43:14
**knowledge** [2] - 16:16, 54:1
**known** [1] - 56:13
**knows** [3] - 31:12, 43:7, 48:19
**Kristofcak** [1] - 2:10
**KYLE** [1] - 1:12
**Kyle** [1] - 2:10

## L

**l(b)** [1] - 7:7
**lack** [2] - 17:13, 42:17
**LaFauci** [5] - 27:13, 27:18, 52:23, 53:22, 68:14
**LaFauci's** [2] - 52:5, 54:3
**landmark** [1] - 37:6
**language** [12] - 8:4, 12:24, 26:8, 28:9, 44:25, 45:4, 45:24, 46:5, 46:15, 46:19, 51:13, 69:14
**LARRY** [1] - 1:15
**last** [7] - 2:15, 3:15, 4:11, 4:14, 20:25, 32:17, 57:4
**latest** [1] - 4:16
**Latin** [1] - 31:5
**law** [44] - 7:13, 7:19, 7:23, 8:5, 8:7, 8:15, 9:5, 9:6, 9:21, 10:12, 13:2, 13:9, 21:11, 21:13, 21:17, 21:25, 22:4, 22:5, 22:7, 22:9, 24:23, 30:21, 42:10, 42:21, 45:8, 45:21, 46:2, 56:20, 56:25, 57:1, 57:10, 57:11, 58:20, 58:22, 59:1, 59:4, 59:22, 61:2, 65:25, 66:15, 68:2
**Law** [1] - 30:24
**lawsuits** [1] - 34:19
**lay** [1] - 47:24
**lead** [1] - 42:1
**least** [11] - 3:10, 4:18, 4:21, 21:2, 21:3, 27:8, 29:11, 42:17, 42:22, 55:3, 57:11
**left** [2] - 4:2, 31:15
**legal** [2] - 33:9, 57:6
**legislating** [1] - 8:3
**legislative** [4] - 25:18, 25:20, 26:13, 32:20
**less** [1] - 14:10
**letter** [3] - 34:3, 34:4, 35:24
**letters** [1] - 35:3
**level** [2] - 21:7, 36:24
**lick** [1] - 13:15
**life** [1] - 64:15
**lightning** [1] - 41:4
**likelihood** [1] - 10:9
**likely** [1] - 32:10
**limitation** [1] - 50:23
**limited** [2] - 36:4, 49:3
**limits** [1] - 31:19
**line** [4] - 15:7, 24:2, 49:9, 49:10
**link** [1] - 6:10
**linked** [3] - 14:14, 14:17, 15:1
**linking** [1] - 15:3
**liquidate** [1] - 32:18
**Lisa** [1] - 1:23
**LISA** [1] - 71:3
**list** [3] - 25:13, 30:24, 40:7
**listed** [2] - 36:7, 47:3
**lists** [2] - 24:20, 40:5
**litany** [2] - 47:13, 47:22
**litigation** [3] - 52:19, 58:17
**LITIGATION** [1] - 1:13
**live** [1] - 23:14
**living** [8] - 22:16, 39:8, 39:9, 39:24, 39:25, 40:1, 40:16, 64:4
**lodge** [1] - 44:18
**logic** [1] - 55:10
**long-standing** [1] - 8:4
**look** [22] - 8:22, 9:13, 21:11, 23:16, 23:25, 26:13, 30:5, 32:6, 32:19, 34:25, 35:9, 36:14, 40:20, 47:20,

50:12, 51:10, 57:11, 66:4, 66:13, 66:14, 66:25, 67:11
**looked** [2] - 13:1, 66:3
**looking** [2] - 12:1, 66:10
**looks** [1] - 35:2
**Loper** [1] - 32:6
**lost** [1] - 60:21
**lowest** [1] - 68:22

