UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **JOYCE BEATTY**, <br><br> Plaintiff, <br><br> v. <br><br> **DONALD J. TRUMP** *et al.*, <br><br> Defendants. | Case No. 25-cv-4480 (CRC) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

The notion of a national cultural center in Washington, D.C. dates back to the mid-1950s, when President Eisenhower formed a commission to consider creating a public auditorium in the country's capital.  Both the idea—and the necessary fundraising—stalled for a few years, until President Kennedy resuscitated the effort in the early 1960s.  After President Kennedy's assassination, Congress enacted a statute authorizing the federal government to provide millions of dollars to match private donations to the new institution—known, henceforth, as the John F. Kennedy Center for the Performing Arts ("Kennedy Center" or "Center").[1]  Upon signing the bill into law, President Johnson foresaw that "the institution now given the breath of life [would] have a long and distinguished future."[2]

Roughly sixty years later, the Kennedy Center's immediate future is considerably cloudier.  After taking office for the second time in early 2025, President Trump fired the chair

---

[1] <u>See generally</u> "Creating the National Cultural Center," The Trump Kennedy Center (last accessed March 12, 2026), https://www.kennedy-center.org/memorial/jfk/highlights/national-cultural-center/.

[2] <u>President Signs Arts Center Bill; Cultural Complex in Capital to Have Kennedy Name</u>, N.Y. Times (Jan. 24, 1964), https://www.nytimes.com/1964/01/24/archives/president-signs-arts-center-bill-cultural-complex-in-capital-to-have.html?searchResultPosition=87.

of the Center's Board of Trustees ("the Board"), replaced many of its general trustees, appointed himself as a trustee, and then became the Board's chair.  In December 2025, the Board voted to add President Trump's name to the Center, making it the "Donald J. Trump and John F. Kennedy Center for the Performing Arts."  And just a few weeks ago, on February 1, 2026, President Trump announced that the Center would close for roughly two years for construction, revitalization, and what he has characterized as "Complete Rebuilding."

Plaintiff Joyce Beatty, a member of the House of Representatives and an *ex officio* member of the Board, has sued to challenge the Center's renaming and imminent closure, bringing a bevy of statutory claims sounding in trust law, along with Administrative Procedure Act ("APA"), *ultra vires*, and mandamus claims.  She has also moved for a preliminary injunction ("PI") to prevent the Center's closure and reconstruction.

On an even more exigent timeline, Representative Beatty seeks emergency relief in the form of a temporary restraining order ("TRO") that would enable her to prepare for, participate in, and vote during a March 16, 2026 meeting, at which the parties seem to agree the Board will consider and officially decide whether to close the Center.  In this Memorandum Opinion and Order, the Court weighs *only* Beatty's TRO request and does not reach issues raised by her concomitant PI motion unless strictly necessary to consider here.

After reviewing the expedited briefing and record evidence before it, the Court will **GRANT** Beatty's TRO motion in part and **DENY** it in part.  The parties agree that Beatty will be able to attend the meeting, so no further relief is due there.  The Court further concludes that she has a likelihood of success on her common law-inflected statutory claims that (1) her lack of access to *any* information about the Center's imminent closure; (2) the potential bar on her participation at the March 16 meeting; and (3) her inability to vote on the Kennedy Center's

closure violate her rights as a fiduciary under the Center's organic statute.  As to her information and participation requests, Beatty faces the risk of irreparable harm without the Court's intervention, especially because once the meeting comes and goes without a meaningful ability for her to consider the issues and weigh in, that injury cannot be undone.  That harm outweighs the minimal burden to the government of providing her certain readily-available information in advance of Monday's meeting and allowing her a reasonable opportunity to participate in deliberations.  The Court will therefore order that Beatty receive certain information and documents in advance of the meeting, to the extent they exist.  It further orders that Beatty be afforded a meaningful opportunity to lodge her dissent at the meeting and not be categorically barred from speaking.  By contrast, as explained further below, the irreparable harm and balance-of-equities factors do not clearly support Beatty's request for an order directing the Board to let her vote at the meeting.

It goes without saying that the conclusions in this Memorandum Opinion were reached on an emergency basis and may be revisited down the road, especially "to the extent the factual or equitable circumstances change."  Lawyers' Committee for Civ. Rights Under Law v. Pres. Advisory Comm'n on Elec. Integ., 265 F. Supp. 3d 54, 59 (D.D.C. 2017).  But in light of present extenuating circumstances, and the unprecedented swiftness and opacity with which the Kennedy Center is poised to close, the Court believes that the extraordinary relief of a TRO—limited in time and scope as it may be—is warranted.

## I.    Background

### A.  Legal Background

The Kennedy Center is a creature of statute.  Congress organized the Center as a "bureau" within the Smithsonian Institution, directed by a Board "whose duty it shall be to

maintain and administer" the Center and "site thereof as . . . a living memorial to John Fitzgerald Kennedy, and to execute such other functions as are vested" in it.  20 U.S.C. § 76h(a)(1).  By statute, the Center's Board is composed of several *ex officio* members who occupy positions in federal and D.C. government, as well as thirty-six general trustees who are appointed by the President to serve six-year terms.  Id. § 76h(a)(2,), (b).

The statute assigns to the Board several enumerated duties and goals, including to "present" a variety of performing arts from the United States and other countries; to serve as a leader in developing national performing arts education, policy, and programming; to offer "facilities for other civic activities"; and to establish within the Center "a suitable memorial in honor of the late President[.]"  20 U.S.C. § 76j(a)(1)(A)–(E).  Among other things, the Board is responsible for "plan[ning], design[ing], and construct[ing] each capital repair, replacement, improvement rehabilitation, alteration, or modification necessary to maintain the functionality of the building and site at current standards of life, safety, security and accessibility."  Id. § 76j(a)(1)(G).

To achieve these objectives, Congress has empowered the Board to do the kinds of things boards typically do: negotiate contracts, prepare budgets, employ personnel, solicit and accept gifts, transfer property, bargain with employees, procure insurance, and issue annual reports.  Id. §§ 76j(a)(2)(A)–(D); 76k(a)–(d), (f); 76l(c), (e).  The statute further provides that the Board "shall have all the usual powers and obligations of a trustee in respect of all trust funds administered by it."  Id. § 76l(b).  To that ultimate end, the Board is "authorized . . . to make such bylaws, rules, and regulations, as it deems necessary for the administration of its functions . . . including, among other matters, bylaws, rules, and regulations relating to the administration of its trust funds and [its own] organization and procedure[.]"  Id. § 76(a).

A review of the Center's organic statute does, however, reveal some important guardrails. For one thing, "[n]o change in the management and operation of the grounds may be made without the express approval of Congress and of the Secretary of the Interior." Id. § 76j(a)(2)(F). For another, the Board's actions related to performing arts and to the payment of trust funds "shall not be subject to review by any officer or agency other than a court of law." Id. § 76k(e). Furthermore, although the Board may "function notwithstanding vacancies," "twelve members of the Board shall constitute a quorum for the transaction of business." Id. § 76l(a). Impliedly, then, the Board needs at least a quorum to do its core "business."

Two final points underscore the Center's role not just as a national institution for the performing arts, but as a presidential memorial. Congress commanded that it be "the sole national memorial" to President Kennedy "within the city of Washington and its environs." Id. § 76q. And, with a handful of exceptions, see id. § 76j(b)(2), "no additional memorials or plaques in the nature of memorials shall be designated or installed in the public areas" of the Center. Id. § 76j(b)(1).

B.  Factual Background

Representative Beatty is a member of Congress who hails from Ohio's third congressional district, which encompasses part of Columbus and its northeastern suburbs. First Amended Complaint ("FAC") ¶ 13. By virtue of that position, she serves as an *ex officio* trustee on the Kennedy Center's Board. Id. Beatty has lodged a declaration indicating that prior to 2025, "the Board of Trustees conducted its affairs in a manner consistent with the Kennedy Center's statutory mission: to maintain and administer the Center as a living memorial to President John F. Kennedy and as a premier performing arts institution for all Americans." See Declaration of Joyce Beatty ("Beatty Decl."), ECF No. 13-2 ¶ 3.