## M

**magnitude** [2] - 14:6, 41:7
**maintain** [7] - 22:16, 39:24, 39:25, 40:16, 64:14, 67:5
**maintenance** [1] - 64:18
**major** [1] - 43:7
**majority** [3] - 58:18, 68:25, 69:2
**manage** [2] - 47:18, 49:25
**managed** [1] - 62:10
**management** [4] - 15:15, 37:20, 61:19
**mandate** [1] - 10:22
**mandatory** [3] - 19:7, 22:21, 40:3
**manner** [2] - 64:20, 69:10
**manor** [1] - 50:17
**March** [3] - 1:5, 3:5, 71:8
**massive** [2] - 37:13, 69:19
**match** [1] - 38:24
**material** [4] - 56:2, 56:6, 65:8, 65:10
**materials** [7] - 3:8, 4:4, 4:19, 15:18, 43:9, 55:22, 57:21
**matter** [7] - 9:1, 28:21, 33:9, 51:25, 54:11, 54:12, 69:24
**matters** [4] - 28:2, 53:8, 53:17, 56:15
**MCCOY** [1] - 1:19
**mean** [33] - 6:10, 14:18, 18:9, 19:22, 21:14, 23:16, 24:18, 25:13, 26:2, 26:19, 27:14, 29:4, 29:21, 30:4, 30:13, 30:20, 30:21, 36:9, 37:9, 38:5, 38:10, 40:20, 40:24, 41:2, 42:19, 53:18, 54:10, 54:22, 54:23, 56:23, 67:9, 68:11, 68:17
**meaning** [5] - 8:6, 8:7, 11:2, 11:3, 32:18
**means** [5] - 29:4, 31:1, 49:15, 66:23
**meant** [2] - 25:5, 31:5
**measure** [2] - 60:8, 60:15
**meet** [1] - 29:23
**meeting** [36] - 3:6, 3:9, 3:10, 3:12, 3:17, 3:22, 4:7, 4:9, 4:25, 5:7, 5:22, 14:9, 15:6, 18:2, 18:4, 18:22, 19:19, 23:17, 25:3, 43:4, 43:15, 44:9, 44:17, 55:13, 55:18, 56:17, 61:24, 62:2, 62:4, 62:11, 62:17, 62:21, 63:2, 65:11, 69:25
**meetings** [7] - 7:3, 43:19, 53:2, 53:3, 53:6, 53:10, 53:23
**member** [12] - 11:14, 11:24, 12:14, 17:1, 19:20, 25:15, 29:6, 31:11, 37:2, 48:4, 62:14, 66:1
**members** [32] - 12:3, 12:5, 12:10, 24:20, 25:24, 26:24, 28:19, 29:11, 29:17, 30:15, 31:13, 31:17, 32:11, 47:1, 47:2, 48:6, 48:14, 50:3, 50:17, 50:18, 51:5, 51:14, 51:25, 52:10, 52:11, 53:16, 53:19, 68:5, 69:10, 69:11
**memorial** [7] - 22:16, 39:9, 39:24, 39:25, 40:1, 40:16, 64:4
**mentioned** [1] - 38:3
**merits** [7] - 6:8, 6:15, 18:8, 20:21, 56:24, 63:25, 64:23
**met** [1] - 10:9
**micromanage** [2] - 23:17, 44:8
**micromanaging** [1] - 35:11
**might** [29] - 23:3, 27:7, 33:7, 33:18, 43:18, 43:20, 47:12, 47:20, 50:3, 52:12, 52:15, 52:16, 54:1, 55:2, 56:14, 56:18, 59:10, 62:8, 62:16, 63:7, 63:11, 64:1, 64:17, 65:2, 65:3, 65:15, 65:22, 68:9
**million** [2] - 63:14, 63:17
**mind** [1] - 5:20
**minds** [1] - 18:11
**minimal** [1] - 47:1
**minimum** [1] - 32:14
**minority** [5] - 11:14, 11:24, 12:5, 12:14, 17:1
**minutes** [5] - 52:13, 52:15, 52:24, 52:25
**miscommunication** [1] - 3:18
**modicum** [2] - 42:22, 43:2
**modification** [1] - 64:13
**modify** [2] - 50:17, 69:10
**moment** [7] - 18:20, 18:21, 20:4, 20:24, 55:14, 56:11, 61:15
**Monday** [18] - 3:9, 4:5, 4:15, 5:7, 5:15, 5:22, 13:14, 15:6, 16:9, 17:4, 18:20, 19:12, 20:5, 54:25, 55:18, 56:9, 61:16, 65:11
**monopolizing** [1] - 25:2
**monthly** [1] - 29:23
**months** [4] - 15:17, 33:1, 33:25, 34:22
**monumental** [1] - 5:8
**moon** [3] - 58:11, 59:24, 60:22
**Moon** [1] - 60:19
**MOREIRA** [1] - 71:3
**Moreira** [2] - 1:23, 71:10
**morning** [1] - 4:16
**most** [6] - 5:18, 6:2, 6:4, 17:17, 19:18, 34:17
**motion** [15] - 3:1, 3:3, 4:11, 5:2, 9:6, 11:8, 15:11, 17:4, 19:4, 33:5, 43:22, 44:2, 47:14, 47:21, 70:15
**MOTION** [1] - 1:9
**mouse** [2] - 30:1, 69:18
**move** [4] - 16:6, 19:4, 23:5, 61:9
**moves** [1] - 53:8
**MR** [143] - 2:7, 2:12, 2:17, 5:4, 5:7, 6:3, 6:5, 6:18, 6:23, 7:6, 7:10, 7:25, 8:16, 9:15, 9:22, 10:5, 10:25, 11:10, 11:13, 11:19, 11:23, 12:21, 14:13, 14:20, 14:22, 15:5, 16:8, 16:11, 16:24, 17:8, 17:15, 17:24, 18:20, 19:13, 19:16, 21:6, 21:24, 22:3, 23:7, 23:19, 23:22, 24:11, 24:16, 25:6, 25:9, 26:6, 26:12, 29:1, 29:12, 29:15, 30:18, 30:20, 31:21, 33:2, 33:6, 33:13, 35:1, 35:8, 35:13, 36:23, 37:3, 37:5, 37:25, 38:12, 38:22, 39:1, 39:4, 39:8, 39:16, 39:19, 40:19, 41:9, 41:11, 41:15, 41:18, 41:23, 42:24, 43:12, 44:14, 44:19, 45:2, 45:10, 46:6, 46:12, 46:14, 46:18, 46:24, 47:11, 48:15, 48:17, 48:23, 49:4, 49:11, 49:18, 49:21, 50:2, 51:9, 52:9, 52:18, 52:22, 53:2, 53:21, 53:25, 54:6, 54:15, 54:17, 55:7, 55:19, 56:3, 56:10, 57:9, 57:16, 57:23, 58:1, 58:5, 58:8, 58:10, 58:15, 58:25, 60:1, 60:11, 60:16, 61:1, 61:9, 62:6, 62:8, 62:15, 63:3, 63:16, 63:21, 65:7, 65:10, 65:13, 66:6, 66:8, 66:18, 66:22, 67:12, 67:25, 68:4, 68:14, 68:17, 70:13
**multiple** [1] - 49:14
**music** [1] - 64:7
**must** [3] - 45:19, 47:1, 60:14

## N

**name** [4] - 2:15, 2:23, 21:4, 33:22
**names** [1] - 29:17
**NATHANIEL** [1] - 1:12
**Nathaniel** [1] - 2:8
**nation's** [1] - 43:8
**nature** [4] - 31:25, 49:3, 49:5, 62:25
**nay** [2] - 65:3, 65:4
**near** [2] - 47:16, 47:18
**neatly** [1] - 55:25
**necessarily** [9] - 14:17, 43:18, 45:6, 45:25, 53:18, 53:21, 61:15, 62:13, 65:21
**necessary** [3] - 13:11, 64:13, 64:18
**need** [9] - 11:18, 15:6, 19:8, 19:9, 40:21, 43:9, 59:18, 65:4
**needed** [2] - 4:15, 70:11
**needs** [3] - 16:1, 16:19, 39:14
**neuter** [3] - 29:9, 30:2, 30:11
**never** [6] - 15:23, 15:25, 30:23, 52:10, 69:25
**New** [5] - 7:15, 15:10, 16:14, 35:17, 37:10
**new** [3] - 13:6, 25:22, 25:24
**next** [3] - 19:10, 20:16, 64:17
**nicety** [1] - 29:20
**night** [2] - 4:14
**nine** [1] - 48:9
**Ninth** [1] - 33:13
**nobody** [1] - 28:14
**nonprofit** [2] - 36:15, 37:7
**nonvoting** [3] - 31:11, 31:13, 48:3
**norm** [4] - 15:12, 31:7, 31:8, 32:23
**Norm** [1] - 2:9
**normal** [1] - 36:17
**normally** [3] - 13:20, 32:1, 37:15
**NORMAN** [1] - 1:15
**note** [5] - 8:10, 10:1, 49:12, 58:16, 63:21
**noted** [6] - 5:14, 44:4, 46:24, 50:16, 51:20, 62:22
**notes** [2] - 47:23, 71:5
**nothing** [6] - 10:21, 16:2, 18:6, 25:11, 25:16, 41:4
**noting** [1] - 42:2
**notion** [1] - 9:19
**nub** [1] - 64:22
**number** [4] - 7:19, 25:13, 50:17, 69:10
**nutshell** [1] - 22:25
**NW** [4] - 1:13, 1:20, 1:24, 71:12