In Beatty's telling, things changed in 2025.  President Trump fired the Board's longtime chair in February 2025 and replaced several of its general trustees.  Id. ¶ 4.  The President also appointed himself as a general trustee, and the Board elected him as its new chair.  Id. ¶ 5. Under his direction, the Board fired the Center's president and replaced her with Defendant Richard Grenell.  Id.

### 1. May 2025 Bylaw Amendment

Following this initial upheaval, the reconstituted Board convened in May 2025 to amend the Center's bylaws to reflect that *ex officio* members were "non-voting members" of the body and general trustees were "voting members."  Beatty Decl. ¶ 8; see also Bylaws of the Board of Trustees of the John F. Kennedy Center for the Performing Arts, as approved May 19, 2025 ("May Bylaws"), ECF No. 13-5, at 4.  The parties contest whether this amendment to the bylaws reaffirmed or departed from the Board's prior practice.  Beatty explains that, "[i]n [her] recent memory, votes of the Kennedy Center Board have largely been non-controversial and unanimous."  Beatty Decl. ¶ 6.  She further attests that "[v]otes were conducted by voice, with no differentiation made between ex officio and appointed trustees," and that she has "voted on matters in the past."  Id.  With her reply brief, Beatty also submits a declaration from Lawrence Wilker, who served as President of the Kennedy Center from 1991 to 2001.  See Declaration from Lawrence Wilker ("Wilker Decl."), ECF No. 20.  Mr. Wilker explains that, during his tenure, he had "full responsibility for the day-to-day operations" at the Center and "attended and participated in numerous" Board meetings.  Id. ¶ 4.  And during that time, "[t]o the best of [his] knowledge and recollection, the ex officio members of the Board were treated in all respects the same as the trustees appointed by the President," including that they shared the same "voting" and "participatory" rights.  Id. ¶¶ 5–6.

The government responds with two declarations that controvert Beatty and Wilker's assertions. Joseph LaFauci, Vice President of Board Relations and Government Affairs for the Kennedy Center since spring of 2025, states that based on his "own personal knowledge, and from Center records that [he] has reviewed, it is [his] understanding and belief that ex officio Board members have never counted toward a quorum of voting members, nor have they voted." See Declaration of Joseph LaFauci ("LaFauci Decl."), ECF No. 19-1 ¶ 3. Mr. LaFauci also notes that the May amendments "were presented to the Board, put to a vote, and were passed unanimously," with "[n]o ex officio member disput[ing] this practice." Id. ¶ 4. The government has also offered a declaration from former Congressman William Shuster, who attests that during his seven years as an *ex officio* Board member from 2012 to 2019, he "never voted, never observed other ex officio members vote, or ever heard of an ex officio member voting." See Declaration of William Shuster ("Shuster Decl."), ECF No. 19-2 ¶ 2. Per Mr. Shuster, "[e]x officio members do not count and have never counted toward a voting quorum." Id.

In a late-breaking filing, Beatty has submitted copies of the Kennedy Center's tax forms from 2022 and 2023, which appear to include an institutional representation that it had fifty-nine "voting" members during those years. See ECF No. 22-1; ECF No. 22-2. This number corresponds to the sum of the thirty-six presidentially-appointed general trustees and remaining *ex officio* members identified in the statute. See ECF No. 22 at 1. Where the tax form gives regulated parties a space to detail "material differences in voting rights" between board members, the Center appears not to have identified any such differences. Id. at 2.

## 2. Kennedy Center Renaming

Whoever is right on the matter, Beatty apparently was not able to vote after the bylaw amendment was put in place. In December 2025, she participated remotely in a Board meeting

convened at the private residence of Defendant Andrea Wynn, whom President Trump had appointed as a trustee. Beatty Decl. ¶¶ 9–10. To Beatty's surprise, it was announced at the end of the meeting that Board would vote on whether to add Trump's name to the Kennedy Center title. Id. ¶ 11. Beatty tried to voice her opposition to the announcement, but found herself involuntarily muted. Id. ¶ 12. The Board took a vote and declared the result "unanimous": The Center would be renamed. Id. ¶ 13. The next day, President Trump's name "was installed on the Kennedy Center's front portico." Id. ¶ 14. Public reporting suggests that, in the wake of the renaming, numerous artists canceled performances, and ticketholders have canceled reservations. Id. ¶ 16.

Beatty, for her part, decided to file suit in this case, challenging the name change as unlawful under 28 U.S.C. § 76l and the common law of trusts, among other authorities. See ECF No. 1. She named as defendants the Kennedy Center, President Trump, Mr. Grenell, the Board itself, and scores of its general and *ex officio* trustees (who are collectively referred to, hereinafter, as "Defendants").

### 3. Kennedy Center Closure

That brings us to the more recent present. On February 1, 2026, President Trump took to Truth Social and announced that the Kennedy Center would close for roughly two years, starting in July 2026:

> After a one year review of the Trump Kennedy Center, that has taken place with Contractors, Musical Experts, Art Institutions, and other Advisors and Consultants, deciding between either Construction with Closure and Re-Opening or, Partial Construction while continuing Entertainment Operations through a much longer period of time . . . I have determined that the Trump Kennedy Center, if temporarily closed for Construction, Revitalization, and Complete Rebuilding, can be, without question, the finest Performing Arts Facility of its kind, anywhere in the World. . . .
>
> Based on these findings, and totally subject to Board approval, I have determined that the fastest way to bring the Trump Kennedy Center to the highest level of Success, Beauty and

Grandeur, is to cease Entertainment Operations for an approximately two year period of time . . .

Therefore, the Trump Kennedy Center will close on July 4th, 2026, in honor of the 250th Anniversary of our Country, whereupon we will simultaneously begin Construction of the new and spectacular Entertainment Complex.  Financing is completed, and fully in place!  This important decision, based on input from many Highly Respected Experts, will take a tired, broken, and dilapidated Center . . . and turn it into a World Class Bastion of Arts, Music, and Entertainment . . .

Feb. 1, 2026 Truth Social Post by President Trump ("Truth Social Post"), ECF No. 13-12, at 1.

Beatty again reports being taken by surprise:  She had been "aware that the Board had previously discussed plans for various capital improvements to the Center—including improvements funded by Congress's recent $257 million appropriation, which the Board was informed were already underway—but to [her] knowledge the Board had never discussed" such an extended closure.  Beatty Decl. ¶ 18.

So a few weeks into February, Beatty sent a letter to President Trump and Mr. Grenell, expressing concerns about the closure and seeking several pieces of information from them, including: a detailed description of the intended renovations or "rebuilding," along with timelines, proposed contracts, and details about funding sources; a timeline for securing approvals from the National Capital Planning Commission, the Commission on Fine Arts, and other relevant authorities; a list of performance contracts the Center had in place for the two-year closure period and explanations as to how they would be addressed; a list of the experts President Trump had consulted during the one-year review, along with reports and communications from those experts regarding the Kennedy Center; and any analysis conducted as to the need to close the Center and documentation related to the costs associated with closure.  See Feb. 20, 2026 Letter from Rep. Beatty to President Trump and Mr. Grenell ("Feb. 20 Letter"), ECF No. 13-6, at

3–4; <u>see also</u> Beatty Decl. ¶ 23. She has yet to hear back from either the President or Mr. Grenell. Beatty Decl. ¶ 24.