## O

**object** [2] - 43:20, 44:11
**objection** [2] - 42:23, 44:18
**objects** [1] - 17:12
**obligated** [1] - 44:16
**obligation** [2] - 22:14, 22:16
**obligations** [20] - 6:24, 6:25, 7:1, 7:11, 10:16, 11:2, 11:4, 12:25, 16:17, 25:11, 29:18, 29:19, 38:20, 39:24, 40:13, 45:12, 45:19, 46:1, 46:10, 49:15
**observed** [1] - 52:10
**obviate** [1] - 59:18
**obviates** [1] - 61:13
**obviously** [7] - 4:9, 4:15, 5:17, 23:1, 59:3, 59:10, 62:10
**occur** [3] - 21:13, 34:6, 53:11
**occurred** [2] - 15:23, 32:20
**occurring** [1] - 13:13
**occurs** [1] - 18:21
**OF** [4] - 1:1, 1:9, 1:20, 71:1
**offering** [1] - 32:13
**office** [2] - 26:1, 31:2
**officer** [3] - 8:15, 59:7
**Official** [1] - 1:23
**official** [4] - 52:14, 67:24, 68:1, 71:11
**OFFICIAL** [1] - 71:1
**officio** [24] - 3:12, 4:6, 12:9, 19:20, 25:14, 26:1, 27:21, 28:19, 28:22, 30:15, 30:22, 30:23, 30:25, 31:16, 47:2, 48:14, 51:5, 51:14, 51:25, 52:10, 52:11, 53:3, 53:9, 53:19
**officios** [4] - 25:23, 27:25, 49:19, 49:20
**often** [1] - 37:19
**Ogden** [1] - 2:10
**old** [2] - 7:12, 8:5
**once** [1] - 38:17
**one** [50] - 3:5, 6:25, 7:11, 7:12, 11:9, 12:23, 13:5, 13:23, 15:7, 15:24, 16:9, 16:12, 16:14, 17:2, 18:12, 20:23, 21:10, 24:20, 24:25, 26:16, 27:13, 27:20, 29:5, 32:5, 32:15, 35:3, 35:25, 37:10, 39:1, 40:20, 42:25, 45:5, 48:7, 48:8, 51:2, 52:12, 52:13, 52:20, 60:4, 66:13, 66:16, 67:7, 67:13, 68:12, 68:19, 69:13, 69:22, 70:17
**one-year** [5] - 13:23, 15:24, 68:12, 68:19
**ones** [1] - 48:9
**ons** [1] - 22:12
**open** [1] - 39:4
**opera** [1] - 40:5
**operate** [2] - 13:20, 45:15
**operations** [2] - 64:19, 64:21
**opinion** [6] - 60:3, 60:17, 60:18, 60:22, 65:20
**opportunity** [2] - 43:2, 43:20
**opposed** [1] - 28:25
**opposing** [1] - 20:9
**opposite** [2] - 18:9, 22:8
**opposition** [2] - 3:21, 4:13
**order** [24] - 3:4, 3:13, 4:11, 6:1, 16:11, 16:19, 17:17, 19:5, 23:15, 24:5, 34:15, 34:25, 35:9, 36:6, 38:7, 39:2, 39:4, 39:5, 40:14, 42:22, 47:21, 65:3
**orderly** [1] - 61:18
**organic** [5] - 5:10, 12:17, 45:17, 47:18, 50:10
**organization** [11] - 28:8, 28:10, 28:11, 31:19, 42:8, 42:12, 47:19, 49:13, 49:22, 69:15, 69:19
**organizational** [2] - 49:5, 49:6
**organizations** [1] - 48:13
**organized** [1] - 5:19
**organizing** [1] - 42:8
**original** [1] - 33:23
**others'** [1] - 67:4
**otherwise** [2] - 12:4, 28:23
**ousted** [3] - 58:12, 61:4, 67:2
**outline** [1] - 37:13
**outlined** [1] - 47:17
**outside** [5] - 15:12, 22:4, 22:5, 22:7, 58:20
**outvote** [1] - 68:25
**oversight** [6] - 12:12, 19:21, 30:3, 30:7, 30:9, 30:12
**owed** [1] - 46:1
**own** [3] - 14:24, 15:1, 68:9

## P

**p.m** [2] - 1:5, 70:20
**page** [1] - 48:24
**Pages** [2] - 47:22, 60:18
**pages** [1] - 48:10
**papers** [1] - 15:1
**par** [1] - 3:23
**parade** [1] - 13:8
**park** [1] - 30:8
**part** [5] - 12:11, 13:12, 34:6, 40:20, 58:12
**participate** [9] - 3:10, 3:22, 5:23, 16:19, 50:4, 50:5, 61:18, 61:20, 61:21
**participation** [7] - 4:1, 7:2, 16:12, 16:15, 16:21, 23:8, 34:25
**particular** [7] - 22:5, 33:20, 44:1, 47:15, 48:4, 49:2, 65:22
**particularly** [1] - 2:20
**parties** [1] - 67:14
**parts** [1] - 10:25
**party** [1] - 65:22
**pass** [2] - 24:5, 48:21
**passed** [2] - 5:13, 63:17
**past** [1] - 27:11
**pattern** [1] - 13:13
**peace** [1] - 66:12
**pendent** [1] - 9:20
**pending** [1] - 51:3
**Pennsylvania** [1] - 1:16
**people** [3] - 27:22, 30:25, 67:20
**perform** [3] - 13:11, 22:17, 22:21
**performances** [1] - 40:6
**performing** [3] - 22:18, 43:8, 64:11
**perhaps** [2] - 31:20, 67:23
**period** [3] - 26:2, 46:13, 54:2
**permit** [1] - 51:18
**permitted** [4] - 26:1, 51:14, 61:17, 61:18
**person** [5] - 25:14, 26:20, 29:6, 29:14, 61:23
**personal** [1] - 54:1
**persons** [2] - 59:15, 59:17
**perspective** [1] - 9:12
**persuasive** [1] - 57:11
**philharmonic** [3] - 15:11, 35:17, 37:10
**phrase** [1] - 11:1
**PI** [2] - 19:4, 38:18
**piece** [1] - 36:20
**pieces** [2] - 51:2, 56:13
**place** [3] - 15:21, 50:11
**places** [1] - 31:10
**plaintiff** [10] - 2:5, 3:3, 4:10, 4:15, 46:17, 47:23, 48:10, 57:7, 57:22, 57:24
**Plaintiff** [2] - 1:3, 1:12
**plaintiff's** [3] - 2:22, 42:25, 47:20
**plaintiffs** [3] - 3:1, 57:20, 60:7
**plan** [5] - 14:19, 19:6, 40:23, 64:11
**planned** [3] - 14:10, 14:12, 64:24
**planning** [1] - 15:17
**plans** [9] - 14:1, 15:23, 19:9, 19:10, 19:12, 40:22, 43:7, 43:10, 55:3
**play** [1] - 23:25
**plays** [1] - 40:6
**plenty** [2] - 11:21, 41:21
**plug** [1] - 57:5
**point** [34] - 3:18, 11:6, 12:17, 20:17, 21:8, 26:14, 27:6, 28:5, 32:13, 32:17, 33:19, 41:1, 42:25, 45:3, 46:4, 47:11, 48:7, 48:19, 49:1, 50:15, 54:18, 57:13, 58:22, 59:9, 59:11, 64:3, 64:8, 65:16, 67:13, 67:15, 67:18, 68:22, 68:24, 69:4
**pointed** [5] - 31:9, 31:11, 66:14, 66:20, 67:1
**pointing** [1] - 48:8
**points** [7] - 7:25, 8:25, 14:22, 17:24, 66:11, 69:3, 69:23
**police** [1] - 24:3
**policies** [1] - 44:12
**policy** [1] - 59:13
**poor** [1] - 33:14
**portion** [1] - 31:21
**position** [5] - 12:13, 47:13, 57:9, 60:13, 62:16
**possess** [1] - 48:1
**possesses** [1] - 64:3
**possibility** [1] - 4:21
**possible** [1] - 62:17
**post** [1] - 32:6
**post-Chevron** [1] - 32:6
**postpone** [1] - 4:9
**postponed** [1] - 4:25
**posture** [2] - 34:2, 34:10
**potential** [1] - 13:17
**potentially** [3] - 3:7, 52:19, 57:12
**power** [14] - 26:17, 26:23, 27:2, 27:4, 29:1, 29:3, 29:5, 29:19, 30:2, 30:16, 31:25, 50:14, 69:16, 69:21
**powerful** [2] - 19:18, 69:7
**powers** [23] - 6:24, 7:1, 7:10, 7:13, 7:22, 8:8, 11:2, 11:4, 12:25, 24:18, 29:18, 29:19, 31:22, 32:2, 32:3, 45:12, 46:10, 46:16, 47:7, 51:6, 51:22, 69:17
**practice** [5] - 27:11, 32:17, 32:19, 51:25, 54:13
**pre** [1] - 21:2
**precisely** [1] - 34:7
**predecessor** [1] - 54:3
**predicates** [1] - 45:21
**prefaced** [2] - 20:25, 61:11
**prefacing** [1] - 64:1
**pregnant** [1] - 8:7
**prejudged** [1] - 4:20
**prejudice** [1] - 23:2
**preliminary** [4] - 3:2, 13:25, 68:10, 68:15
**premier** [1] - 43:8