### 4. *March 16 Board Meeting*

On or about February 27, Beatty learned from another congressional *ex officio* member that President Trump would be convening a special meeting of the Board on March 16 at the White House. <u>See</u> FAC ¶ 53; Declaration of Todd Valentine ("Valentine Decl."), ECF No. 20-1 ¶ 2. Beatty's chief of staff emailed Mr. Grenell and the General Counsel of the Kennedy Center on March 4, explaining that Beatty had not received an invitation and was therefore unable to RSVP. Her chief of staff did not hear back, which suggested to him that Beatty "was being treated differently than other members of the Board because of her vocal opposition to recent steps" it had taken. Valentine Decl. ¶ 3.

Beatty then amended her complaint in this case, expanding her common law and administrative law claims to encompass the impending closure. Sensing that others on the Board intended to box her out of the closure decision, as they had with the renaming, Beatty also challenged that exclusion as a violation of her rights as a trustee under 20 U.S.C. § 76l. <u>See</u> <u>id.</u> ¶¶ 85–91. And because the March 16 meeting is slated to take place in just a few days, Beatty has also moved the Court for a TRO that would require the Board to invite her to the meeting, give her the information she asked for in her letter of concern, allow her to participate fully as a Board member in the meeting, and authorize her to vote on the closure decision. <u>See generally</u> ECF No. 13. That same motion also includes a request for a PI to stay the closure and renaming of the Center during the pendency of the litigation. The Court will tackle these issues at a later date—though not too much later, given the time-sensitive nature of the events here described.

Briefing on the TRO motion has taken place over the course of the last few days, and a hearing was held just two days ago.

During the course of briefing, the parties have come to agree that Beatty *was*, in fact, invited to the March 16 meeting; as it turned out, the electronic invitation had gone to the spam folder of her personal email account.  Valentine Decl. ¶ 4; see also LaFauci Decl. ¶ 2.  The government has also represented that Beatty "will be permitted to participate, to the same extent as any other trustee, subject to the rules governing Board proceedings and as applied in the Chair's discretion."  Opp. to TRO Mot. at 7.  However, it refuses to provide Beatty the information she has requested or to permit her to vote at the meeting.  Id. at 16–17.

## II.    Legal Standard

A TRO is "an extraordinary remedy, one that should be granted only when the moving party, by a clear showing, carries the burden of persuasion."  Dellinger v. Bessent, 766 F. Supp. 3d 57, 62 (D.D.C. 2025) (quoting Sibley v. Obama, 810 F. Supp. 3d 309, 310 (D.D.C. 2011)). "As with a preliminary junction, a party seeking a TRO must establish (1) that he is likely to succeed on the merits[;] (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest."  State v. Musk, 769 F. Supp. 3d 1, 4–5 (D.D.C. 2025) (quoting Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014)).  The third and fourth factors generally "merge" when the government opposes a motion for emergency injunctive relief.  Nken v. Holder, 556 U.S. 418, 435 (2009).[3]  At base, "[c]rafting" emergency or preliminary relief "is an exercise of

_____

[3] The Court notes that some doctrinal wrinkles persist when it comes to the standard for preliminary relief.  The D.C. Circuit has previously applied a "sliding scale" approach, in which a stronger showing on one factor may make up for a weaker showing on others, but the Circuit has also flagged that such an approach may be "in tension with intervening Supreme Court decisions" suggesting that each factor must be considered independently.  Changji Esquel Textile

discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." Kim v. FINRA, 698 F. Supp. 3d 147, 161–62 (D.D.C. 2023) (quoting Trump v. Int'l Refugee Assistance Proj., 582 U.S. 571, 579 (2017)).

### III.  Analysis

As initially presented in the TRO motion, the limited, albeit multi-part, question before the Court was whether it may order the Board to (1) invite Representative Beatty to the March 16 meeting; (2) give her access to the information she requested in advance of the meeting; (3) permit her to participate meaningfully at the meeting; and (4) authorize her to vote on the closure and any proposed construction of the Kennedy Center at the meeting.  As the briefing process has unfolded, the first request for relief has resolved itself.  The parties now agree that Beatty's invitation to the meeting got lost in the "mail," and that she will be permitted to attend the meeting, after all.  So on that front, there is no relief left for the Court to order.

Setting that request aside, the government has expressly refused to grant Beatty's requests for information about the closure and the opportunity to vote.  In fact, it contends not only that she lost the right to vote last May, but also that she *never* had the right to begin with. With regard to Beatty's request about speaking at the meeting, the government states that she "will be permitted to participate, to the same extent as any other trustee, subject to the rules governing Board proceedings and as applied in the Chair's discretion."  Opp. to TRO Mot. at 7. Beatty points out that this assurance is "carefully caveated" and therefore gives her reason to think, based on past experience, that she will again be silenced.  TRO Reply Br. at 21.  The Court

_____

Co. Ltd. v. Raimondo, 40 F.4th 716, 726 (D.C. Cir. 2022).  The Court would come to the same conclusions laid out in this Memorandum Opinion under either approach.

will review the TRO factors as to the informational request first before turning to Beatty's right to participate in and vote at the meeting.

   A.  <u>Access to Information</u>

       *1.  Likelihood of Success on the Merits*

          a.  <u>Threshold Issues: Cause of Action, Duty of Prudence, and Trustee Standing</u>

In her FAC, Beatty alleges that the Defendants have violated her rights as a trustee and fiduciary of the Kennedy Center, as laid out in 20 U.S.C. § 76l.  <u>See</u> FAC ¶¶ 84–91.  That claim, over which the Court has federal question jurisdiction under 28 U.S.C. § 1331, serves as a basis for Beatty's present emergency request for access to information about the Kennedy Center's planned closure in advance of the March 16 meeting.  In the alternative, Beatty's complaint suggests that her lack of access to information and general exclusion from the closure decision are *ultra vires*.  <u>See</u> <u>id.</u> ¶¶ 99–100.

At this juncture, the Court is persuaded that Beatty may sue under the terms of the Kennedy Center's organic statute itself and thus need not address whether the alleged violations are alternatively actionable through the vehicle of an *ultra vires* claim.  Moreover, the government has not meaningfully objected to Beatty's claims for emergency relief for lack of a cause of action; instead, it focuses on rebutting her claims on their merits.

Under Beatty's theory, which the Court accepts at this preliminary stage, a Kennedy Center trustee can sue under 20 U.S.C. § 76l because the statute affords the Board "all the usual powers and obligations of a trustee in respect of all trust funds administered by it," <u>id.</u> § 76l(b), and the Board, in turn, is "composed of" its *ex officio* and general trustee members, <u>id.</u> § 76h(a)(2).  The statute thus confers "the usual powers and obligations of a trustee" on its individual members.  Neither side disputes that in so stating, Congress intended to legislate

against the backdrop of common-law trust principles.  That consensus is unsurprising, given that "words of a statute must be read in their context and with a view to their place in the overall statutory scheme," including with an eye toward "statutory history," and, in appropriate circumstances, "considerations of incorporation and the old-soil canon."  Jazz Pharmaceuticals, Inc. v. Kennedy, 141 F.4th 254, 261 (D.C. Cir. 2025) (cleaned up); cf. Central States, Se. and Sw. Areas Pension Fund, Inc. v. Central Transport, Inc., 472 U.S. 559, 570 (1985) (explaining that in the ERISA context, "rather than explicitly enumerating *all* of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility").