**prepared** [1] - 34:18
**present** [3] - 35:5, 55:13, 64:6
**presentation** [6] - 14:5, 35:6, 36:4, 36:18, 37:18, 55:23
**presented** [2] - 55:21, 55:22
**president** [7] - 3:24, 5:11, 15:10, 27:24, 35:17, 37:10, 56:12
**President** [10] - 13:22, 14:15, 14:23, 29:7, 34:4, 47:4, 51:17, 63:14, 64:4, 68:20
**President's** [2] - 15:24, 35:25
**presidentially** [1] - 32:14
**presiding** [1] - 62:2
**Preston** [1] - 60:19
**presumption** [1] - 30:15
**pretense** [1] - 20:13
**pretty** [11] - 12:6, 13:10, 13:13, 13:19, 30:1, 33:14, 37:9, 37:14, 40:4, 42:16, 43:6
**prevent** [1] - 20:8
**prevented** [4] - 20:1, 22:18, 22:23
**preventing** [1] - 56:21
**preview** [2] - 21:3, 38:2
**primarily** [1] - 27:7
**primary** [1] - 54:18
**problem** [4] - 18:7, 33:18, 34:1, 55:14
**procedural** [8] - 28:21, 29:20, 38:8, 38:10, 39:22, 49:3, 49:7, 50:4
**procedurally** [1] - 50:2
**procedure** [14] - 12:17, 28:8, 28:10, 28:12, 29:21, 29:24, 30:1, 31:19, 42:8, 42:12, 43:18, 49:10, 69:15, 69:19
**procedures** [5] - 43:14, 44:8, 44:12, 47:19, 61:19
**proceed** [2] - 6:1, 63:23
**proceeding** [4] - 43:21, 61:2, 62:2, 67:6
**proceedings** [4] - 42:6, 43:19, 44:7, 71:6
**process** [8] - 4:22, 12:16, 20:12, 20:18, 28:21, 28:24, 29:4, 35:12
**processes** [1] - 38:11
**proclivity** [1] - 56:13
**professor** [2] - 15:14, 35:18
**programs** [1] - 2:14
**prohibited** [1] - 70:7
**project** [1] - 63:18
**projection** [1] - 36:21
**promise** [2] - 54:7, 66:8
**promised** [1] - 70:8
**prong** [2] - 38:3, 59:17
**proper** [1] - 60:20
**propose** [1] - 23:20
**proposed** [4] - 36:21, 63:10, 63:23, 63:24
**proposition** [1] - 21:19
**protected** [1] - 65:24
**protocols** [1] - 62:11
**prove** [1] - 59:18
**provide** [10] - 4:4, 7:7, 10:19, 14:3, 35:10, 44:23, 45:18, 64:18, 65:21, 68:8
**provided** [9] - 3:8, 8:9, 41:3, 43:3, 55:1, 56:5, 62:21, 63:2, 65:13
**provides** [8] - 6:23, 7:3, 7:10, 9:12, 10:11, 27:14, 44:22, 44:24
**providing** [1] - 56:6
**provision** [12] - 7:9, 8:12, 10:23, 12:7, 28:5, 29:16, 40:3, 45:10, 48:5, 50:8, 64:9, 64:17
**prudence** [2] - 16:16, 42:19
**prudent** [3] - 6:6, 18:8, 24:25
**public** [6] - 19:19, 20:5, 59:7, 67:24, 68:1
**pull** [1] - 14:2
**pure** [1] - 33:9
**purpose** [3] - 12:5, 12:10, 60:9
**purposes** [1] - 9:6
**pursue** [3] - 6:16, 19:2, 21:1
**put** [6] - 12:10, 32:21, 43:22, 55:25, 67:13, 68:4
**puts** [1] - 30:4
**putting** [1] - 12:11


## Q


**quality** [1] - 64:20
**questions** [4] - 3:25, 9:18, 43:15, 61:5
**quick** [1] - 66:11
**quickly** [3] - 9:14, 33:22, 52:20
**quintessential** [1] - 39:13
**quite** [1] - 32:21
**quo** [1] - 28:4
**quorum** [3] - 29:12, 29:13, 47:1
**quote** [4] - 6:24, 14:25, 25:25, 34:16
**quote-unquote** [1] - 14:25