Looking to those common-law principles, the Court cannot but conclude that, as a general matter, Kennedy Center trustees may sue to rectify an infringement on their ability to carry out their fiduciary duties.  See, e.g., Restatement (Third) of Trusts § 81(1)–(2) ("If a trust has more than one trustee, except as otherwise provided by the terms of the trust, each trustee has a duty and the right to participate in the administration of the trust," and "[e]ach trustee also has a duty to use reasonable care to prevent a co-trustee from committing a breach of trust and, if a breach of trust occurs, to obtain redress."); id. § 94(2) (authorizing "suit for the enforcement" of both private and charitable trusts); id. § 94, cmt. c ("If a trust has several trustees, one or more of them can maintain a suit against one or more others to compel them to perform their duties under the trust or to enjoin them from committing or compel them to redress a breach of trust.").[4]  The

---

[4] The Court will refract present questions of trust law through well-established and oft-cited treatises, as well as the statutory and case law of the District of Columbia, which it has no reason to believe is consequentially distinct from the trust law of other jurisdictions.  The parties appear to agree that relying on D.C. authority to resolve this motion is appropriate.  See Opp. to TRO Mot. at 10–11 ("Given the location of the Center in the District of Columbia and the fact that this Court and the D.C. Circuit have previously assessed similar trustee claims under the laws of the District of Columbia, providing persuasive and potentially binding precedent for this

statute further contemplates that judicial review is available where a trustee suffers such an infringement, as it provides that the "actions of the Board relating to performing arts and to payments made or directed to be made by the Board from any trust funds shall not be subject to review by any officer or agency *other than a court of law*."  20 U.S.C. § 76k(e) (emphasis added).

Having examined the vehicle for Beatty's common law-inflected statutory claim, the Court now looks under the hood.  Beatty asserts that she needs access to information in advance of the March 16 meeting because, without it, she cannot fulfill one of her core fiduciary duties as a trustee—namely, her duty of prudence.  It is black-letter trust law that a trustee "has a duty to administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust."  Restatement (Third) of Trusts § 77(1).  That duty "requires the exercise of reasonable care, skill, and caution."  Id. § 77(2).  And exercising fiduciary care, in turn, requires the trustee to expend

> reasonable effort and diligence in planning the administration of the trust, in making and implementing administrative decisions, and in monitoring the trust situation, with due attention to the trust's objectives and the interests of the beneficiaries. This will ordinarily involve investigation appropriate to the particular action under consideration, and also *obtaining relevant information* about such matters as the contents and resources of the trust estate and the circumstances and requirements of the trust and its beneficiaries.

Id. § 77, cmt. b (emphasis added).

The duty of prudence thus entails at least some modicum of access to information. Moreover, as a leading treatise in the field explains, the "correlative of the duty of a co-trustee to participate actively in the administration" of a trust is "the duty of a co-trustee, particularly one

_____

Court to apply, Defendants proceed here as if District of Columbia law governs."); TRO Reply Br. at 8–12 (applying D.C. trust law).

empowered to exercise greater control of having greater knowledge of trust affairs, to inform each co-trustee of all material facts that have come to his or her attention and that are relevant to the administration of the trust."  G. Bogert, The Law of Trusts and Trustees § 584.  That transparency is equally important when it comes to "a trustee with a minority vote."  Id.[5]

Before considering what the duty of prudence means for Beatty in the lead-up to the March 16 meeting, two preliminary points.  *First*, the government suggests that the Kennedy Center, as a charitable trust rather than a private trust, "is subject to very different legal rules, including a balancing of policy concerns and objectives."  Opp. to TRO Mot. at 10 n.2.  Not quite.  Although there are some important differences between charitable trusts and private trusts—as the Court will discuss in just a moment—"[t]he powers, duties, and liabilities of trustees of a charitable trust are, with only a few exceptions, the same as the powers, duties[,] and liabilities of private trusts."  Bogert, Law of Trusts § 391; see also Restatement (Third) of Trusts § 1, cmt. c ("Much of the law stated throughout this Restatement applies to charitable trusts."); D.C. Code § 19-1301.02 ("This chapter applies to express trusts, charitable or noncharitable . . .").  In any case, the parties do not suggest that the duty of prudence is applied differently to charitable trustees as to private trustees.

---

[5] Beatty's briefing and argument at the TRO hearing leaned heavily on the D.C. Circuit's decision in Cummock v. Gore, 180 F.3d 282 (D.C. Cir. 1999).  That opinion, which confronted the exclusion of a member of a committee established under the Federal Advisory Committee Act, supports the general principle that members of deliberative bodies need information to make decisions.  It also reinforces the "absurd[ity]" of holding that a "public deliberative body that is subject to precise statutory mandates to ensure openness and fair deliberations" may "simply exclude unpopular viewpoints from participation."  Id. at 291.  While informative, the decision is somewhat orthogonal to this case, which doesn't involve the same "precise statutory mandates."  Given the hybrid statutory/common-law theory of Beatty's claim, she gets more mileage out of the deep body of trust law that underscores the importance of information to prudent decision-making.

*Second*, the government submits that Beatty lacks a sort of common-law standing to sue for breach of fiduciary duty because, when it comes to charitable trusts, "the traditional rule has been that only a public officer, usually the state Attorney General, has standing to bring an action to enforce the terms of the trust." Hooker v. Edes Home, 579 A.2d 608, 612 (D.C. 1990).  That general rule is true—and crucial—when it comes to the risk that "any and all" *beneficiaries* of a charitable trust, who are necessarily a "large and constantly shifting" class because the res of a charitable trust is to be applied "for some form of public benefit," may engage in "vexatious litigation" and place undue, "recurring burdens on the trust res."  Id. at 611–12 (quoting, in part, G. Bogert, The Law of Trusts and Trustees § 411 (2d ed. rev. 1977)).  "An exception to th[is] general rule . . . exists where an individual seeking enforcement of the trust has a 'special interest' in continued performance of the trust distinguishable from that of the public at large." Id. at 612.  In order to proceed under the "special interest" exception, a plaintiff must demonstrate that she belongs to a "particular," "sharply defined," and "limited" class of potential beneficiaries and that she challenges more than "an ordinary exercise of discretion on a matter expressly committed to the trustees."  Id. at 614–15.

The Court does not read Hooker, its underlying rationale, or its progeny to restrict the availability of a fiduciary-duty cause of action against a trust when the suit is brought by other *trustees*.  For one thing, D.C.'s Uniform Trust Code provides both that trustees "shall exercise reasonable care" to "[p]revent a cotrustee from committing a serious breach of trust" and "[c]ompel a cotrustee to redress a serious breach of trust," see D.C. Code § 19-1307.03(g)(1)– (2), and that "[t]he settlor of a charitable trust, *among others*, may maintain a proceeding to enforce the trust," id. § 19-1304.05(c) (emphasis added).

For another, both the Restatement of Trusts and Bogert—key sources of trust law authority in the District[6]—acknowledge that "[a] suit can be maintained for the enforcement of a charitable trust" by a "co-trustee," in addition to the Attorney General, other public officer, or another person with a special interest in enforcement.  Restatement (Second) of Trusts § 391; Restatement (Third) of Trusts § 94(2) ("A suit for the enforcement of a charitable trust may be maintained only by the Attorney General or other appropriate public officer or by a co-trustee or successor trustee, by a settlor, or by another person who has a special interest in the enforcement of the trust."); Bogert, Law of Trusts § 413 ("Cotrustees, former and subsequent trustees, or subtrustees frequently obtain standing to enforce a charitable trust.  These individuals hold a fiduciary interest that distinguishes them from the general public and provides reason to believe that, in a representational capacity, such a person will give whole-hearted support to the cause of the charity.").