## R


**raised** [2] - 3:14, 45:3
**raises** [1] - 56:23
**ratcheting** [1] - 33:15
**rather** [1] - 70:16
**RDR** [3] - 1:23, 71:3, 71:10
**read** [5] - 8:21, 25:19, 30:13, 44:22, 63:13
**readily** [1] - 55:5
**real** [3] - 31:23, 31:25, 40:22
**reality** [1] - 33:16
**really** [15] - 13:6, 16:4, 19:25, 32:23, 40:24, 44:5, 44:6, 45:6, 47:14, 54:11, 58:20, 61:12, 61:13, 66:13, 67:22
**reason** [10] - 13:12, 14:14, 28:24, 30:4, 33:11, 34:6, 36:10, 40:21, 48:8, 67:12
**reasonable** [2] - 20:2, 65:10
**reasons** [1] - 45:5
**rebuttal** [1] - 66:7
**received** [3] - 4:14, 13:15, 43:21
**recent** [2] - 52:2, 52:6
**recess** [1] - 70:18
**recognize** [1] - 59:13
**recognized** [2] - 42:20
**recommend** [2] - 54:24, 54:25
**recommendation** [1] - 55:23
**recommended** [1] - 55:12
**reconstruction** [4] - 2:25, 3:7, 3:9, 38:8
**record** [6] - 2:3, 2:6, 37:8, 52:14, 53:5, 70:2
**redo** [1] - 18:22
**redressability** [1] - 38:4
**reference** [1] - 50:9
**referred** [1] - 51:5
**refers** [1] - 7:21
**reflect** [1] - 55:16
**regard** [1] - 4:17
**regarding** [1] - 3:8
**regardless** [1] - 17:21
**regents** [3] - 50:11, 50:16, 69:9
**Regents** [2] - 50:21, 50:24
**regulations** [1] - 42:10
**rehabilitation** [1] - 64:13
**related** [1] - 19:2
**relates** [1] - 48:5
**relating** [1] - 42:11
**relationship** [2] - 57:20, 58:3
**relevant** [9] - 4:18, 56:14, 56:15, 56:25, 58:3, 63:22, 64:17, 65:8, 65:11
**relief** [10] - 5:15, 6:10, 12:19, 21:1, 33:11, 38:23, 42:4, 44:2, 44:6, 65:20
**remaining** [1] - 60:19
**remedable** [1] - 18:25
**remedied** [1] - 20:3
**remedies** [1] - 40:15
**remedying** [1] - 38:15
**remember** [2] - 27:22, 52:8
**rename** [1] - 18:3
**renaming** [1] - 24:8
**RENEE** [1] - 1:12
**renovation** [2] - 2:25, 43:7
**renovations** [5] - 37:11, 37:12, 63:10, 63:24
**repair** [3] - 63:18, 64:12, 64:18
**replacement** [1] - 64:12
**reply** [3] - 4:14, 11:8, 27:23
**Report** [1] - 25:19
**report** [6] - 25:20, 25:25, 26:10, 51:4, 51:12, 51:13
**REPORTER** [2] - 11:17, 71:1
**Reporter** [3] - 1:23, 1:23, 71:11
**represent** [1] - 62:12
**representational** [1] - 68:3
**representations** [4] - 23:10, 35:4, 51:24, 62:24
**representative** [2] - 52:7, 52:9
**Representative** [1] - 42:3
**request** [6] - 3:19, 35:3, 36:7, 43:24, 62:23, 65:23
**requested** [1] - 44:6
**requests** [2] - 61:12, 61:13
**required** [2] - 37:1, 51:17
**requirements** [2] - 59:25, 64:20
**requires** [1] - 22:22
**requiring** [3] - 3:4, 4:4, 51:15
**reserving** [1] - 51:10
**respect** [11] - 13:6, 28:14, 32:25, 34:24, 45:12, 46:10, 47:6, 47:8, 49:22, 64:10
**respectfully** [2] - 36:23, 37:3
**respond** [1] - 25:22
**response** [4] - 8:1, 14:22, 26:3, 31:18
**responsibilities** [3] - 7:21, 45:1, 46:20
**responsibility** [1] - 44:21
**responsible** [1] - 61:23
**responsibly** [2] - 10:20, 37:1
**rest** [1] - 59:9
**restatement** [4] - 30:20, 57:1, 58:23, 59:6
**restatements** [1] - 24:24
**restraining** [4] - 3:4, 4:11, 47:21, 50:13
**restriction** [1] - 50:25
**result** [2] - 12:16, 17:20
**review** [12] - 8:14, 8:19, 8:21, 10:3,

13:23, 15:24, 15:25, 36:1, 52:23, 68:12, 68:19, 68:21
**reviewed** [1] - 27:15
**rightful** [1] - 61:3
**rightfully** [1] - 50:15
**rights** [17] - 6:24, 10:15, 17:2, 23:6, 23:13, 24:17, 25:10, 29:18, 45:18, 46:1, 46:19, 47:6, 47:25, 48:6, 49:14, 50:4, 51:22
**ripeness** [1] - 33:18
**risk** [2] - 17:16, 58:16
**road** [1] - 34:9
**Robert's** [1] - 29:22
**role** [1] - 23:17
**Room** [2] - 1:24, 71:12
**room** [2] - 5:1, 62:5
**rooted** [3] - 9:24, 10:4, 12:24
**rooting** [1] - 9:19
**roughly** [1] - 48:9
**RSVP** [1] - 62:10
**rubber** [2] - 17:19, 18:6
**Rule** [1] - 60:19
**rule** [3] - 8:4, 8:5, 66:15
**rules** [2] - 29:22, 42:10
**ruling** [1] - 4:17
**running** [2] - 33:17, 33:22
**runs** [1] - 10:15