The Moon cases, on which the government heavily relies, are not to the contrary—if anything, they bolster Beatty's position.  See Family Fed'n for World Peace v. Hyun Jin Moon, 129 A.3d 234 (D.C. 2015) ("Moon I"); Family Fed'n for World Peace v. Hyun Jin Moon, 338 A.3d 10 (D.C. 2025) ("Moon II").  The plaintiffs in those D.C. Court of Appeals cases alleged that the defendants "undertook a series of coordinated and calculated illegal actions to usurp" a D.C. nonprofit corporation "and its corporate assets and wrest control" of the corporation from the Unification Church religious movement.  Moon I, 129 A.3d at 238.  Two of the five plaintiffs

---

[6] See, e.g., He Depu v. Yahoo! Inc., 950 F.3d 897, 901 n.2 (D.C. Cir. 2020) ("Because the D.C. Court of Appeals cites Bogert on Trusts and the Restatement (Second) of Trusts as authoritative in applying the common law of the District, we do so as well."); Cabaniss v. Cabaniss, 464 A.2d 87, 91 (D.C. 1983) ("In the absence of any definitive case or other authority in this jurisdiction on the specific matter at issue, we have turned to, and conclude we agree[] with[,] the pertinent sections of the Restatement . . .").

in the case were former directors of the corporation before they were "ousted," id. at 240, so they presumably owed a fiduciary duty to the corporation in a way that was unique from the other beneficiary plaintiffs.  The Court of Appeals concluded that both the former director plaintiffs and other plaintiffs satisfied the special interest test, permitting them to "contest the complained-of actions by the defendants" under trust law.  Id. at 244.  But the Court of Appeals was also careful to note that, "[i]n addition to finding that the ousted directors have special interest standing, . . . they fall within the definition of 'among others' in D.C. Code § 19-1304.05 . . . for enforcement of charitable trusts, and may 'maintain a proceeding to enforce the trust.'"  Id. at 244 n.16.  And it elaborated that the D.C.'s Uniform Trust Code "establishes that when co-trustees are appointed to act as stewards of a trust, each trustee shall exercise reasonable care to . . . prevent a co-trustee from committing a serious breach of trust; and . . . compel a co-trustee to redress a serious breach of trust."  Id. (cleaned up).

The Court therefore does not view Hooker or the Moon cases as obstacles to Beatty's common-law standing to sue as a trustee and declines to apply the special interest test given Beatty's unique position and fiduciary interest in protecting the trust.[7]

b.  Underlying Merits

With the brush cleared, the Court returns to the question at hand:  Has Beatty clearly shown that she needs access to some preliminary information in advance of the March 16 meeting in order to fulfill her fiduciary duty?  On the record before the Court at this early stage,

_____

[7] The Court further notes that Representative Beatty was appointed a trustee by virtue of her elected position, so perhaps she is a type of "public official" who would have standing to enforce the trust under what Hooker calls the "traditional rule."  Cf. Raven v. Sajet, 334 F. Supp. 3d 22, 30 (D.D.C. 2018) (explaining that "political accountability persists" at the Board of Regents of the Smithsonian Institution because it "sports heads from the Executive, Legislative, and Judicial Branches," along with individuals "appointed by politically-accountable representatives in Congress").  In any case, the Court need not reach this question today.

the answer is yes.  According to President Trump's Truth Social post, the Kennedy Center has

undergone a "one year review," during which time the President (and perhaps others) consulted

with "Contractors, Musical Experts, Art Institutions, and other Advisors and Consultants" to

envision its future.  See Truth Social Post at 1.  After that review, and "[b]ased on [his]

findings," President Trump concluded that temporary closure for "Construction, Revitalization,

and Complete Rebuilding" was in order.  Id.  He further touted that "[f]inancing is completed,

and fully in place!"  Id.  In the President's words, "[t]his important decision, based on input from

many Highly Respected Experts, will take a tired, broken, and dilapidated Center . . . and turn it

into a World Class Bastion of Arts, Music, and Entertainment . . . ."  Id.

        The President's social media post underscores that he, along with contractors, experts,

advisors, and consultants, have been reimagining the Kennedy Center for a full year.  The

financing for this "Complete Rebuilding" is "fully in place."  Although Mr. LaFauci's

declaration attests that "there will be no *significant* construction work" at the site until after July

7 of this year, "some preliminary work" has already "been started."  LaFauci Decl. ¶ 5 (emphasis

added).  And "limited information regarding construction planning has been presented to the

members of the Building and Grounds Committee, of which [Beatty] is not a member."  Id. ¶ 6.

        As the foregoing facts suggest, a project of this salience and magnitude—which threatens

to involve at least some demolition and reconstruction of a major national memorial and active

performing arts theater—does not happen overnight.  If it is the case that many external advisors

and Board members have been consulted, the financing is set, and already-made decisions are

currently being implemented on-site, there *must* be some concrete information to share with the

full Board, including Beatty.  The government's assertion, both in its briefing and at the hearing,

that such information is "preliminary" and not yet sufficiently "finalized" to share with the full

slate of decisionmakers—just *four days* before the Board is set to vote on a complete, two-year closure of the Center they are statutorily charged with overseeing—borders on preposterous.

That's not all. Beatty has submitted declarations from several experts of her own, including a former president of the New York Philharmonic and a practitioner in arts management. Together, these declarations reveal that

> [a] governing board charged with stewardship of an institution like the Kennedy Center would expect to receive, before approving a closure of this kind, a comprehensive package of planning materials: an overall architectural concept, identification of the major professional consultants who will lead the project, timelines, budgets, and supporting analysis from each of the relevant specialists.

See Declaration of Deborah Borda ("Borda Decl."), ECF No. 13-19 ¶ 18; see also Declaration of Edwin Andrew Taylor ("Taylor Decl."), ECF No. 13-20 ¶ 15 (same).

It hardly takes an inferential leap to conclude that a Kennedy Center trustee who wants to "exercise reasonable effort and diligence" in "planning," "making," and "implementing" trust-related decisions, see Restatement (Third) of Trusts § 77, cmt. b, would require more than the length of a single meeting to evaluate such a "comprehensive package." The government's assurance that Beatty "*will* be provided with [unspecified] information regarding the proposed construction at the Center" at the March 16 meeting is thus cold comfort—and, from a fiduciary perspective, strikes the Court as falling below even a forgiving standard of prudence.

To be clear, none of this is to say that *all* trustees at *all* stages in the trajectory of a major project must have *all* the information about the undertaking. As the government points out, Congress authorized the Board to set procedures to govern its internal business, and that may very well encompass when and how it conveys information to its trustees. See 20 U.S.C. § 76l(a). The trouble here is that the Defendants have flatly refused to provide *any* information within a timespan that any reasonable trustee—including general trustees—would deem necessary to assess a proposal of such magnitude. In other words, these are exceptional

circumstances, both in the potential immensity of the announced work on the Kennedy Center and the manner in which most of its trustees have been sidelined from one of the more consequential decisions in the institution's lifespan.  As such, the Court finds that Beatty is likely to succeed in proving that the failure to timely provide her with *any* information about the Kennedy Center's imminent closure has infringed on her fiduciary rights and duties under 20 U.S.C. § 76l and the principles of trust law it imports.

### 2. Irreparable Harm and Balance of Equities

In light of the foregoing, the Court has little trouble concluding that Beatty's lack of access to core information about the Kennedy Center's closure and reconstruction plans will cause her irreparable harm, and that her harm outweighs any conceivable prejudice to the government.

First, the Court considers Beatty's irreparable harm, for which the D.C. Circuit "has set a high standard."  Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).  The injury must "be both certain and great," and "actual and not theoretical."  Id. (citation omitted).  It must also be imminent and beyond remediation without the Court's intervention.  Id.

Again, to date, Beatty has not received any information from her co-trustees, Board leadership, or staff as to even the basic scope of the work that is planned for the Kennedy Center—whether it turns out to be modest renovation, complete demolition and rebuilding, or something in between.  See Beatty Decl. ¶¶ 19, 24, 28.  This harm is certain, great, and actual, as Beatty and her co-trustees are tasked with making a decision of serious consequence for the nation's flagship cultural institution.  The informational deprivation has been ongoing for at least a few weeks, if not longer, since Beatty formally requested eight categories of documents from

the President and Mr. Grenell on February 20.  "[T]imely awareness" is "necessary" here because there are "ongoing proceedings of national importance," and under such exigent circumstances, "stale information is of little value."  Brennan Ctr. for Justice v. Dep't of Commerce, 498 F. Supp. 3d 87, 101 (D.D.C. 2020) (cleaned up).  Nor is there an imminence problem, not least because the Board is slated to make a decision about the near-term future of the Kennedy Center in a few days.  Finally, the specific harm considered here is irreparable because, after the March 16 meeting passes, "there can be no do over and no redress" as to the lost opportunity to exercise her fiduciary duty in that pivotal moment.  League of United Latin Am. Citizens v. Executive Off. of President, 808 F. Supp. 3d 29, 81 (D.D.C. 2025) (citation omitted).  Beatty has faced, and will continue to face, irreparable harm without the information she needs to make an informed decision about the Kennedy Center's future.