## S


**safety** [2] - 11:15, 64:15
**salience** [1] - 20:5
**satisfactory** [1] - 56:5
**satisfied** [1] - 62:13
**satisfy** [2] - 44:20, 67:19
**satisfying** [1] - 45:21
**saw** [2] - 50:12, 50:14
**scale** [1] - 21:15
**scant** [1] - 27:12
**scenario** [3] - 10:17, 17:9, 47:15
**scenarios** [1] - 61:25
**schedule** [1] - 11:21
**scheduled** [1] - 3:7
**scheduling** [1] - 4:12
**school** [1] - 34:18
**scope** [2] - 37:11, 37:13
**score** [1] - 16:7
**screaming** [1] - 33:17
**SE** [1] - 1:16
**seclusion** [1] - 22:1
**second** [12] - 5:21, 5:24, 11:6, 13:4, 17:4, 18:14, 28:5, 38:14, 48:7, 57:1, 60:17, 67:16
**seconds** [1] - 24:2
**section** [1] - 9:4
**Section** [4] - 7:5, 45:10, 46:6, 46:25
**security** [2] - 62:11, 64:15
**see** [4] - 2:19, 15:18, 19:9, 56:21
**seek** [1] - 43:24
**seeking** [5] - 5:14, 6:11, 16:12, 38:24, 42:5
**seeks** [2] - 3:4, 42:3
**sense** [4] - 6:4, 12:2, 16:22, 62:3
**sensitive** [1] - 53:17
**sent** [2] - 34:3, 34:4
**separate** [7] - 23:13, 38:16, 39:19, 39:20, 39:23, 58:6
**separately** [1] - 3:3
**September** [1] - 52:25
**serious** [1] - 19:22
**serve** [2] - 25:25, 48:3
**service** [1] - 30:8
**session** [4] - 53:8, 53:18, 53:20, 70:1
**sessions** [3] - 53:11, 53:13, 53:16
**set** [2] - 2:20, 21:17
**settled** [2] - 32:17, 32:19
**several** [2] - 30:21, 48:8
**shall** [9] - 40:4, 45:11, 46:1, 46:9, 47:2, 48:3, 51:6, 64:5, 64:6
**shell** [1] - 20:12
**shifting** [1] - 59:14
**shot** [1] - 41:23
**shove** [1] - 24:24
**show** [2] - 27:9, 62:19
**showing** [3] - 51:15, 58:20, 61:14
**shows** [4] - 17:3, 26:4, 31:22, 48:20
**Shuster** [1] - 52:9
**Shuster's** [1] - 52:7
**shut** [4] - 5:9, 12:4, 40:9, 40:14
**shutdown** [5] - 13:16, 14:15, 22:15, 38:14, 38:15
**shuts** [1] - 22:18
**shutting** [1] - 40:1
**side** [12] - 13:7, 15:22, 18:5, 24:25, 27:6, 28:1, 28:2, 32:13, 32:22, 49:9, 49:10, 70:5
**significant** [1] - 24:8
**silence** [1] - 70:9
**similar** [4] - 24:17, 34:12, 34:20, 62:16
**simple** [1] - 23:22
**simplest** [1] - 22:10
**single** [2] - 29:14, 66:1
**single-person** [1] - 29:14
**singular** [1] - 46:7
**sit** [1] - 44:17
**site** [3] - 64:10, 64:14, 64:19
**situation** [1] - 68:23
**size** [1] - 37:11
**slightly** [1] - 64:1
**slow** [2] - 11:18, 33:7
**slowly** [2] - 41:19, 66:9
**small** [2] - 30:1, 67:20
**Smithsonian** [12] - 26:23, 26:25, 27:2, 31:22, 31:24, 50:11, 50:16, 50:19, 50:21, 69:6, 69:7, 69:10
**so..** [1] - 41:20
**soil** [2] - 7:12, 8:5
**solve** [3] - 23:11, 23:23, 34:1
**solving** [1] - 23:24
**someone** [3] - 23:25, 26:20, 43:9
**sometimes** [5] - 28:19, 30:22, 30:25, 41:19
**somewhere** [1] - 63:13
**soon** [1] - 34:20
**sooner** [1] - 70:16
**sorry** [6] - 2:15, 11:9, 59:23, 60:5, 63:25, 66:17
**sort** [18] - 5:19, 14:4, 15:1, 20:13, 24:1, 24:14, 25:16, 32:8, 34:11, 38:10, 39:12, 41:3, 54:1, 54:20, 58:19, 58:21, 69:2, 70:2
**sorts** [1] - 28:18
**sounding** [1] - 45:7
**sources** [2] - 26:15, 57:7
**Southern** [2] - 7:15, 16:14
**speaking** [5] - 23:23, 24:7, 30:16, 70:4, 70:7
**speaks** [1] - 29:14
**Special** [1] - 67:19
**special** [8] - 57:19, 58:2, 59:15, 59:18, 60:21, 66:24, 67:2, 67:21
**specific** [6] - 43:13, 43:18, 45:18, 47:6, 47:17, 50:15
**specifically** [3] - 13:1, 60:2, 60:4
**specified** [1] - 46:2
**specify** [1] - 45:25
**speed** [1] - 41:19
**splitting** [1] - 49:13
**spreadsheet** [1] - 36:20
**spring** [2] - 54:4, 54:7
**squarely** [1] - 21:20
**St** [2] - 1:13, 1:20
**stage** [3] - 2:20, 42:3, 45:14
**stamp** [2] - 17:20, 18:6
**stand** [2] - 30:17, 70:18
**standard** [1] - 10:9
**standards** [2] - 59:2, 64:15
**Standing** [1] - 67:19
**standing** [21] - 8:4, 19:2, 21:1, 21:3, 21:12, 23:3, 23:4, 37:23, 38:4, 57:20, 58:7, 59:10, 59:11, 59:12, 60:13, 60:21, 66:24, 67:3, 67:14, 67:17, 67:21
**start** [10] - 4:22, 6:16, 21:6, 21:7, 21:19, 24:13, 42:2, 54:14, 55:7
**started** [5] - 24:13, 27:18, 52:5, 54:4, 54:5
**starting** [1] - 2:5
**starts** [1] - 21:14
**state** [7] - 7:20, 9:20, 45:21, 51:20, 56:20, 59:7, 68:2
**statement** [1] - 42:20
**STATES** [2] - 1:1, 1:10
**States** [4] - 2:13, 3:24, 56:12, 71:11
**states** [2] - 59:5, 59:6
**status** [1] - 28:4
**statute** [54] - 5:10, 5:12, 6:21, 6:23, 7:21, 8:6, 8:7, 8:9, 8:22, 9:25, 10:11, 10:22, 10:23, 12:1, 12:2, 12:8, 12:18, 13:3, 22:22, 25:12, 26:4, 26:7, 26:11, 28:6, 29:9, 29:10, 29:14, 29:16, 30:5, 30:23, 32:7, 39:25, 40:2, 43:13, 44:21, 44:22, 44:24, 45:16, 45:17, 47:3, 47:5, 47:18, 47:25, 50:10, 50:21, 51:8, 51:11, 51:17, 53:13, 64:6, 69:5, 69:6, 69:7
**statutes** [8] - 25:13, 26:18, 26:19, 47:14, 47:22, 48:1, 48:12, 69:20
**statutory** [12] - 11:1, 32:9, 32:10, 40:12, 45:4, 45:23, 46:18, 47:12, 50:12, 51:2, 54:11, 64:25
**stay** [1] - 70:17
**stead** [1] - 62:1
**stenographic** [1] - 71:5
**STEPHEN** [1] - 1:19
**steps** [1] - 60:9
**Steven** [1] - 2:14
**stewards** [1] - 67:9
**sticking** [1] - 10:18
**still** [3] - 4:19, 23:13, 69:1
**stop** [5] - 34:2, 38:7, 46:13, 56:19
**stress** [4] - 13:22, 14:4, 15:9, 23:8
**strike** [1] - 43:8
**strong** [3] - 13:1, 25:18, 31:8
**stronger** [1] - 25:7
**strongest** [1] - 51:2
**structural** [6] - 27:4, 29:2, 31:23, 31:25, 69:9, 69:16
**structure** [5] - 12:1, 12:2, 12:8, 28:11, 36:15
**stuff** [1] - 39:14
**subcommittees** [1] - 29:22
**subject** [9] - 3:23, 4:1, 8:14, 23:10, 47:4, 52:16, 61:18, 61:19, 63:7
**submitted** [4] - 14:8,

15:11, 15:14, 27:23
**subsection** [1] - 64:9
**Subsection** [4] - 45:11, 46:7, 50:20
**subsequent** [1] - 2:24
**substance** [1] - 28:25
**substantial** [1] - 24:8
**substantially** [1] - 5:11
**substantive** [2] - 17:12, 49:9
**succeed** [2] - 10:11, 32:10
**success** [1] - 10:9
**successor** [1] - 58:13
**sucked** [1] - 8:6
**sue** [7] - 7:8, 7:13, 7:16, 8:8, 13:9, 13:10, 66:16
**sues** [1] - 11:24
**suffer** [1] - 61:15
**suffered** [2] - 38:5, 38:6
**suffering** [2] - 61:14, 62:19
**sufficient** [2] - 10:19, 17:11
**suggest** [2] - 13:7, 52:15
**suggested** [1] - 68:8
**suggesting** [1] - 32:21
**suggestion** [2] - 4:9, 34:9
**suing** [1] - 58:4
**suit** [1] - 68:2
**suits** [2] - 7:18, 7:19
**summarizing** [1] - 59:3
**summing** [1] - 59:3
**Sunday** [1] - 56:1
**supplemental** [1] - 9:20
**supported** [1] - 55:23
**supports** [1] - 59:24
**supposedly** [2] - 68:12, 68:19
**Supreme** [1] - 21:11
**surround** [1] - 14:7
**survey** [1] - 59:22
**suspect** [2] - 31:3, 41:6