Second, balancing the equities.  The government's showing of prejudice is lackluster. Defendants' submission that they would incur "significant harm" by having to turn over some set of documents rings hollow.  Opp. to TRO Mot. at 16.  Beatty "is not asking" for anything "bespoke," but instead the "timelines, budgets, and plans Defendants *already have prepared*." TRO Reply Br. at 3.  Since plans for major work at the Kennedy Center have been brewing for a year, the government is hard-pressed to argue that there is no readily-available material to provide.  If there are no such plans, the Defendants are free to say so.  Given that the government has proffered no other monetary, informational, or other administrative harm to outweigh the irreparable injury Beatty has identified, she has carried her burden for emergency relief by a clear showing.

3. *Scope of Relief*

Finally, the Court considers whether to grant Beatty's request for all eight categories of information detailed in her February 20 letter, or some other subset of information. Given that this dispute has arrived in Court very late in the game, it might have been sufficient for present purposes to direct Board leadership to circulate whatever presentation they have planned for March 16. That way, at the very least, Beatty could preview what would be discussed a few days in advance. But based on the government's briefing and representations at the TRO hearing, even that material is a moving target and/or has not been "finalized." Opp. to TRO Mot. at 16; see also TRO Hearing Tr. 56:10–17 (government counsel explaining that it "could take up until the moment" of the meeting to finalize the presentation of information and that the Board's chair "has a well-known proclivity for trying to make sure that pieces of information are included that might be relevant . . . to upcoming matters that he's involved in").

Absent any inkling of what, if anything, will be presented at the meeting, the Court is forced to craft its own list of materials to order the Defendants to supply. In arriving at the documents described below, the Court has attempted to carefully balance Beatty's obligation to be prepared to consider matters before the Board with the Board's power to manage its own affairs. It is neither the Court's role nor desire to micromanage Board meetings or delve into the minutia of the Board's decision-making process. Nor does the following list require the Board to create a "bespoke" presentation for Beatty. It encompasses standard items that any prudent trustee would expect to review before reaching a decision on the matter being presented. Moreover, all the materials, if they exist, should be readily available to the Defendants. With some narrowing, the Court's order draws from the list of documents that Beatty requested in her February 20 letter, less a few categories which appear to be moot given the unfolding of events.

Accordingly, the Court will order Mr. Grenell or his designee to provide Beatty, through counsel, within 24 hours of the March 16 meeting:

1. All documents prepared for or presented to the Board's Buildings and Grounds Committee in connection with its vote to recommend the closure and any subsequent construction projects.

2. The following categories of information, to the extent not covered by (1):

   a. All information provided to members of the Board's Buildings and Grounds Committee in advance of its vote to recommend (i) the closure of the Center, and (ii) any subsequent construction projects on the Center's grounds;

   b. The latest consolidated budget for the anticipated work;

   c. A list of the artistic or performance contracts that will be affected by the planned closure of the Center, or alternatively, documents indicating which artistic or performance contracts will be affected by the planned closure;

   d. A list of the experts or advisors who provided input during "one year review" of the Center as described in President Trump's Truth Social Post, or alternatively, documents indicating which experts or advisors were consulted; and

   e. Any reports provided by those experts and advisors to the Center's leadership or the Building and Grounds Committee relating to the "one year review" or the planned closure of the Center.

3. If any of the documents described in (1) or (2) do not exist, Mr. Grenell or his designee must notify Beatty of that fact in writing.

B.  Right to Participate and Vote

The Court now turns to Beatty's contention that the Defendants are poised to violate her statutory fiduciary rights if she is not permitted to speak and vote at the meeting.  The threshold conclusions about Beatty's cause of action and trustee standing outlined above apply here.

### 1. Likelihood of Success on the Merits

In evaluating her participation and voting requests for relief, the Court will start by briefly reiterating a point it made earlier.  The Kennedy Center statute confers "the usual powers and obligations of a trustee" on the Board's individual members.  20 U.S.C. § 76l(b).  In addition to a right to information derived from a trustee's duty of prudence, a trustee also has a "duty and the right to participate in the administration of the trust," except "as otherwise provided by the terms of the trust."  Restatement (Third) of Trusts § 81(1).  In other words, trustees have both an obligation and an opportunity to participate in trust decision-making, whether or not that takes the precise form of casting a vote.  Cf. id. § 39, cmt. a ("[W]hen feasible all trustees must be consulted before decisions are made.").

Beyond being well-rooted in black-letter trust law, this default rule is entirely sensible; after all, if an individual joins a deliberative body, but is then entirely "wall[ed] . . . off" from its operations, her membership is "render[ed] . . . essentially meaningless."  Cummock v. Gore, 180 F.3d 282, 291 (D.C. Cir. 1999).  To render Beatty's Kennedy Board membership "meaningless" not only contravenes common-law trust principles, but also by extension, Congress's carefully chosen language.  These considerations persuade the Court that a blanket prohibition on Beatty's ability to participate at Board meetings, including by speaking and engaging in deliberation, violates her core fiduciary right to participate in the trust's administration.

Whether Beatty has a statutory right to vote at Board meetings, including the upcoming one, is a trickier question.  In May 2025, the Board amended its bylaws to designate general trustees as voting and *ex officio* trustees as non-voting.  Beatty contends that the Center's organic statute vests her with a right to vote in Board proceedings, and therefore the May 2025 amendments are void.

To assess this claim, it is necessary to explore what the statute does and doesn't say on the matter.  Congress has delineated whom the Board "shall be composed of" in granular detail.  See 20 U.S.C. § 76h(a)(2).  It has also provided that the Board "may function notwithstanding vacancies and twelve members of the Board shall constitute a quorum for the transaction of business."  See 20 U.S.C. § 76l(a).  And the Board is "authorized . . . to make such bylaws, rules, and regulations, as it deems necessary for the administration of its functions under this subchapter, including, among other matters, bylaws, rules, and regulations relating to the administration of its trust funds" and, relevant here, "the *organization and procedure* of the Board."  Id. (emphasis added).

By its plain terms, then, the statute says nothing about which members may or may not vote.  How are we to read that silence, in light of the other provisions just mentioned?  Though a close question, the Court is—at least at this early stage—persuaded that each Board member identified in § 76h(a)(2) is likely entitled to vote at Board meetings, so the provision of the May 2025 bylaws that strips *ex officio* members of their ability to vote is likely void.  It reaches this tentative conclusion for the textual, structural, and historical reasons that follow.

The Court begins with the observation that the term *ex officio* does not inherently connote that a trusteeship is solely honorary in nature.  It means, rather, that a role is "[b]y virtue or because of an office."  Ex Officio, Black's Law Dictionary (12th ed. 2024).  Though "[t]he term

is often misused as a synonym for 'nonvoting,'" "an ex officio member is a voting member unless the applicable governing document provides otherwise." Id.

Next, the Center's organic statute does not distinguish between general trustees and *ex officio* members in any way, other than to identify who they are and to specify the term limits and parameters of general trustees. See 20 U.S.C. § 76h(a)(2). Coupled with the section providing that trustees possess "all the usual powers and obligations . . . in respect of all trust funds" they collectively administer, 20 U.S.C. § 76l(b), the lack of any meaningful distinction between general and *ex officio* trustees suggests at least a baseline presumption that they possess the same fundamental "powers and obligations" under trust law.