## T

**table** [1] - 3:20
**tabled** [1] - 17:4
**Taylor** [4] - 15:15, 35:18, 37:9, 37:12
**teachers** [1] - 34:17
**teaches** [3] - 15:15, 35:19, 37:13
**technical** [1] - 9:1
**temporary** [3] - 3:4, 4:11, 47:21
**ten** [2] - 19:11, 33:1
**tendency** [1] - 41:19
**tenure** [2] - 50:18, 69:11
**term** [2] - 30:23, 59:10
**terms** [10] - 38:10, 45:16, 45:18, 47:17, 47:25, 49:13, 50:4, 50:5, 64:2, 69:14
**terribly** [1] - 14:2
**test** [3] - 57:14, 58:12, 67:21
**text** [3] - 45:23, 51:11, 54:19
**THE** [147] - 1:1, 1:1, 1:10, 2:2, 2:11, 2:15, 2:18, 5:6, 5:19, 6:4, 6:8, 6:22, 7:5, 7:7, 7:18, 8:11, 9:13, 9:16, 10:2, 10:18, 11:9, 11:12, 11:17, 11:20, 12:13, 14:8, 14:17, 14:21, 15:4, 16:6, 16:10, 16:20, 17:3, 17:10, 17:19, 18:17, 19:1, 19:14, 20:23, 21:23, 21:25, 23:5, 23:15, 23:20, 24:10, 24:13, 25:5, 25:8, 26:3, 26:10, 28:18, 29:10, 29:13, 30:13, 30:19, 31:14, 32:24, 33:3, 33:12, 34:23, 35:2, 35:9, 36:14, 36:24, 37:4, 37:23, 38:1, 38:17, 38:23, 39:2, 39:5, 39:15, 39:18, 40:17, 41:8, 41:10, 41:12, 41:17, 41:21, 42:14, 43:5, 44:10, 44:16, 44:24, 45:9, 46:4, 46:9, 46:13, 46:15, 46:22, 47:10, 48:11, 48:16, 48:19, 48:25, 49:5, 49:17, 49:19, 50:1, 51:4, 52:4, 52:12, 52:21, 53:1, 53:15, 53:24, 54:4, 54:9, 54:16, 54:20, 55:17, 55:20, 56:8, 56:23, 57:15, 57:19, 57:24, 58:2, 58:6, 58:9, 58:14, 58:22, 59:23, 60:7, 60:12, 60:23, 61:8, 62:4, 62:7, 62:14, 62:24, 63:13, 63:20, 64:22, 65:9, 65:12, 66:3, 66:7, 66:17, 66:21, 67:11, 67:23, 68:1, 68:13, 68:16, 70:12, 70:14
**theory** [7] - 21:3, 22:20, 22:25, 23:4, 32:12, 61:3, 67:17
**they've** [5] - 15:1, 36:9, 36:11, 40:8, 70:1
**thinking** [1] - 41:25
**thinks** [2] - 32:15, 35:10
**third** [2] - 20:17, 57:2
**threatens** [2] - 57:17, 59:19
**three** [3] - 3:10, 5:14, 19:11
**threw** [1] - 63:14
**throughout** [2] - 20:12, 51:23
**thumb** [1] - 21:14
**Thursday** [2] - 1:5, 55:18
**timeline** [1] - 53:5
**today** [3] - 3:13, 4:2, 40:18
**together** [3] - 5:25, 14:3, 15:3
**toggle** [1] - 31:23
**tomorrow** [3] - 29:6, 40:24, 56:1
**top** [1] - 26:22
**tort** [1] - 21:25
**totally** [1] - 23:19
**touch** [2] - 5:16, 20:15
**toward** [1] - 23:24
**traditional** [2] - 45:15, 46:16
**transcript** [2] - 71:5, 71:6
**TRANSCRIPT** [1] - 1:9
**transition** [1] - 54:2
**TransUnion** [6] - 21:10, 21:21, 22:1, 22:4, 38:3, 38:19
**treasurer** [2] - 62:1, 70:6
**treatise** [1] - 57:2
**trial** [1] - 52:16
**tried** [1] - 34:2
**trigger** [1] - 8:5
**TRO** [4] - 3:12, 3:15, 3:19, 4:4
**true** [9] - 20:4, 24:18, 30:22, 32:16, 52:2, 52:3, 66:24, 71:4, 71:6
**truly** [1] - 18:5
**Trump** [5] - 2:4, 13:22, 14:23, 29:7, 34:13
**TRUMP** [1] - 1:6
**Trump's** [1] - 14:15
**trust** [38] - 7:19, 7:23, 9:21, 10:23, 12:18, 12:24, 13:2, 16:23, 22:2, 38:6, 38:20, 42:9, 42:11, 42:17, 43:11, 44:13, 44:14, 45:1, 45:7, 45:13, 45:17, 45:22, 46:10, 46:16, 46:19, 47:25, 49:8, 50:6, 56:25, 57:18, 58:3, 58:20, 59:20, 61:4, 67:6, 67:7
**trustee** [32] - 3:12, 6:6, 7:1, 7:11, 7:13, 7:14, 8:9, 10:16, 10:20, 13:8, 13:10, 20:18, 23:18, 29:18, 44:11, 45:12, 45:25, 46:10, 46:17, 46:19, 47:7, 47:8, 56:20, 58:4, 58:12, 58:13, 60:14, 60:24, 61:20, 65:2, 65:3
**Trustees** [1] - 25:25
**trustees** [47] - 3:23, 4:6, 5:23, 6:25, 17:18, 17:21, 18:1, 18:3, 23:18, 25:1, 26:16, 28:15, 28:16, 28:22, 28:23, 30:16, 32:14, 32:15, 44:25, 45:7, 45:15, 46:2, 46:23, 46:25, 47:3, 47:25, 49:14, 49:23, 51:1, 51:18, 51:22, 53:3, 53:9, 53:12, 55:6, 55:13, 56:2, 56:7, 58:17, 59:16, 61:3, 65:14, 66:16, 67:8
**trusts** [3] - 13:9, 59:8, 67:5
**truth** [1] - 23:25
**try** [3] - 33:7, 34:9, 70:9
**trying** [3] - 33:25, 56:13, 69:18
**Tuesday** [1] - 4:14
**tuned** [1] - 70:17
**turn** [3] - 2:19, 5:3, 47:12
**turns** [2] - 4:17, 16:2
**Tweet** [2] - 14:15, 40:11
**two** [27] - 3:7, 4:6, 5:20, 5:24, 7:25, 8:10, 8:17, 8:24, 10:25, 14:13, 14:22, 17:24, 19:16, 26:18, 27:7, 38:16, 48:10, 49:23, 58:10, 58:11, 59:25, 60:2, 66:18, 66:25, 69:3, 69:13, 69:22
**type** [2] - 15:16, 69:14
**types** [2] - 29:24, 35:21
**typically** [4] - 29:24, 43:19, 58:17, 61:24
**tyranny** [1] - 69:2