Additionally, as Beatty points out, Congress regularly differentiates between voting and non-voting members of other bodies. See generally TRO Mot. at 13–14 (collecting citations). In statutes creating various boards, commissions, and centers, it has specified that *ex officio* members are non-voting, or that some subset of *ex officio* members is non-voting. See id. at 14–15 (collecting citations). That Congress has not done the same here is perhaps telling.

To this point, the government has a rejoinder:

> [I]f Congress knows how to impose restrictions on a Board's ability to manage its affairs—*e.g.*, by explicitly providing that certain trustees do and do not have voting rights—then its decision not to impose similar restrictions on the Center suggests it intended the Board to have full discretion to manage its internal affairs.

Opp. to TRO Mot. at 9. But Beatty would seem to be correct that this argument "proves too much." TRO Reply Br. at 14. For example, it would be both bizarre and potentially contrary to the statute for the Board, in its discretion, to strip voting rights from all the general trustees. See 20 U.S.C. § 76l(a) (requiring a quorum of twelve members in order to "transact[] . . . business"). Neither does it seem right that the Board could agree to strip the voting rights of all but a particular set of twelve members. Yet taken to its logical conclusion, the government's approach

would seem to allow for an ever-changing set and number of voting members, constrained only by the quorum provision.  That state of affairs strikes the Court as not just a mess, but also inconsistent with the background principle that there are no distinctions between trustees aside from the basis of their membership on the Board.[8]

This brings the Court to a more fundamental point:  While the Board is free to make "bylaws, rules, and regulations, as it deems necessary" for "administrati[ve]," "organization[al]," and "procedur[al]" purposes, there are some substantive trustee rights and duties that lie beyond the terrain of bylaws and may be molded only by the trust's paramount governing document— the organic statute.  Id.  To be sure, the bulk of the Board's operations are appropriately laid out in bylaws, a core day-to-day governance document, rather than the statute.  But where possible, courts are to give "effect" to "every clause and part of a statute."  RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (D.D.C. 2012) (citation omitted).  For this reason, the Court declines to read the "bylaws, rules, and regulations" language in the statute as a catch-all that automatically permits the Board to internally regulate *any* subject, just because that subject is not expressly mentioned in the organic statute.  Congress's references to "administration," "organization," and "procedure" must be doing some work.  Based on the circumstances

_____

[8] Perhaps relevant here, in support of their arguments, the parties each lay claim to the same provision of the Smithsonian Institution's organic statute, which authorizes its Board of Regents to "modify the number of members, manner of appointment of members, or tenure of members, of the boards or commissions" under its jurisdiction "other than" itself, the Kennedy Center, and two other boards.  20 U.S.C. § 42(b).  In Beatty's view, the statutory limitation "reflects Congress's deliberate decision to fix the decision-making structure of the Kennedy Center Board by statute rather than allow it to evolve through internal bylaw amendments." TRO Reply Br. at 16.  In the government's estimation, the fact that Congress did not impose on the Kennedy Center Board the same restriction it imposed on the Smithsonian Board to tinker with its own composition suggests that the Kennedy Center Board is in fact free to tinker.  TRO Hearing Tr. 50:15–51:3.  As both of those readings are plausible, the Court doesn't find that piece of statutory evidence particularly illuminating at this stage.

presented here, a trustee's categorical ability to vote tilts toward the substantive side of the line, not the procedural.  The right to vote would seem to implicate a trustee's core duties, beyond the Board's internal organization and housekeeping.  By contrast, the Board's ability to perform such tasks as "organiz[ing]" itself into committees and reserving only certain matters for full Board approval strikes the Court as well within the Board's discretion.

On a final note, the Court takes account of the 1994 amendments to the Kennedy Center statute, which added several new *ex officio* members to the Board.  At this point, it is not crystal clear which way these amendments cut.  In a corresponding House Report, legislators explained that "[a]lthough these trustees are ex officio, they are permitted to vote."  H.R. Rep. No. 103-453, pt. 1, at 11 (1994).  Though this language did not make it into the text of the statute, it at least suggests that Congress did not intend for *ex officio* trustees to be categorically *barred* from voting in all Board proceedings.  Still, the language is no doubt permissive.  So, at least on the record before the Court, the notion that the House Report is an unequivocal expression of Congress's intent that *ex officio* members vote is not airtight.

To recap, the Kennedy Center's organic statute neither expressly prohibits nor expressly authorizes *ex officio* members to vote at full Board meetings.  In the absence of a clear signal, the Court has parsed the specific text of the statute, its structure (both internally and in relation to the rest of the Code), and the only directly on point piece of legislative history that the parties have brought to the Court's attention.  Taken together, these data points suggest that general trustees and *ex officio* trustees were not meant to have different voting powers, and, as a result, that the May 2025 bylaw amendments stripping *ex officio* members of their right to vote are likely contrary to the statute and void.

That is the legal side of the ledger.  The factual side is more puzzling:  Different individuals affiliated with the Board at different times offer divergent perspectives on whether *ex officio* members have *ever* voted in the past.  <u>Compare</u> Beatty Decl.; Wilker Decl., <u>with</u> LaFauci Decl.; Shuster Decl.  Notwithstanding that the Board apparently engages in voice votes that may make it difficult to discern who exactly has participated in any given vote, there are surely meeting minutes or other relevant records that, once unearthed, will shed light on the Board's historical practice.  Yet the government has not filed any such documentation thus far.

Based on the present record, the Court is moved more by Beatty's attestation that she herself has voted at Board meetings, along with a declaration from a former president of the Center responsible for "day-to-day operations" who explained that "the ex officio members of the Board were treated in all respects the same as the trustees appointed by the President," including that they shared the same "voting" and "participatory" rights.  Beatty Decl. at ¶ 6; <u>Wilker Decl. at</u> ¶¶ 4–6.  The government's declarations pale in comparison.  The government's first affiant, Mr. LaFauci, only joined the Center last spring, and his declaration is vague as to the basis for his conclusion that *ex officio* members have never voted.  <u>See</u> LaFauci Decl. at ¶ 3 ("from [LaFauci's] personal knowledge, and from Center records that [he] reviewed, it is [his] understanding and belief that ex officio Board members have . . . [not] voted").  And although the government's second affiant, Mr. Shuster, attests that during his seven years as an *ex officio* Board member from 2012 to 2019, he never voted, heard about, or saw another ex officio member vote, Shuster Decl., ECF No. 19-2 ¶ 2, the Court lacks sufficient context to infer from his declaration that such voting never happened.  That Beatty has the more accurate read of the Board's historical practice is bolstered by the tax forms she has filed, which indicate that the Center has institutionally represented in recent years that all trustees may vote, <u>see</u> ECF No. 22

at 1–2—though the possibility remains that the Board adopted different voting practices in different eras of its storied history.

The Court has addressed this factual dispute given the considerable time and effort the parties have devoted to it. But at the end of the day, that dispute is largely beside the point. As the parties have recognized, Beatty's right to vote seems to rest on a legal question of statutory interpretation. In a <u>Chevron</u> world, the Court might have deferred to the Board's reasonable interpretation of the statute.[9] But we are no longer in that world, and recent developments in the law counsel in favor of interpreting the statute afresh, <u>see Loper Bright Enterprises v. Raimondo</u>, 603 U.S. 369 (2024)—even if that means that some Kennedy Center trustees or staff have held erroneous understandings of the rights of *ex officio* members based on their personal experiences.

In sum, the Court tentatively concludes that the opportunity to vote at all in Board proceedings tilts toward the substantive side of the line of trustee rights—making it a statutory right under 20 U.S.C. § 76l(b)—rather than the procedural, administrative, or organizational side, which is the province of the Board's discretion under § 76l(a). The question is, to be sure, debatable. And it is distinct from the question of whether *ex officio* trustees' voting rights can be curtailed in certain settings, such as Executive Sessions. Beatty has challenged the bylaws' categorical prohibition on her right to vote on *any* Board matter whatsoever. On that claim, she seems likely to succeed.