## U

**U.S** [4] - 1:20, 1:24, 31:9, 31:10
**UCI** [1] - 60:9
**ultimate** [1] - 38:23
**ultimately** [1] - 38:2
**ultra** [8] - 6:20, 10:4, 10:7, 10:13, 10:15, 10:17, 10:18, 19:6
**under** [32] - 6:12, 6:20, 7:9, 8:5, 8:8, 9:4, 9:5, 9:7, 9:24, 21:20, 32:12, 42:10, 44:21, 45:8, 46:2, 46:25, 47:7, 48:1, 50:7, 50:19, 53:13, 59:16, 60:19, 61:1, 61:3, 64:5, 65:24, 66:15, 70:15
**underscores** [1] - 47:15
**understood** [1] - 51:17
**undertaking** [1] - 42:8
**unhappy** [1] - 12:16
**unheard** [1] - 22:6
**unhelpful** [1] - 21:9
**unification** [1] - 66:21
**Unification** [1] - 60:10
**uniform** [1] - 67:7
**unique** [1] - 13:13
**Unit** [1] - 1:16
**UNITED** [2] - 1:1, 1:10
**United** [4] - 2:13, 3:24, 56:12, 71:11
**University** [1] - 15:15
**unless** [1] - 61:5
**unlike** [1] - 31:20
**unquote** [1] - 14:25
**unusual** [1] - 28:3
**unwieldy** [1] - 28:24
**up** [22] - 4:8, 8:6, 9:14,

10:2, 16:2, 16:4, 17:3, 26:4, 32:7, 33:15, 35:14, 38:24, 40:20, 41:13, 41:20, 43:15, 49:12, 50:10, 56:11, 56:17, 59:3, 66:25
**upcoming** [2] - 55:13, 56:15
**update** [2] - 14:25, 15:2
**urgently** [1] - 70:10
**USC** [6] - 6:25, 28:6, 40:2, 46:7, 48:2, 48:10
**uses** [1] - 30:23
**usual** [11] - 7:10, 11:1, 11:4, 12:25, 25:10, 29:18, 45:12, 46:3, 46:9, 46:16, 47:7

## V

**vague** [1] - 69:14
**vehicle** [1] - 6:15
**vest** [1] - 46:16
**vested** [1] - 48:13
**vice** [3] - 61:24, 61:25, 70:6
**view** [4] - 29:15, 39:20, 39:22, 67:10
**violate** [2] - 16:22, 44:13
**violation** [5] - 5:10, 5:12, 19:7, 38:6, 38:20
**vires** [8] - 6:20, 10:4, 10:7, 10:13, 10:15, 10:17, 10:19, 19:6
**virtue** [2] - 26:1, 31:2
**voice** [1] - 19:14
**voices** [3] - 17:6, 17:10, 24:25
**vote** [44] - 3:6, 3:12, 4:5, 4:7, 13:14, 14:5, 14:10, 14:11, 15:1, 15:2, 16:1, 18:4, 19:15, 25:12, 25:14, 25:15, 26:1, 26:17, 26:20, 26:21, 28:17, 28:19, 28:20, 28:22, 28:23, 29:23, 30:15, 30:16, 31:17, 32:11, 32:15, 33:21, 39:22, 42:23, 43:23, 51:14, 51:18, 53:16, 53:19, 58:18, 65:2, 65:3
**vote's** [1] - 16:8
**voted** [6] - 18:2, 52:1, 52:14, 53:8, 53:9, 54:24
**votes** [3] - 17:10, 29:6, 53:11
**voting** [30] - 5:24, 7:2, 16:18, 23:5, 23:13, 24:11, 25:5, 25:6, 25:9, 27:21, 27:22, 27:25, 29:6, 29:19, 31:12, 32:25, 33:18, 33:20, 34:5, 48:6, 48:13, 49:6, 49:8, 50:5, 51:6, 51:22, 52:8, 52:10, 52:11

## W

**wants** [5] - 23:25, 26:20, 31:12, 69:15, 69:21
**warning** [2] - 34:5, 34:6
**warranted** [1] - 42:4
**Washington** [6] - 1:4, 1:14, 1:17, 1:21, 1:25, 71:13
**WASHINGTON** [1] - 1:13
**ways** [4] - 41:25, 44:7, 51:2, 62:23
**week** [1] - 19:10
**weeks** [2] - 5:1, 19:11
**welcome** [1] - 2:11
**whatsoever** [2] - 4:20, 43:2
**White** [3] - 20:14, 62:5, 62:12
**whole** [5] - 12:10, 14:14, 21:17, 36:19, 53:20
**wields** [1] - 29:2
**WILLIAM** [1] - 1:19
**William** [1] - 2:13
**wind** [1] - 26:4
**wing** [1] - 20:14
**Wing** [1] - 20:15
**word** [2] - 30:1, 53:7
**world** [2] - 32:6, 66:12
**worry** [1] - 41:22
**worth** [1] - 40:10
**writes** [1] - 69:20
**wrongfully** [1] - 61:4

## Y

**year** [7] - 13:23, 15:24, 34:18, 36:1, 68:12, 68:19
**years** [1] - 15:17
**York** [5] - 7:15, 15:10, 16:14, 35:17, 37:10
**yourself** [1] - 2:6

## Z

**ZELINSKY** [81] - 1:12, 2:7, 5:4, 5:7, 6:3, 6:5, 6:18, 6:23, 7:6, 7:10, 7:25, 8:16, 9:15, 9:22, 10:5, 10:25, 11:10, 11:13, 11:19, 11:23, 12:21, 14:13, 14:20, 14:22, 15:5, 16:8, 16:11, 16:24, 17:8, 17:15, 17:24, 18:20, 19:13, 19:16, 21:6, 21:24, 22:3, 23:7, 23:19, 23:22, 24:11, 24:16, 25:6, 25:9, 26:6, 26:12, 29:1, 29:12, 29:15, 30:18, 30:20, 31:21, 33:2, 33:6, 33:13, 35:1, 35:8, 35:13, 36:23, 37:3, 37:5, 37:25, 38:12, 38:22, 39:1, 39:4, 39:8, 39:16, 39:19, 40:19, 41:9, 41:11, 66:8, 66:18, 66:22, 67:12, 67:25, 68:4, 68:14, 68:17, 70:13
**Zelinsky** [2] - 2:8, 5:2
**Zoom** [1] - 62:4