### 2. *Irreparable Harm and Balance of Equities*

Though the Court thinks that Beatty has the better statutory argument as to both participation and the right to vote, her battle for emergency relief on these fronts is not yet won.

---

[9] That said, the Court recognizes that the Kennedy Center, as a bureau of the Smithsonian, is not treated as an agency for purposes of the APA. <u>See Dong v. Smithsonian Inst.</u>, 125 F.3d 877, 878–880, 883 (D.C. Cir. 1997).

She must still clearly establish irreparable harm and show that the balance of equites militates in her favor.  The Court considers these two factors first as to Beatty's request for the right to participate at the meeting and then as to her request for the right to cast a vote.

        a.  <u>Right to Participate</u>

There is no doubt that, if Beatty is completely barred from speaking at or otherwise participating in the March 16 meeting, she will suffer irreparable harm.  At the risk of repetition, she has a well-defined right to participate in deliberations as a Board trustee, and once the March 16 meeting passes, "there can be no do over and no redress" as to the lost opportunity to exercise her fiduciary duty.  <u>League of United Latin Am. Citizens</u>, 808 F. Supp. 3d at 81 (citation omitted).  Although the facts alleged in the FAC and addressed in the briefing suggest that Beatty may be unlikely to convince a majority of her colleagues to agree, she still has the right to voice her dissent and at least try to persuade other colleagues of her position.

The government identifies no prejudice that would befall it or the public if Beatty exercises her right to participate, so the balance of equities weighs in her favor.  Instead, the government insists that Beatty simply has no basis for relief as to her right to speak at the March 16 meeting because it has assured her that she "will be permitted to participate, to the same extent as any other trustee, subject to the rules governing Board proceedings and as applied in the Chair's discretion."  Opp. to TRO Mot. at 7.  This voluntary assurance is close to the relief that Beatty seeks—"a narrow order that she may not be categorically prevented from exercising her basic right as a trustee to speak at the meeting and participate in the deliberations," TRO Reply Br. at 21—but no cigar.  The Court declines to "supervise the minute-to-minute conduct of a Board meeting," <u>id.</u>, and will not dictate precisely *how* Beatty's right should be respected.  But the Board's rules and Chair's discretion may not be wielded to entirely prevent her or other

dissenting colleagues from contributing to the conversation in some meaningful form.  After all, it doesn't take a parliamentarian to recognize that inviting discussion on motions prior to a vote is a ubiquitous occurrence at all board meetings.

          b.   <u>Right to Vote</u>

The Court finally turns to Beatty's request to cast a vote at Monday's meeting, whose merits are less clearcut than those of the information and participation issues.  The irreparable harm and balance of the equities play out differently on this front.  Recall that the irreparable harm standard is "high," and the injury must be both "certain and great."  <u>See</u> <u>Chaplaincy</u>, 454 F.3d at 297 (citations omitted).  Although Beatty's inability to exercise a statutorily-conferred vote is sufficiently concrete and would not seem to be redressable once the vote has passed, the Court will order that Beatty be able to participate at the meeting and engage in deliberations.  As a result, the marginal harm to her from not voting is much less, as she *will* be able to lodge her objections on the record and have the opportunity to persuade her colleagues of her position.

The Court further notes that the change to the bylaws, which stripped her of her voting rights, occurred last May, and she only sued to rectify the problem six months later in December. To be clear, "a delay in filing" *alone* "is not a proper basis for denial" of emergency relief. <u>Gordon v. Holder</u>, 632 F.3d 722, 724 (D.C. Cir. 2011).  And a delay in filing is also understandable when the "effects" of the challenged action "are more acutely felt" as time goes on.  <u>Fed. Ed. Ass'n v. Trump</u>, 795 F. Supp. 3d 74, 100 (D.D.C. 2025).  However, delays "may support a conclusion that the plaintiff cannot satisfy the irreparable harm prong."  <u>Gordon</u>, 632 F.3d at 725.  Here, Beatty has not indicated that she opposed the change to the bylaws at the time (*e.g.*, by objecting to or voting against the change when she still had the power to do so), which,

notwithstanding the pressing circumstances here, somewhat lessens the force of her request for the "extraordinary" relief of a TRO.

In balancing the equities, the Court notes that if it is wrong on the close question of whether the May 2025 bylaws are contrary to statute and thus void, it will have infringed on the Board's statutorily-conferred authority to manage its own internal operations. The government represents that, in preparing for the closure, the Board has "act[ed]" on "assumption that its duly adopted bylaws were properly in effect." See Opp. to TRO Mot. at 16–17. Furthermore, to the extent that a ruling as to the validity of one provision of those bylaws could cast other provisions into doubt, that qualifies as an injury to the Board—albeit one that could potentially be overcome with additional factual representations as to prejudice (or the lack thereof) down the road. Given the diminished injury associated with Beatty's inability to vote, and the burden that an erroneous statutory ruling could pose for the Board, the balance of equities tips in the government's favor.

"The Supreme Court has emphasized that preliminary injunctive relief is never awarded as of right and, as a matter of equitable discretion, it does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits," or even, for that matter, on a showing of irreparable injury. Kim, 698 F. Supp. 3d at 172 (cleaned up). Even if the Court tends to agree at this early stage with Beatty's construction of the Kennedy Center's organic statute, "[j]udicial restraint is particularly warranted" given the statutory ambiguity and murkier showings on the second and third TRO factors. C.G.B. v. Wolf, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (Cooper, J.).

## IV.  Conclusion

Having weighed the relevant considerations, the Court will **GRANT** in part and **DENY** in part Beatty's request for a TRO regarding various aspects of the Kennedy Center Board

meeting slated to take place on March 16.  The parties agree that Beatty will be able to attend the meeting.  The Court finds that Beatty has made a clear showing that the extraordinary relief of a TRO is warranted as to her right to have advance access to information that will inform the exercise of her duty of prudence as a trustee.  Likewise with her right to participate in the meeting—meaning that she may not be categorically barred from speaking, as she allegedly was at last December's meeting, and must be provided a meaningful opportunity to voice her dissent.

The Court finds, however, that Beatty has not carried her burden as to her right to vote, at least at this very early stage.  While her statutory arguments are persuasive, the question whether the statute provides a right to vote is not clearcut, and the irreparable harm and balance of the equities persuade the Court to stay its hand, for now.

To avoid the risk of bad facts making bad law, the Court concludes by stressing the uniqueness of this case and the narrowness of today's ruling.  Rarely should a trustee, in any setting, be denied all material information and any opportunity to voice her dissent on a vote as consequential as one to close and potentially rebuild the trust's sole piece of real estate.  Yet that is what Representative Beatty alleges here, concerning no less than the lone monument for President Kennedy in Washington and arguably the most important performing arts center in the country.  All this is to say that today's ruling should not be taken to encourage future dissenting trustees to race to the courthouse seeking emergency relief based on quotidian grievances about board procedures.  And it bears repeating that this ruling is not the Court's final word in the case.  Tentative conclusions made now may not harden into settled judgments later.  Still other issues lie ahead.  In light of the urgency and magnitude of the present situation, however, at least some emergency relief is now in order.

36

For the foregoing reasons, it is hereby

**ORDERED** that Plaintiff's [13] Motion for a Temporary Restraining Order is GRANTED in part and DENIED in part.  It is further

**ORDERED** that Defendants shall supply Plaintiff with the information and documents identified in this Memorandum Opinion, or indicate that the information and documents do not exist, at least 24 hours before the March 16, 2026 meeting of the Kennedy Center Board.  It is further

**ORDERED** that Plaintiff shall be provided a meaningful opportunity to provide input and not be categorically barred from speaking at the March 16, 2026 meeting.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>March 14, 2026</u>